# EXHIBIT A

DocuSign Envelope ID: 06AC690C-58A4-4D58-A573-C5255A93A09D



# Attachment B
## Alternative Dispute Resolution Agreement

(Revised June 2018)

## ALTERNATIVE DISPUTE RESOLUTION AGREEMENT

1.   **How This Agreement Applies.** This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. Except as it otherwise provides, this Agreement applies to any past, present or future dispute arising out of or related to your employment with Uber Technologies, Inc. ("Company") or employment with one of its affiliates, successors, subsidiaries, assigns or parent companies, including without limitation any of its or their agents, executives, fiduciaries, directors, insurers, investors, attorneys or employees, or termination of employment and survives after the employment terminates. Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Except as this Agreement otherwise provides, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement, including the formation, scope, application, enforceability, revocability or validity of the Agreement or any portion of the Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse you (individually or in concert with others) or the Company from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except where this Agreement otherwise provides, this Agreement also applies, without limitation, to disputes with any entity or individual arising out of or related to the application for employment, background checks, privacy, the employment or the termination of that employment (including without limitation post-employment defamation or retaliation), contracts, trade secrets, unfair competition, compensation, m e a l breaks and rest periods, classification, minimum wage, seating, expense reimbursement, overtime, discrimination, harassment, retaliation and claims arising under the Fair Credit Reporting Act, Defend Trade Secrets Act, Civil Rights Act of 1964, 42 U.S.C. § 1981, Rehabilitation Act, Civil Rights Acts of 1866 and 1871, Civil Rights Act of 1991, 8 U.S.C. § 1324b (unfair immigration related practices), Pregnancy Discrimination Act, Equal Pay Act, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, False Claims Act, and state or local statutes or regulations, if any, addressing the same or similar subject matters, and all other federal, state and local legal, statutory and common law claims arising out of or relating to your employment or the termination of employment.

This Agreement does not apply to litigation pending in a state or federal court or arbitration as of the date of your receipt of this Agreement. This Agreement also does not apply to claims for workers' compensation benefits, state disability insurance or unemployment insurance benefits. Where you allege claims of sexual assault or sexual harassment, you may elect to bring those claims in a court of competent jurisdiction instead of arbitration. Uber agrees

to honor your election of forum with respect to your individual sexual harassment or sexual assault claim but in so doing does not waive the enforceability of this Agreement as to any other provision (including but not limited to paragraph 3—Class Action Waiver, which will continue to apply in court and arbitration), controversy, claim or dispute.

Nothing in this Agreement prevents you from making a report to or filing a claim or charge with a government agency, including without limitation the Equal Employment Opportunity Commission (www.eeoc.gov), U.S. Department of Labor (www.dol.gov), U.S. Securities and Exchange Commission (www.sec.gov), the Occupational Safety and Health Administration (www.osha.gov), National Labor Relations Board (www.nlrb.gov), or Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Agreement. This Agreement also does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Agreement. Nothing in this Agreement prevents or excuses a party from satisfying any conditions precedent and/or exhausting required administrative remedies under applicable law before bringing a claim in arbitration. The Company will not retaliate against you for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

**2.**     **How Arbitration Proceedings Are Conducted.**  Except as otherwise provided in this Agreement, any controversy, claim or dispute covered by this Agreement shall be settled by arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association ("AAA") then in effect unless otherwise agreed to by the parties. These rules are available at www.adr.org, or you can ask Human Resources for a copy. The arbitrator shall be a member of the bar of the state in which the arbitration will be conducted or a retired judge who presided at a state or federal court in that state. If for any reason the AAA will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted for appointment of a neutral Arbitrator. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.

All arbitration hearings shall be conducted in the state where you primarily reside(d) and work(ed) and within 50 miles of the Uber office in which you work(ed) or to which you report(ed) or at any other location mutually agreed to. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. The Arbitrator must follow applicable law and may award any party any remedy to which that party would have been entitled in the party's individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available in a court of law to a party in the party's individual capacity will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions

of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy in accordance with applicable law, and any such application shall not be deemed incompatible with or waiver of this agreement to arbitrate. The court to which the application is made is authorized to consider the merits of the arbitrable controversy to the extent it deems necessary in making its ruling, but only to the extent permitted by applicable law. All determinations of final relief, however, will be decided in arbitration.

3.    **Class Action Waiver.** Both you and the Company agree to bring any dispute, claim or controversy on an individual basis only, and not on a class or collective basis. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action, or as a member in any purported class or collective proceeding ("Class Action Waiver"). Notwithstanding any other provision of this Agreement or the AAA Rules, disputes regarding the revocability, validity or enforceability of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class or collective action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class or collective action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

Subject to any controlling judicial determination providing otherwise, in which case that determination shall apply to this Agreement, private attorney general representative actions brought on behalf of the state under the California Labor Code are not arbitrable, not within the scope of this Agreement and may be maintained in a court of law, but a claim you bring on your own behalf as an aggrieved employee for recovery of underpaid wages or other individual relief (as opposed to a representative claim for civil penalties) is arbitrable and within the scope of this Agreement.

You will not be retaliated against, disciplined or threatened with discipline as a result of your filing of or participation in a class or collective action in any forum. However, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class or collective actions or claims.

The Class Action Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

4.    **Your Right to Opt Out of Arbitration.** Arbitration is not a mandatory condition of your employment at the Company, and therefore you may submit a statement notifying the Company that you wish to opt out and not be subject to this Agreement. Your decision to be bound or not bound by this Agreement is entirely voluntary. In order to opt out, you must send an email to employeeoptout@uber.com stating your first and last name and your intention to opt out. In order to be effective, your opt-out notice must be provided within 30 days of your receipt of this Agreement. If you opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that

decision and may pursue available legal  remedies without regard to this  Agreement. If you  do  not  opt out  within 30 days of  your receipt  of  this Agreement, continuing  your employment constitutes mutual acceptance of the terms of this Agreement by you and the Company. You  have the right  to consult with counsel of your choice concerning this Agreement.

5.      **Enforcement of This Agreement.** This Agreement replaces all prior agreements regarding the arbitration of disputes covered by this Agreement and is the  full and complete  agreement relating to  the  formal resolution  of disputes covered by  this Agreement. In  the event any portion of  this Agreement is  deemed  unenforceable, the remainder of this  Agreement will be  enforceable.

**AGREED:**                                          **AGREED:**

**Employee**                                        **Uber Technologies, Inc.**

Sir Lawrence Davis
_____
(Print Employee's Name)                             **By:** _Pranesh Anthapur_
                                                    _____
_Sir Lawrence Davis_ _____                     Pranesh Anthapur
                            e)                      Vice President, Human Resources

July 24, 2018
_____
(Date)

Alternative Dispute Resolution Agreement (rev. June 2018)                                4

# EXHIBIT B



AMERICAN ARBITRATION ASSOCIATION®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

**To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.**

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☑.

| Parties (Claimant) | | |
|---|---|---|
| Name of Claimant: Sir Lawrence Davis | | |
| Address: 1501 North Central Ave., Apt. 341 | | |
| City: Phoenix | State: Arizona | Zip Code: 85004 |
| Phone No.: 918-830-2626 | Fax No.: | |
| Email Address: sirdavis2004@gmail.com | | |
| Representative's Name (if known): Christopher R. Houk | | |
| Firm (if applicable): Houk Law Firm PLLC | | |
| Representative's Address: 1050 East Southern Ave., A-3 | | |
| City: Tempe | State: Arizona | Zip Code: 85282 |
| Phone No.: 480.569.2377 | Fax No.: 480.569.2379 | |
| Email Address: chouk@houklawfirm.com | | |

| Parties (Respondent) | | |
|---|---|---|
| Name of Respondent: Uber USA Phoenix | | |
| Address: 201 East Washington St. | | |
| City: Phoenix | State: Arizona | Zip Code: 85004 |
| Phone No.: 800-353-8237 | Fax No.: | |
| Email Address: | | |
| Representative's Name (if known): Kristy Peters | | |
| Firm (if applicable): Littler Mendelson PC | | |
| Representative's Address: 2425 E Camelback Rd, Ste. 900 | | |
| City: Phoenix | State: Arizona | Zip Code: 85106 |
| Phone No.: 602.474.3639 | Fax No.: | |
| Email Address: KPeters@littler.com | | |

Claim: What was/is the employee/worker's annual wage range? ☑ Less than $100,000 ☐ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim: $500,000 plus attorneys' fees

Claim involves: ☑ Statutorily Protected Rights ☐ Non-Statutorily Protected Rights

 **AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

| |
|---|
| In detail, please describe the nature of each claim. You may attach additional pages if necessary:<br><br>See Exhibit A. |
| Other Relief Sought: ☑ Attorneys Fees  ☐ Interest  ☐ Arbitration Costs  ☑ Punitive/ Exemplary<br>☑ Other: |
| Please describe the qualifications for arbitrator(s) to hear this dispute:<br><br>See Exhibit B. |

| Hearing: Estimated time needed for hearings overall: | | hours  or  3 | | days |
|---|---|---|---|---|

| |
|---|
| Hearing Locale: **Metropolitan Phoenix Area**<br><br>*(check one)* ☐ Requested by Claimant ☐ Locale provision included in the contract |
| Filing Fee requirement or $300 (max amount per AAA) |
| Filing by Company: ☐ $2,200 single arbitrator ☐ $2,800 three arbitrator panel |
| Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee. |

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Christoper R. Houk | 9/15/20 |

| |
|---|
| Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online. |

Exhibit A – Nature of Claims

Sir Lawrence Davis, an African American male employee, was employed by Uber USA Phoenix from August 2018 until December 3, 2019, when he was terminated. He performed his job duties well, receiving accolades from supervisors and mentors and recommendations for promotions.

Uber discriminated against Mr. Davis on the basis of race, sex, or retaliation, including by

- Negatively stereotyping him as an "angry black person" and making personnel decision based on bias.
- Hiring a less-qualified white, female coworker, Elise Anaya, for a promotion over Mr. Davis.
  - o While Mr. Davis had four years of Uber experience and four years of prior experience in the field, Ms. Anaya did not have any prior work experience necessary for the position.
  - o Two of Mr. Davis's supervisors recommended him for the promotion.
  - o While Mr. Davis has a master's degree, Ms. Anaya does not.
  - o Following the hiring of Ms. Anaya, Uber gave confusing and contradictory answers as to the reasons for its hiring decision. Uber refused to confirm even basic information such as whether Mr. Davis interviewed for one position or two, conflating the two positions at times and differentiating them at other times.
- Issuing undeserved performance evaluations to Mr. Davis shortly after he began raising concerns about Uber's unfair hiring practices.
- Placing Mr. Davis on a series of development plans, claiming that he did not meet the required hours on certain projects, ignoring that
  - o several of Mr. Davis's supervisors repeatedly approved his hours and never informed him that there was problem with where he focused his hours and
  - o (2) Uber informed him that he was, in fact, meeting his hours.
- Terminating Mr. Davis while he was on a development plan.

Mr. Davis filed a series of complaints alleging race, sex discrimination, and retaliation about Uber's inconsistent hiring process and about sex and race discrimination in hiring of Ms. Anaya. Mr. Davis also filed a Charge of Discrimination with the EEOC based on race and sex discrimination and retaliation. While Uber claims it did an investigation, it got key facts wrong and failed to investigate all of Mr. Davis's claims.

Uber terminated Mr. Davis's employment because of his race and retaliation in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 USC § 2000e-3(a), and because of sex discrimination and retaliation under Title VII.

Race and retaliation claims brought under 42 U.S.C. § 1981 have no cap on damages. The available damages for Section 1981 and Title VII claims are: back pay, front pay, compensatory, punitive damages and attorneys' fees.

Exhibit B - Qualifications of the Arbitrator

Familiarity with race and sex discrimination, and retaliation cases in employment under Title VII and Section 1981. A retired judge or magistrate or a mediator steeped in employment law would be preferable.

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D



**Uber Technologies, Inc.**

1455 Market Street, 4th Floor

San Francisco, CA 94103

July 23, 2018

Sir Lawrence Davis

**OFFER OF EMPLOYMENT**

Dear Sir Lawrence,

On behalf of Uber Technologies, Inc., a Delaware corporation ("Uber" or the "Company"), I am pleased to extend you this conditional offer of employment in the position of COE Specialist II. Should you accept this offer, your employment by the Company shall be governed by the following terms and conditions (this "Agreement"):

1.   **Duties and Scope of Employment.**

    a.   **Position.** During your employment under this Agreement (your "Employment"), the Company agrees to employ you in the position of COE Specialist II or in such other position as the Company subsequently may assign to you.  You will report to the Company's Community Operations Manager, Ben Sterling, or to such other person as the Company subsequently may determine. You will begin your Employment working out of the Company's office in Phoenix, AZ. You will perform the duties and have the responsibilities and authority customarily performed and held by an employee in your position or as otherwise may be assigned or delegated to you by your supervisor.

    b.   **Obligations to the Company.** During your Employment, you shall devote your full business efforts and time to the Company.  During your Employment, without express written permission from a senior leader of your organization, you shall not render services in any capacity to any other person or entity and shall not act as a sole proprietor or partner of any other person or entity or own more than five percent (5%) of the stock of any other corporation.  Notwithstanding the foregoing, you may serve on corporate, civic or charitable boards or committees, deliver lectures, fulfill speaking engagements, teach at educational institutions, or manage personal investments without such advance written consent, provided that such activities do not individually or in the aggregate interfere with the performance of your duties

**UBER**

1

under this Agreement. You shall comply with the Company's policies and rules, as they may be in effect from time to time during your Employment.

c.   **No Conflicting Obligations.** You represent and warrant to the Company that you are under no obligations or commitments, whether contractual or otherwise, that are inconsistent with your obligations under this Agreement. In connection with your Employment, you shall not use or disclose any trade secrets or other proprietary information or intellectual property in which you or any other person has any right, title or interest and your Employment will not infringe or violate the rights of any other person. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer.

d.   **Commencement Date.** You shall commence full-time Employment as soon as reasonably practicable and in no event later than August 6, 2018. Your first date of employment with the Company is referred to below as your "Start Date."

2.   **Compensation**

a.   **Compensation.** You will be paid $16.50 per hour, less standard deductions and withholdings. In the event you incur overtime hours, you will be paid at the appropriate overtime rate of pay for the state in which you work. You will be paid every other Friday. If the regular payday falls on a Company-recognized holiday, then you will be paid on the work day before the regular payday. Adjustments to your hourly pay or other compensation, if any, will be made by the Company at its sole and absolute discretion.

b.   The foregoing compensation provisions are subject to the terms and conditions established under any applicable plans and/or policies of the Company, as such may be amended from time to time.

Withholding Taxes. All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

3.   **Paid Time Off and Employee Benefits.**

During your Employment, you shall be eligible for paid vacation / paid time off, in accordance with the Company's paid time off policy generally available to similarly situated employees of the Company, as it may be amended from time to time. During your Employment, you shall be eligible to participate in the employee benefit plans maintained by the Company and generally available to similarly situated employees of the Company, subject in each case to the generally applicable terms and conditions of the plan in question and to the determinations of any person or committee administering such plan.

4.   **Business Expenses.**

The Company will reimburse you for your necessary and reasonable business expenses incurred in connection with your duties hereunder upon presentation of an itemized account and appropriate supporting documentation, all in accordance with the Company's generally applicable policies.

5.   **Termination.**

**UBER**                                                                                                      2

a.   **Employment at Will.** Your Employment shall be "at will," meaning that either you or the Company shall be entitled to terminate your Employment at any time and for any reason, with or without cause or notice. Any contrary representations that may have been made to you are superseded by this Agreement. This Agreement shall constitute the full and complete agreement between you and the Company on the "at-will" nature of your Employment, which may only be changed in an express written agreement signed by you (or your authorized representative) and a duly authorized officer of the Company.

b.   **Rights Upon Termination.** Except as expressly provided herein, upon the termination of your Employment for any reason, you shall only be entitled to the compensation and benefits earned and the reimbursements described in this Agreement for the period preceding the effective date of the termination.

6.   **Pre-Employment Conditions.**

This offer is contingent upon the following conditions. This offer will be withdrawn (whether or not you have already signed it) if any of the below conditions is not satisfied. Unless and until all such steps have been completed, this conditional offer of employment may be withdrawn and you should not resign your current employment, otherwise alter your employment status, or alter any personal circumstances in reliance on this conditional offer.

a.   **Confidentiality Agreement.** This offer and your commencement of employment with the Company are contingent upon the execution, and delivery to an officer of the Company, of the Company's Confidential Information and Invention Assignment Agreement, a copy of which is enclosed as Attachment A for your review and execution (the "Confidentiality Agreement"), prior to or on your Start Date.

b.   **Work Authorization.** For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided within three (3) business days of your Start Date, or our employment relationship with you may be terminated. This offer may be rescinded if you are unable to begin work at the Company within a reasonable amount of time (as determined by the Company, in its sole discretion) due to work eligibility issues (e.g., if your request for an employment visa is denied or if an employment visa cannot be obtained within a reasonable amount of time) or export control licensure requirements.

c.   **Alternative Dispute Resolution Agreement.** This offer and your commencement of employment with the Company is contingent upon the execution, and delivery to an officer of the Company, of the Alternative Dispute Resolution Agreement, a copy of which is enclosed as Attachment B for your review and execution, prior to or on your Start Date.

d.   **Background Check.** This offer and your commencement of employment with the Company are contingent on the Company's receipt, evaluation, and approval of a background check, consistent with applicable law.

e.   **Compliance.**

(1)   **Restricted Parties Lists Verification.** This offer of employment and/or your continued Employment with the Company is contingent upon verification that you and, if applicable, your affiliated entity/institution do not appear on any of the Restricted Parties Lists

**UBER**                                                                                                    3

maintained by the U.S. Government that will prevent the Company from transacting (including but not limited to financial transactions) or engaging in certain type of activities with you, directly or indirectly.

(2) **Foreign National Employee - Export License Determination.** If an export control license is required in connection with your Employment, this offer is further contingent upon receipt of the necessary export license and any similar government approvals by the Company's office where you are based. Your employment with the Company will commence following receipt of such export license and governmental approvals; and is conditioned upon your (a) maintaining your employment with the Company, and (b) continued compliance with all conditions and limitations imposed by such license. If for any reason such export license and governmental approvals cannot be obtained within a commercially reasonable time from your date of signature, this offer will automatically terminate and have no force and effect. Additionally, should an export license become necessary at any point following the commencement of your employment with the Company, no export-controlled information or materials will be released to you until such license and any similar government approvals are obtained. The Company is not obligated to apply for any export license or other government approval that may be required in connection with your employment, and the Company cannot guarantee that any such license or similar approvals will be granted, if sought.

    f.    **Timely Acceptance.** This offer will remain open until July 25, 2018. To indicate your acceptance of the Company's offer on the terms and conditions set forth in this letter, please sign, date, and return it no later than that date.

7. **Successors.**

    a.    **Company's Successors.** This Agreement shall be binding upon any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business or assets that becomes bound by this Agreement.

    b.    **Your Successors.** This Agreement and all of your rights hereunder shall inure to the benefit of, and be enforceable by, your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

8. **Miscellaneous Provisions.**

    a.    **Modifications and Waivers.** No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by you (or your authorized representative) and by an authorized officer of the Company (other than you). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

    b.    **Whole Agreement.** No other agreements, representations or understandings (whether oral or written and whether express or implied) which are not expressly set forth in this Agreement have been made or entered into by either party with respect to the subject matter hereof. This Agreement, the Confidentiality Agreement, and the

**UBER** 4

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

Alternative Dispute Resolution Agreement contain the entire understanding of the parties with respect to the subject matter hereof.

c.   **Choice of Law and Severability.** This Paragraph 8(c) ("**Choice of Law and Severability**") does not apply to Paragraph 8(d) ("**Arbitration**") or to the Alternative Dispute Resolution Agreement contained in Attachment B to this Agreement, and to the extent that this Paragraph 8(c) conflicts with Paragraph 8(d) or the Alternative Dispute Resolution Agreement, the provisions contained in Paragraph 8(d) and the Alternative Dispute Resolution Agreement control. Subject to the preceding sentence, this Agreement otherwise shall be interpreted in accordance with the laws of the State in which you work/last worked without giving effect to provisions governing the choice of law, and if any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any applicable jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the minimum extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect.  If any provision of this Agreement is rendered illegal by any present or future statute, law, ordinance or regulation (collectively, the "Law") then that provision shall be curtailed or limited only to the minimum extent necessary to bring the provision into compliance with the Law.  All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

d.   **Arbitration.** Attachment B to this Agreement is an Alternative Dispute Resolution Agreement. This Alternative Dispute Resolution Agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and is incorporated by reference into and is part of this offer of employment. Therefore, before accepting this offer of employment, please read the Alternative Dispute Resolution Agreement carefully.

e.   **No Assignment.** This Agreement and all of your rights and obligations hereunder are personal to you and may not be transferred or assigned by you at any time. The Company may assign its rights under this Agreement to any entity that assumes the Company's obligations hereunder in connection with any sale or transfer of all or a substantial portion of the Company's assets to such entity.

f.   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

UBER                                                                                                                          5

We are all delighted to be able to extend you this offer and look forward to working with you. Please understand that this offer is contingent upon successful completion of your background check investigation and satisfaction of the other pre-employment conditions listed above. To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me, along with a signed and dated original copy of the Confidentiality Agreement and the Alternative Dispute Resolution Agreement. The Company requests that you begin work in this new position on or before August 6, 2018. This offer must be accepted on or before July 25, 2018. Please indicate the date (either on or before the aforementioned date) on which you expect to begin work in the space provided below (the "Start Date").

**ACCEPTED AND AGREED:**

**Signed:**                                              **Uber Technologies Inc.**

*Sir Lawrence Davis*                                    ~~~~~~~~~~~~~

Sir Lawrence Davis                                      Ben Sterling

                                                       Community Operations Manager

July 24, 2018                                          July 24, 2018

Date                                                   Date

Anticipated Start Date: August 6, 2018

Attachment A:  Confidential Information and Invention Assignment Agreement

Attachment B:  Alternative Dispute Resolution Agreement

Attachment C:  Proprietary Information Affirmation

**UBER**                                                        6

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D



## Attachment A
Confidential Information and Invention Assignment Agreement

(Revised April 2017)

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER TECHNOLOGIES, INC.**

**CONFIDENTIAL INFORMATION AND INVENTION
ASSIGNMENT AGREEMENT**

As a condition of my becoming employed (or my employment being continued) by Uber Technologies, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company, and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

**1.      Relationship.**   This Confidential Information and Invention Assignment Agreement ("Agreement") will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either re-employs me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing.  Any such employment or consulting relationship between the Company and me, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

**2.      Confidential Information.**

**(a)      Protection of Information.**   I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information (as defined below) that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

**(b)      Confidential Information.**   I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called, learned about, or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

2

UTI – CIIAA (rev. April 2017)

**(c)** **Third Party Information.** My agreements in this Section 2 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.

**(d)** **Trade Secrets Act Notice.** Notwithstanding the foregoing obligations, pursuant to 18 U.S.C. § 1833(b), I understand and acknowledge that I shall not be held criminally or civilly liable under any U.S. federal or state trade secret law for the disclosure of a trade secret that is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

**(e)** **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

## 3. Ownership of Inventions.

**(a)** **Inventions Retained and Licensed.** I have attached hereto, as **Exhibit A**, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's proposed businesses, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

**(b)** **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 3(d) of this Agreement in which I have an interest, I will promptly so inform the Company. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute under all applicable intellectual property laws without restriction of any kind.

**(c)** **Inventions.** I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 3(g) below.

**(d)** **Assignment of Company Inventions.** I agree that I will promptly make full

3

written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and agree to assign and do hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. To the extent possible under applicable law, and to the extent that I have moral rights in any Company Inventions, I agree to assign and do hereby assign such moral rights to the Company. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, including any moral rights I may have in Company Inventions that are not assignable to the Company, which I now have or may hereafter have for infringement of any and all Company Inventions.

(e) **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Company Inventions made by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 4 and 5.

(f) **Patent and Copyright Rights.** I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters of patents, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

**(g)** **Exception to Assignments.** I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, or any invention developed entirely on my own time for which no equipment, supplies, facilities or trade secret information of the Company was used and (i) that does not relate directly or indirectly to the Company's business or to the Company's actual or demonstrably anticipated research or development, and (ii) that does not result from any work performed by me for the Company. For the avoidance of doubt, the applicable law for the state of California includes California Labor Code Section 2870.[1] In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

**4.** **Company Property; Returning Company Documents.** I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

**5.** **Termination Certification**. In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as **Exhibit B**; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

**6.** **Notice to Third Parties.** I understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement.

**7.** **No Solicitation of Employees, Consultants and Other Parties.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the

---

[1] California Labor Code Section 2870 states: "Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer."

termination of the Relationship for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity. Further, during the Relationship and at any time following the termination of the Relationship for any reason, whether with or without cause, I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

## 8.     Representations and Covenants.

   **(a)     Facilitation of Agreement.** I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

   **(b)     No Conflicts or Use of Non-Company Confidential Information.** I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use in the course of the Relationship any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not incorporate or induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I am under no obligations or commitments, contractual or otherwise, that are inconsistent with my obligations under this Agreement. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

   **(c)     Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

## 9.     General Provisions.

   **(a)     Governing Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the state of in which I was last employed by the Company, without giving effect to the principles of conflict of laws.

   **(b)     Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.   Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)   **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.

(d)   **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(e)   **Remedies.**  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.  Should there be legal adjudication of this Agreement, I agree that the prevailing party will be entitled to an award of its attorneys' fees and costs.

(f)   **Advice of Counsel.**  I acknowledge that, in executing this Agreement, I have had the opportunity to seek the advice of independent legal counsel, and I have read and understood all of the terms and provisions of this Agreement.  This Agreement shall not be construed against any party by reason of the drafting or preparation hereof.

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.


**UBER TECHNOLOGIES, INC.**

**EMPLOYEE**


Sir Lawrence Davis
_____
(Print Employee's Name)

Sir Lawrence Davis   _____

By: _Pranesh Anthapur_____

Pranesh Anthapur
Vice President, Human Resources


7

UTI – CIIAA (rev. April 2017)

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## EXHIBIT A

### LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 3(a)

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|

___ No inventions, improvements, or original works of authorship

___ Inventions, improvements, or original works of authorship listed above

___ Additional sheets attached

**EMPLOYEE**

Sir Lawrence Davis
_____

(Print Employee's Name)

*Sir Lawrence Davis*
_____

(Employee's Signature)

July 24, 2018
_____

(Date)

8

UTI – CIIAA (rev. April 2017)

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## EXHIBIT B

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flowcharts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Uber Technologies, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement (the "Agreement") signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from the date of this Certification, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity. Further, I shall not at any time use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

**EMPLOYEE**

_____
(Print Employee's Name)

_____
(Employee's Signature)

_____
(Date)

UTi – CIIAA (rev. April 2017)

9

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D



# Attachment B
# Alternative Dispute Resolution Agreement

(Revised June 2018)

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## ALTERNATIVE DISPUTE RESOLUTION AGREEMENT

**1.     How This Agreement Applies.** This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. Except as it otherwise provides, this Agreement applies to any past, present or future dispute arising out of or related to your employment with Uber Technologies, Inc. ("Company") or employment with one of its affiliates, successors, subsidiaries, assigns or parent companies, including without limitation any of its or their agents, executives, fiduciaries, directors, insurers, investors, attorneys or employees, or termination of employment and survives after the employment terminates. Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Except as this Agreement otherwise provides, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement, including the formation, scope, application, enforceability, revocability or validity of the Agreement or any portion of the Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse you (individually or in concert with others) or the Company from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except where this Agreement otherwise provides, this Agreement also applies, without limitation, to disputes with any entity or individual arising out of or related to the application for employment, background checks, privacy, the employment or the termination of that employment (including without limitation post-employment defamation or retaliation), contracts, trade secrets, unfair competition, compensation, meal breaks and rest periods, classification, minimum wage, seating, expense reimbursement, overtime, discrimination, harassment, retaliation and claims arising under the Fair Credit Reporting Act, Defend Trade Secrets Act, Civil Rights Act of 1964, 42 U.S.C. § 1981, Rehabilitation Act, Civil Rights Acts of 1866 and 1871, Civil Rights Act of 1991, 8 U.S.C. § 1324b (unfair immigration related practices), Pregnancy Discrimination Act, Equal Pay Act, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, False Claims Act, and state or local statutes or regulations, if any, addressing the same or similar subject matters, and all other federal, state and local legal, statutory and common law claims arising out of or relating to your employment or the termination of employment.

This Agreement does not apply to litigation pending in a state or federal court or arbitration as of the date of your receipt of this Agreement. This Agreement also does not apply to claims for workers' compensation benefits, state disability insurance or unemployment insurance benefits. Where you allege claims of sexual assault or sexual harassment, you may elect to bring those claims in a court of competent jurisdiction instead of arbitration. Uber agrees

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

to honor your election of forum with respect to your individual sexual harassment or sexual assault claim but in so doing does not waive the enforceability of this Agreement as to any other provision (including but not limited to paragraph 3—Class Action Waiver, which will continue to apply in court and arbitration), controversy, claim or dispute.

Nothing in this Agreement prevents you from making a report to or filing a claim or charge with a government agency, including without limitation the Equal Employment Opportunity Commission (www.eeoc.gov), U.S. Department of Labor (www.dol.gov), U.S. Securities and Exchange Commission (www.sec.gov), the Occupational Safety and Health Administration (www.osha.gov), National Labor Relations Board (www.nlrb.gov), or Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Agreement. This Agreement also does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Agreement. Nothing in this Agreement prevents or excuses a party from satisfying any conditions precedent and/or exhausting required administrative remedies under applicable law before bringing a claim in arbitration. The Company will not retaliate against you for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

**2.    How Arbitration Proceedings Are Conducted.**  Except as otherwise provided in this Agreement, any controversy, claim or dispute covered by this Agreement shall be settled by arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association ("AAA") then in effect unless otherwise agreed to by the parties. These rules are available at www.adr.org, or you can ask Human Resources for a copy. The arbitrator shall be a member of the bar of the state in which the arbitration will be conducted or a retired judge who presided at a state or federal court in that state. If for any reason the AAA will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted for appointment of a neutral Arbitrator. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.

All arbitration hearings shall be conducted in the state where you primarily reside(d) and work(ed) and within 50 miles of the Uber office in which you work(ed) or to which you report(ed) or at any other location mutually agreed to. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. The Arbitrator must follow applicable law and may award any party any remedy to which that party would have been entitled in the party's individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available in a court of law to a party in the party's individual capacity will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions

of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy in accordance with applicable law, and any such application shall not be deemed incompatible with or waiver of this agreement to arbitrate. The court to which the application is made is authorized to consider the merits of the arbitrable controversy to the extent it deems necessary in making its ruling, but only to the extent permitted by applicable law. All determinations of final relief, however, will be decided in arbitration.

**3.      Class Action Waiver.** Both you and the Company agree to bring any dispute, claim or controversy on an individual basis only, and not on a class or collective basis. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action, or as a member in any purported class or collective proceeding ("Class Action Waiver"). Notwithstanding any other provision of this Agreement or the AAA Rules, disputes regarding the revocability, validity or enforceability of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class or collective action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class or collective action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

Subject to any controlling judicial determination providing otherwise, in which case that determination shall apply to this Agreement, private attorney general representative actions brought on behalf of the state under the California Labor Code are not arbitrable, not within the scope of this Agreement and may be maintained in a court of law, but a claim you bring on your own behalf as an aggrieved employee for recovery of underpaid wages or other individual relief (as opposed to a representative claim for civil penalties) is arbitrable and within the scope of this Agreement.

You will not be retaliated against, disciplined or threatened with discipline as a result of your filing of or participation in a class or collective action in any forum. However, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class or collective actions or claims.

The Class Action Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

**4.      Your Right to Opt Out of Arbitration.** Arbitration is not a mandatory condition of your employment at the Company, and therefore you may submit a statement notifying the Company that you wish to opt out and not be subject to this Agreement. Your decision to be bound or not bound by this Agreement is entirely voluntary. In order to opt out, you must send an email to employeeoptout@uber.com stating your first and last name and your intention to opt out. In order to be effective, your opt-out notice must be provided within 30 days of your receipt of this Agreement. If you opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that

decision and may pursue available legal remedies without regard to this Agreement. If you do not opt out within 30 days of your receipt of this Agreement, continuing your employment constitutes mutual acceptance of the terms of this Agreement by you and the Company. You have the right to consult with counsel of your choice concerning this Agreement.

**5.    Enforcement of This Agreement.** This Agreement replaces all prior agreements regarding the arbitration of disputes covered by this Agreement and is the full and complete agreement relating to the formal resolution of disputes covered by this Agreement. In the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

**AGREED:**

**Employee**

Sir Lawrence Davis

(Print Employee's Name)

Sir Lawrence Davis

_____ e)

July 24, 2018

(Date)

**AGREED:**

**Uber Technologies, Inc.**

**By:**
Pranesh Anthapur

Pranesh Anthapur
Vice President, Human Resources

Alternative Dispute Resolution Agreement (rev. June 2018)                              4

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D



# Data Access Policy

(Revised March 2017)

**Confidential**

This document is the property of Uber. It contains information that is proprietary, confidential, or otherwise restricted from disclosure. If you are not an authorized recipient, please return this document to the above-named owner. Dissemination, distribution, copying or use of this document in whole or in part by anyone other than the intended recipient is strictly prohibited without prior written permission of Uber.

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**Objective and Scope**

This document explains the DATA ACCESS POLICY ("Policy") of Uber Technologies, Inc., its subsidiaries, and affiliates ("Uber").

Uber is committed to appropriately protecting its proprietary and confidential information ("Uber Confidential Information"), including but not limited to the personal information Uber collects from its users ("User Information"). This includes protecting all Uber Confidential Information against unauthorized or inappropriate access by Uber personnel. Appropriately protecting Uber Confidential Information is not only required by applicable laws and Uber's Privacy Statements, but is critical to earning and keeping our users' trust.

This Policy defines the circumstances when Uber personnel are permitted to access and use Uber Confidential Information, including User Information, in connection with the performance of their job responsibilities. This Policy should be read in conjunction with the FAQs to this Policy, which provide specific examples of types of access and use of Uber Confidential Information that are permitted or prohibited.

This Policy applies to all Uber employees, temporary workers, and contractors (together, "Personnel"). All Personnel must be knowledgeable about and comply with this Policy.

**Details**

**1. Definitions**

**Uber Confidential Information** includes, but is not limited to, Uber's financial information, business plans and projections, corporate information, and internal-only information relating to Uber products and services. For purposes of this Policy, Uber Confidential Information also includes (1) User Information, including User Information of any Personnel; and (2) personal information of Personnel collected by Uber in connection with their employment.

**User Information** includes any information collected from, or maintained about, actual or potential Uber users. This includes, but is not limited to, names, addresses, phone numbers, email addresses, passwords, driver's license numbers, social security numbers, other identification numbers, photos, background check documents, application documents, financial information, trip history, communications between User and Uber, military status, promotions participation, services use (e.g., UberRush, etc.), activity through partners (via API or otherwise), device IDs, IP addresses, and geolocation coordinates.

**2. Permitted Access and Use**

Personnel **may** access and use Uber Confidential Information, including User Information, solely (1) as necessary for legitimate business purposes based on their

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

roles and responsibilities (a "Legitimate Business Purpose"); or (2) as otherwise stated in this Policy or the FAQs to this Policy. Please see the FAQs to this Policy for specific examples of what constitutes a Legitimate Business Purpose for accessing and using Uber Confidential Information.

If a Legitimate Business Purpose can be accomplished with substantially the same degree of efficiency and with substantially the same results using anonymized or aggregated information instead of User Information, Personnel should use such anonymized or aggregated information instead of accessing and using User Information.

Security and relevant Product teams as appropriate, in consultation with Privacy - Legal, shall establish controls and processes regarding Personnel's access to Uber Confidential Information, including User Information. Personnel are prohibited from accessing Uber Confidential Information, including User Information, other than through such processes.

### 3. **Prohibitions**

#### a. **Access and use**

Unless for a Legitimate Business Purpose or as otherwise stated in this Policy or the FAQs to this Policy, Personnel are prohibited from accessing and using:

- their own User Information;
- the User Information of a celebrity or public figure;
- the User Information of an acquaintance, friend, relative;
- the User Information of co-worker; or
- the User Information of a driver or another rider with which which they have shared a ride.

Please see the FAQs to this Policy for examples of Legitimate Business Purposes for Personnel accessing and using User Information.

#### b. **Disclosure of User Information**

Personnel may not share or disclose User Information with third parties without prior approval from Legal - Privacy or pursuant to a process approved by Legal - Privacy.

### 4. **Auditing and Monitoring**

a.    All access to Uber Confidential Information and User Information will be logged, audited and regularly monitored.

b.    All use of tools to access Uber Confidential Information and User Information will be logged, audited and regularly monitored.

c.    This Policy will be strictly enforced, and violations will result in disciplinary action up to and including termination. In addition, for violations resulting in damage to Uber or its users (in Uber's sole determination), Uber will use all available legal remedies to impose sanctions for violations of this Policy.

d.    All Personnel are responsible for reporting suspected or known violations of this Policy.

e.    Suspected or known violations of this Policy should be reported immediately to: security-abuse@uber.com .

## 5. Questions

Questions regarding this Policy and the FAQs to this Policy, including whether a specific access and use of Uber Confidential Information or User Information is permitted under this Policy, can be submitted to datapolicy@uber.com.

## 6. Policy Owner and Updates

Legal - Privacy is the owner of this Policy.

This Policy was last updated in March 2017.

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## DATA ACCESS POLICY FAQs

**1. May I access my own User Information, i.e., access my own Uber account through Tools?**

You may only access your own User Information through Uber's network and tools if necessary for a Legitimate Business Purpose. This may include (1) testing functions and features on one's own account if necessary to perform one's roles and responsibilities, where such testing cannot be performed on a test account; and (2) performing bug-fixes using one's own account if necessary to perform one's roles and responsibilities, where such bug-fixing cannot be performed on a test account.

Personnel are not permitted to access their own User Information for the purpose of resolving an issue with their account. If you have an issue with your account, you should submit your questions or queries via uber.com/help or the Help menu in the apps.

This Policy does not apply to Personnels' access to their own User Information through the Uber app. For example, this Policy does not prohibit you from looking up your own trips through the Uber app.

**2. May I access the User Information of a celebrity or public figure?**

You may only access the User Information of a celebrity or public figure if necessary for a Legitimate Business Purpose.

Legitimate Business Purposes for accessing the User Information of a celebrity or other public figures may include (1) addressing customer service issues submitted by such person; or (2) as required by law, such as in connection with law enforcement or third-party requests for information.

*Accessing the User Information of celebrity or public figure for any reason other than a Legitimate Business Purpose is a violation of this Policy and is subject to disciplinary action up to and including termination. "Accessing" includes searching for the User Information of a celebrity or public figure, even if the celebrity does not have an Uber account. For example, conducting a search to determine whether Beyonce or Steph Curry has an Uber account is a violation of this Policy (regardless whether they actually have an Uber account), unless necessary for a Legitimate Business Purpose.*

**3. May I access a co-worker's User Information?**

(See next question for information on test accounts -- i.e., accounts that aren't in production or that contain only fake or dummy data not belonging to an actual user. )

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

You may only access a co-worker's User Information if necessary for a Legitimate Business Purpose.

Legitimate Business Purposes for accessing a co-worker's account include performing bug-fixes in connection with an issues experienced by a co-worker, if necessary to perform one's roles and responsibilities. In such circumstance, Personnel accessing a co-worker's account should, to the extent reasonably possible, document the consent of the co-worker to the access and manager approval to the access.

You **may not** access a co-worker's User Information for the purpose of resolving a customer service issue with their account. If they have an issue with their account, they should submit their questions or queries via uber.com/help or the Help menu in the apps.

### 4. Does this Policy apply to access to test accounts?

No. This Policy does not apply to test accounts -- i.e., accounts that aren't in production or that contain only fake or dummy data not belonging to an actual user.

### 5.  May I access a  friend's, relative's or acquaintance's User Information ?

There are generally no Legitimate Business Purposes for accessing a friend's, relative's or acquaintance's User Information.

In particular, you may not access a friend's, relative's or acquaintance's User Information for the purpose of resolving a customer service issue with their account. If they have an issue with their account, they should submit their questions or queries via uber.com/help or the Help menu in the apps.

If you are an engineer addressing an issue relating to an outage or engineering defect, and such issue requires accessing the User Information of a friend, relative or acquaintance, you should open a Phabricator ticket with all relevant details and assign the ticket to someone who does not personally know that individual .

### 6. What if I accidentally access User Information without a business purpose?

If you accidentally access User Information without a Legitimate Business Purpose, please inform your manager and  datapolicy@uber.com .

### 7. As a recruiter / hiring manager, may I check a candidate's trip history to see how much they use Uber?

No. This is not a Legitimate Business Purpose for accessing a candidate's User Information. This is also not permitted under Uber's Privacy Statements.

### 8. May I access the User Information of a journalist, researcher, judge, politician, competitor employee, or any other person with interests potentially adverse to Uber?

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

You may access the User Information of a journalist, researcher, judge, politician, competitor employee, or any other person solely for a Legitimate Business Purpose. This may include accessing their information (1) to determine whether they are using our services in compliance with Uber's terms and conditions, to the extent necessary based on your role and responsibilities; and (2) as required by law, such as in connection with law enforcement or third-party requests for information.

However, it is a serious violation of this Policy to access the User Information of a journalist, researcher, judge, politician, competitor employee, or any other person for the purpose of gathering information about the user or their trips, unless necessary for a Legitimate Business Purpose. For example, Personnel may not access the User information:

- of a journalist covering Uber to determine how frequently they use Uber;
- of a judge handling a case involving Uber to determine whether they use Uber;
- of a politician advancing bills relating to Uber to determine where they have taken trips.

**9. Am I permitted under the Policy to share information with law enforcement officials when they request information about users in my city?**

No. You should instead direct law enforcement or any third-party requests for information about riders or drivers to LERT@uber.com.

**10. The Policy says that Personnel may not share or disclose User Information with third parties without prior approval from Legal - Privacy or pursuant to a process approved by Legal - Privacy. Where can I find information on such processes?**

You may contact datapolicy@uber.com for information on such processes.

**11. I left an item in my Uber.  May I use an internal tool to contact my driver?**

No. This is not a Legitimate Business Purpose for accessing driver User Information. You should contact uber.com/help for assistance in this circumstance.

**12. Someone I know had a problem with their driver.  May I contact the driver to help resolve it?**

No. This is not a Legitimate Business Purpose for accessing driver User Information. You should instead tell that person to submit their questions or queries via uber.com/help or the Help menu in the apps.

**13. May I contact a driver to provide them with feedback?**

No. This is not a Legitimate Business Purpose for accessing driver User Information. You may provide feedback on a trip through the apps.

**14. May I look at how a driver rated me?**

No. This is not a Legitimate Business Purpose for accessing your User Information.

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## ACKNOWLEDGEMENT AND AGREEMENT

I acknowledge and agree that I have received, read, and agree to Uber's Data Access Policy.

**EMPLOYEE**

Sir Lawrence Davis
_____
(Print Employee's Name)

_Sir Lawrence Davis_   _____

July 24, 2018
_____
(Date)

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

## PROPRIETARY INFORMATION AFFIRMATION

Welcome to Uber!  As you know, it is Uber's policy to comply with all the prevailing laws and regulations and to compete fairly in the marketplace.  As such, Uber takes seriously its obligations to compete fairly in the marketplace and expects that same commitment from all of its employees.  In a further attempt to avoid any potential misunderstandings with our competitors or your current or former employers, we require that you read this document carefully and affirm – by checking each box and signing in the space provided – the statements below as a condition of your employment with Uber.  If you are not in a position to tick each of the boxes below, please contact your recruiter immediately.

☐   I have reviewed any agreements with my current or former employers regarding the nondisclosure of proprietary and confidential information and, where legally applicable, restrictions on competition or solicitation of employees and customers, if any, and shall comply with my continuing obligations under any such agreements.  I understand that Uber recommends that I review any such agreements with my counsel.  For the sake of clarity, I have reviewed any such agreements and represent that I am not currently under any non-competition or non-disclosure obligation that would prohibit my employment with Uber or limit my ability to perform the job duties for which Uber is considering me.

☐   I acknowledge that, if Uber requests such information from me, I will provide Uber with a copy of any agreements I have entered into with any of my current or former employers regarding the nondisclosure of proprietary and confidential information, restrictions on competition, or restrictions on solicitation of employees and customers.  I agree that I will delete, prior to providing any agreements to Uber, any portions containing another employer's proprietary and confidential information.

☐   I acknowledge and agree that Uber did not recruit me for the purpose of obtaining confidential and proprietary information regarding my current or former employer(s).

☐   I acknowledge Uber has instructed me that I should not remove or retain any written, electronic, or other materials owned by my current or former employer without the consent of my current or former employer.  After I terminate employment with my current employer, and before I commence employment with Uber, I agree to ensure that all confidential or proprietary property of my current or former employers is permanently removed from any personal electronic device that I have access to (such as mobile phones, tablet devices, laptops, or personal computers), as well as any personal storage, whether hardware-based (such as a flash drive, or other portable storage), or web-based storage (such as my personal email accounts, or cloud-based storage such as Dropbox.  To the best of my knowledge, all personal devices and web-based storage that I have access to no longer have any confidential or proprietary property of any current or former employer.

☐   I acknowledge and agree that I have not previously disclosed and shall not disclose to Uber any current or former employer's confidential and proprietary information.

☐   I understand that, if I suspect misuse or potential misuse of proprietary information or intellectual property (including, but not limited to, patents, copyrights, trademarks, and trade secrets), I will report it to Uber's Integrity Helpline at t.uber.com/helpline or 800-461-9330.  In addition, in the event that any Uber employee requests me to disclose confidential information from my previous and/or current employer, I will not

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

disclose such information and I will immediately report such request to t.uber.com/helpline.

☐    I will immediately notify Uber Legal (employment-us@uber.com) if I receive any letters, complaints or other communications from my current or former employer relating to my post-employment obligations concerning confidential information, non-competition where legally applicable, or non-solicitation of employees and/or partners of my current or former employer.

☐    I understand that my signing and compliance with Uber's Confidential Information and Invention Assignment Agreement and this Proprietary Information Affirmation are conditions of my employment.

☐    I understand that if I breach any confidentiality or restrictive agreement with my prior employer, or violate any prevailing laws and regulations, that breach and/or violation is solely my own responsibility, and not that of Uber.

**By signing below, I** _____Sir Lawrence Davis_____**, confirm the truth of each statement above and that the above statements and agreements cannot be revoked unilaterally.**

Signed:

Sir Lawrence Davis

Date: July 24, 2018

2

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## EXPORT COMPLIANCE FORM

To enable Uber Technologies, Inc. and its subsidiaries ("Uber") to comply with the U.S. Export Controls laws, Uber requires that you complete the Export Compliance Form. Information is collected for Export Controls compliance purposes only and will not be used for the Recruiting and Human Resources processes (information is reviewed by the Export Compliance team, after the offer is signed). In other words, the information provided hereunder will not be considered by Uber for employment purposes other than the Export Controls compliance purposes.

| |
|---|
| **Name:**<br>Sir Lawrence Davis |
| (Last) (First) (Middle) |
| **Date of Birth:**<br>02/15/1986 |
| (MM/DD/YEAR) |
| **Uber Manager Name:**<br>Ben Sterling |
| **Uber Dept. & Team Name:**<br>Community Operations |
| **Your Uber Job Title/Responsibility:**<br>Community Support Representative |
| **Are you a U.S. citizen?**<br>[X] YES          [ ] NO |
| **Are you a U.S. permanent resident alien (also called "green card holder")?**<br>[ ] YES          [ ] NO |
| **Are you a "Protected Individual" (i.e. political refugee or asylum holder)?**<br>[ ] YES          [ ] NO |
| If you checked "yes", there is no question. Please read the Export Compliance Statement on Page 2 and sign & date the bottom of this form. |
| If you checked "no" above to all questions, please complete the rest of this form. |
| Does your country of **current** (i.e. **most recent**) citizenship or permanent residency appear(s) under the following list: Cuba, Iran, North Korea, Sudan, or Syria?<br>[ ] YES          [ ] NO |
| Please provide **all** your country/countries of citizenship (newest to oldest): |
| Please provide **all** your country/countries of permanent residency*, if any:<br>*Permanent residency is the immigration status of a person authorize to live and work on a **permanent** basis in a country of which he/she is not a citizen (e.g. in the U.S., "permanent resident" are also called "green card" holder). |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

## EXPORT COMPLIANCE FORM

The information that I have provided above is true, accurate and complete. I understand that this information is being collected for purposes of complying with the U.S. Export Control laws, which apply to Uber products, services and company operations, including online transfers of software and data/information.

During my employment with Uber, I agree to comply with the U.S. Export Controls laws and regulations, licensing requirements (if applicable), and Uber's export compliance policies and procedures. I understand that reckless and/or willful misconduct *may* result in the imposition of criminal and/or civil fines and penalties, as well as disciplinary actions and/or termination of employment.

Export information and assistance is available by contacting Uber Export Compliance team at: exportcompliance@uber.com.

The Export Compliance team can provide help with the following activities* - Prior to:
- Transacting with an Embargoed Country (Crimea - region of Ukraine, Cuba, Iran, North Korea, Sudan and Syria) and/or a Restricted/Denied Party;
- Collaborating with a foreign entity and/or individual;
- Shipping items, non-publicly available data, and/or software out of the U.S.;
- Traveling with items, non-publicly available data, and/or software out of the U.S.;
- Etc.

*This list is non-exhaustive and provided for illustrative purposes only.

*Sir Lawrence Davis*

S

Sir Lawrence Davis

**Printed Name**

07/24/2018

**Date**

███████████████████████████████████

**Completion of this form is mandatory. Please return this completed form with your signed offer letter. Thank you.**

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

## U.S. EMPLOYEE BENEFITS: 2018

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

## Table of Contents

Eligibility....................................................p3

Enrolling.....................................................p4

High Level Summary of Plans...................p4

Medical.......................................................p5

Dental.........................................................p10

Vision..........................................................p12

Monthly/Employee Costs..........................p14

Life/Disability.............................................p16

Flexible Spending......................................p17

Pre-tax Commuter Program......................p18

401K............................................................p19

Perks/ Additional Benefits........................p20

Benefits Glossary.......................................p21

Benefits Support.........................................p25



DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**

ELIGIBILITY

### Eligibility



All US employees working at least 30 hours per week and eligible dependents may participate in the Uber benefit plans starting on your date of hire. You have 30 days to elect as a new employee and will be given the opportunity to change your elections annually. You may also make changes if you experience a **qualifying life event** during the year. Qualifying events are effective on the date of event.

**ELIGIBLE DEPENDENTS:** You may elect to cover your spouse, domestic partner (living together for 6+ months), dependent children, and/or children of your domestic partner. Note: The cost to cover a domestic partner or a child of a domestic partner is withheld post-tax.  You will also be required documentation as part of dependent verification, required documents listed below.

| Dependent | Documentation Required |
|---|---|
| Child | Government Issued Birth Certificate<br>OR<br>Copy of legal documents stating adoption or legal custody |
| Spouse | Marriage Certificate and Federal Tax Return Issued Within Last 2 Years (send only the first page that lists your dependent(s))<br>OR<br>Marriage Certificate and Proof of Joint Ownership Issued Within Last 6 Months<br>OR<br>Marriage Certificate Only (If married within the last 12 months) |
| Domestic Partner | Declaration of Domestic Partnership and Proof of Joint Ownership Issued Within Last 6 Months |
| Child of Domestic Partner | Government Issued Birth Certificate, Declaration of Domestic Partnership, and Proof of Joint Ownership Issued Within Last 6 Months |

3

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

ELIGIBILITY



### Enrolling

All enrollments are completed through our online enrollment system, **Bswift**. You can access the system through **OneLogin** after completing your new hire onboarding. Take advantage of the Ask Emma enrollment tool or opt for the quick enrollment process.

| Coverage | Provider | Plans |
|---|---|---|
| Medical | Collective Health | 2 Nationwide PPOs |
| | | Nationwide EPO |
| | Kaiser | California HMO |
| | UPMC | Nationwide EPO |
| | | Nationwide PPO |
| Dental | Guardian | Dental Base |
| | | Dental Plus |
| Vision | VSP | Vision Base |
| | | Vision Plus |
| Life / Disability | Liberty Mutual | Basic Life |
| | | Short-Term Disability |
| | | Long-Term Disability |
| | | Voluntary Life |
| Flexible Spending | Navia Benefits | Healthcare FSA |
| | | Dependent Care FSA |
| | | Pre-Tax Transit |
| | | Pre-Tax Parking |
| 401k | Fidelity | Traditional 401k |
| | | Roth 401k |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

MEDICAL

# Medical Benefits

The Uber Benefits Team understands not only the importance of quality medical benefits but also the value of accessibility and ease of understanding. This is why we've partnered with Collective Health to offer access to the largest network in the country, BlueShield, as well as technology to navigate the healthcare industry to make the most of your coverage.

Are you a fan of Kaiser Permanente or UPMC? Don't worry, we've got you covered too!

Review the coverage options and associated costs on the next few pages. Not sure which plan to choose? Reach out to the Benefits Team for help!

4

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# MEDICAL



## How Do PPO Plans Work?

- Preventive care is covered at 100%. Office visits are flat co-payments.

- Coverage is available both **in-network** and **out-of-network**. Costs are less expensive when visiting in-network doctors.

- Additional services (think: tests, procedures, treatments, etc.) are subject to your **deductible** (flat annual amount) and **co-insurance** (percentage of the cost). All co-insurance amounts apply after the deductible is met.

| Plan Name | Collective Health PPO Base | | Collective Health PPO Plus | |
|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network |
| Deductible - Single | $750 per member | | $250 per member | |
| Deductible - Family | $2,250 per family | | $750 per family | |
| Out of Pocket Max - Single | $3,000 per member | $12,000 per member | $2,250 per member | $6,500 per member |
| Out of Pocket Max - Family | $6,000 per family | $24,000 per family | $4,500 per family | $13,000 per family |
| Inpatient Surgery | 20% | 40% | 10% | 30% |
| Outpatient Surgery | 20% | 40% | 10% | 30% |
| Emergency Room | $150 per visit (waived if admitted) | | $150 per visit (waived if admitted) | |
| Urgent Care | $30 per visit | 40% | $20 per visit | 30% |
| Office Visit | $30 per visit No copay preventive care | 40% | $20 per visit No copay preventive care | 30% |
| Diagnostic X-Ray Lab | 10% | 40% | 10% | 30% |
| Pregnancy and Maternity | $30 per visit | 40% | $20 per visit | 30% |
| Chiropractic | $30 per visit (30 visits/year) | 40% (30 visits/year) | $20 per visit (30 visits/year) | 30% (30 visits/year) |
| Infertility Treatment | Not Covered | | 100% | Not Covered |
| Rx Drug – 30 day supply<br><br>Tier 1: Generic<br>Tier 2: Preferred Brand<br>Tier 3: Nonpreferred Brand<br>Tier 4: Specialty | $10: Tier 1<br>$20*: Tier 2<br>$50*: Tier 3<br>$20: Tier 4<br><br>*+$10 If there is a generic equivalent available | Not Covered | $10: Tier 1<br>$20*: Tier 2<br>$50*: Tier 3<br>$20: Tier 4<br><br>*+$10 If there is a generic equivalent available | Not Covered |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# MEDICAL



## UPMC Plans - Pittsburgh Only

- If you are part of the **UPMC EPO**, you may visit providers while traveling throughout the country that are part of the PHCS/Multiplan Networks. For more information visit, multiplan.com/UPMC.
- UPMC PPO Plan offers coverage at participating providers and **non-participating providers.** Costs are less expensive when visiting participating providers. If you would like to find a Participating Provider near you, visit www.upmchealthplan.com

| Plan Name | UPMC PPO | | UPMC EPO |
|---|---|---|---|
| | **Participating Provider** | **Non-Participating Provider** | **In-Network Only** |
| Deductible - Single | $0 | $1,000 per member | None |
| Deductible - Family | $0 per family | $2,000 per family | None |
| Out of Pocket Max - Single | $1,250 per member | $10,000 per member | $1,250 per member |
| Out of Pocket Max - Family | $2,500 per family | $20,00 per family | $2,500 per family |
| Inpatient Surgery | $0 | 40% | $0 |
| Outpatient Surgery | $0 | 40% | $0 |
| Emergency Room | $175 per visit (waived if admitted) | | |
| Urgent Care | $25 per visit | 40% | $25 per visit |
| Office Visit | $10 per visit<br>No copay preventive care | 40% | $10 per visit primary/$25 specialist<br>No copay preventive care |
| Diagnostic X-Ray Lab | $25 | 40% | $25 |
| Pregnancy and Maternity | $10 visit copay | 40%% | $10 per visit copay |
| Chiropractic | $25 visit copay | 40% | $25 per visit copay |
| Infertility Treatment | Not Covered | Not Covered | Not Covered |

| Rx Drug – 30 day supply | |
|---|---|
| Tier 1: Generic<br>Tier 2: Preferred Brand<br>Tier 3: Nonpreferred Brand<br>Tier 4: Specialty | $10 - Generic<br>$30 - Brand<br>$50 - Non Formulary<br>$50 Specialty |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# MEDICAL



## EPO & HMO Plans - Collective Health & Kaiser

### EPO Plan - In Network only

- Coverage is **nationwide** and only available at **in-network providers**.
- Preventative care is covered at 100%. Services are flat co-payments.
- There is **no deductible** and **no co-insurance,** only flat **co-payments**.
- You do not have to designate a primary care physician.

### HMO Plan - Kaiser

- Coverage through Kaiser is only available in **California** and services must be received at **Kaiser** facilities.
- Preventative care is covered at 100%. Services are flat co-payments.
- There is **no deductible** and **no co-insurance**.

| Plan Name | Kaiser HMO 10 - California Only | Collective Health EPO |
|---|---|---|
| Deductible - Single | None | None |
| Deductible - Family | None | None |
| Out of Pocket Max - Single | $1,500 per member | $1,500 per member |
| Out of Pocket Max - Family | $3,000 per family | $3,000 per family |
| Inpatient Surgery | $250 | $250 |
| Outpatient Surgery | $10 per procedure | $0 per procedure |
| Emergency Room | $100 per visit (waived if admitted) | $100 per visit (waived if admitted) |
| Urgent Care | $10 per visit | $10 per visit |
| Office Visit | $10 per visit No copay preventive care | $10 per visit copay No copay preventive care |
| Diagnostic X-Ray Lab | $0 | $0 |
| Pregnancy and Maternity Care | $10 per visit copay | $10 per visit copay |
| Chiropractic | $10 per visit copay (30 visits/year) | $10 per visit (30 visits/year) |
| Infertility | Not Covered | 100% |
| Rx Drug – 30 day supply | $10: generic $20: generic mail-order $30: brand name $60: brand mail-order | $10 : Tier 1 $20*: Tier 2 $50*: Tier 3 $20: Tier 4 *+$10 If there is a generic equivalent available |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# MEDICAL

## Utilizing your Medical Coverage

Once you complete your enrollment in Bswift, your elections are sent to the carriers within 48 hours.

You will receive ID cards in the mail within 10 days. At the same time, you will gain access to your personalized Collective Health Portal which is where you will go to manage your coverage.

Additionally, Uber works with the below partners to provide additional ways to utilize your medical benefits.

## Finding Doctors

To find a doctor under Collective Health, access the provider search on the Collective Health Portal. For doctors under Kaiser or UPMC, utilize the search at kp.org and UPMC.





OneMedical

- Same Day Appointments

- 24/7 clinical support line

- Mobile app with "Treat Me Now" feature

**Membership is covered 100% by Uber using our company code: UBRXOM.**

### Locations:

Boston. Chicago. Los Angeles. New York City. Phoenix. San Francisco Bay Area. Washington, D.C.

New to OneMedical? Sign up at onemedical.com/activate and enter our company code.

For existing OneMedical members, be sure to use our company code when your membership is up for renewal.

Reach out to the OneMedical client services team with any questions or issues, clientservices@onemedical.com

Note: One Medical is not in network with UPMC or Kaiser Permanente

Telemedicine

See a doctor without scheduling an appointment through one of our telemedicine programs. The providers are able to prescribe medication, if necessary, and if they are not able to treat you, they will assist in getting you a same day appointment for an in-person visit.

Collective Health partners with Doctor on Demand to provide this service for $0 per visit. Access Doctor on Demand through your Collective Health Portal.



If you are a Kaiser member, you can access telemedicine services through kp.org.



KAISER PERMANENTE®

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**

DENTAL

# Dental Benefits

Protect those pearly whites by utilizing the dental benefits offered to you through Uber. Your choice is simple as we offer one dental plan through Guardian. Not only will you get your semi-annual cleanings and typical dental services, our plan offers orthodontia. And it's not just for the younger ones in your life, adults can take advantage too!

Review the coverage options and associated costs on the next few pages. Not sure which plan to choose? Reach out to the Benefits Team for help!

8

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

DENTAL

## How Does the Dental Plan Work?

- Dental coverage pays for your services up to the annual benefit maximum, this is the max amount that Guardian will pay per year (minus orthodontia which has it's own limit).

- Preventative care is covered at 100% with two cleanings provided each year.

- To find dentists, visit the Collective Health portal and   visit your personal portal for details on your claims.

- To utilize your coverage, you can present your ID card or provide your social security number at the dentist's office.

| Plan Name | Dental Base | | Dental Plus | |
|---|---|---|---|---|
| Network name | DentalGuard Preferred | | | |
| Network Usage | In | Out | In | Out |
| Annual benefit maximum (Max Guardian pays annually) | $2,000 / person | $2,000 / person | $3500 / person | $3500 / person |
| Deductible (waived on preventive) | $50 per member | | $50 per member | |
| Preventive services *Oral exams, x-rays, cleanings, fluoride* | 0% | | 0% | |
| Basic services *Oral surgery, fillings, root canals, gum surgery* | You Pay: 10% | You Pay: 20% | You Pay: 10% | You Pay: 20% |
| Major services *Crowns, dentures, bridges* | You Pay: 40% | You Pay: 50% | You Pay: 40% | You Pay: 50% |
| Orthodontia | Not Covered | | You pay 50% | |
| Who is eligible | Not Covered | | Adults and Child(ren) | |
| Orthodontia Lifetime Maximum | Not Covered | | $2000 / person lifetime | |

9

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**

VISION

# Vision Benefits

Uber offers two vision plans through VSP to support your vision health whether you use it a lot or just a little. Both plans will give you an annual eye exam but the real difference comes in the allowance you're provided for contacts and glasses. If you're a big user of vision benefits and enjoy getting both contacts and glasses every year, take a look at the plus plan. Not a huge user but want to make sure you're covered when you need it? The base plan might be right for you.

These costs can sometimes add up, especially if you go to an out-of-network provider for your glasses, so if you still have more to pay after your VSP benefits coverage, consider participating in our **flexible spending account.**

Review the coverage options and associated costs on the next few pages. Not sure which plan to choose? Reach out to the Benefits Team for help!

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# VISION

| Plan Name | VSP Vision Base Plan | | VSP Vision Plus Plan | |
|---|---|---|---|---|
| **Network Name** | VSP Network Signature Plan | | | |
| Network usage | In | Out | In | Out |
| | Every Calendar Year | | | |
| Exams | $10 copay | $10 copay (Plan pays up to $50 max) | $10 copay | $10 copay (Plan pays up to $50 max) |
| Lenses | No copay | $48 – single vision $67 – bifocal $86 – trifocal | No copay | $48 – single vision $67 – bifocal $86 – trifocal |
| Contact Lenses & Frames | $130 allowance | $70 - frames $105 - contacts | $200 allowance | $70 - frames $105 - contacts |
| | Every Two Calendar Years | | Every Calendar Year | |
| | $130 allowance | $70 - frames $105 - contacts | $200 allowance | $70 - frames $105 - contacts |



## How Does the Vision Plan Work?

- Both plans cover annual exam, lenses, and an allowance for contacts and frames.

- Uber offers a plus plan that provides a higher allowance and the ability to use it for both frames and contacts every year.

- Your allowance goes much further when visiting an in-network provider.

- To find vision providers, visit the Collective Health portal and visit your personal portal for details on your claims.

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

COSTS

## Cost to Enroll



Below you will see the amount that is withheld from your paycheck **monthly** for participating in each of the available plans. These costs will be visible as you go through the enrollment in Bswift. *If you have medical coverage elsewhere and waive Uber's coverage, you will receive an extra $100 per month in your paycheck (applicable taxes withheld).*

| | Employee Only | Employee + Partner | Employee + Child(ren) | Employee + Family |
|---|---|---|---|---|
| **Collective Health - PPO Base** | | | | |
| | $0 | $120 | $86 | $195 |
| **Collective Health - PPO Plus** | | | | |
| | $15 | $137 | $99 | $223 |
| **Collective Health - EPO IN-Network Only Plan** | | | | |
| | $30 | $152 | $109 | $248 |
| **Kaiser HMO (California Only)** | | | | |
| | $78 | $171 | $140 | $241 |
| **UPMC EPO (PA and Surrounding Area Only)** | | | | |
| | $101 | $269 | $203 | $281 |
| **UPMC PPO (PA and Surrounding Area Only)** | | | | |
| | $126 | $335 | $252 | $350 |
| **Guardian Dental Base** | | | | |
| | $0 | $14 | $18 | $32 |
| **Guardian Dental Plus** | | | | |
| | $9 | $20 | $26 | $43 |
| **VSP Vision Base** | | | | |
| | $0 | $2 | $3 | $6 |
| **VSP Vision Plus** | | | | |
| | $9 | $11 | $12 | $21 |

*(Medical)* *(Dental)* *(Vision)*

*Domestic partner contributions are withheld on a post-tax basis. Contributions made by the employer for domestic partner coverage will be subject to imputed income for the employee.*

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**

# Additional Benefits

While medical, dental, and vision are normally the main event, the benefits don't stop there.

Uber provides basic life insurance, short-term disability, and long-term disability for all eligible employees. In addition, Uber offers flexible spending accounts and life and disability options beyond the basic coverage provided by the company. We also have a 401k plan and a whole host of additional benefits to round out the services that help to support the whole you.

As always, reach out to the Benefits Team for help!

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# LIFE/DISABILITY

**Paid for by Uber**

### Basic Life Insurance
*Uber provides all eligible employees with Basic Life Insurance. Be sure your beneficiary is accurately listed in Bswift.*

| Carrier | Amount | Benefit Maximum |
|---|---|---|
| Liberty Mutual | 2 x Annual Salary | $1,000,000 |

### Short-Term Disability
*This benefit is now tax-free upon receipt so employees' annual income will be grossed up by the amount Uber pays in premium for this coverage. This amount is visible to the employee in bswift.*

| Carrier | Amount | Maximum Benefit | Benefit Period | Waiting Period |
|---|---|---|---|---|
| Liberty Mutual | 70% of weekly salary | $3,500/week | 12 weeks | 7/7 days |

### Long-Term Disability

| Carrier | Amount | Maximum Benefit | Benefit Period | Waiting Period |
|---|---|---|---|---|
| Liberty Mutual | 60% of monthly salary | $12,000/month | Until eligible for social security | 90 days |

**Paid for by You**

### Voluntary Life Insurance
*If you elect coverage over the Guarantee Issue amount or outside of your initial 30 day new hire enrollment window, you will be required to complete a two-page form. Rates can be found on team.uber and within Bswift. Premium is withheld post-tax.*

| | Employee | Spouse | Child |
|---|---|---|---|
| **Minimum coverage amount** | $10,000 | $5,000 | $10,000 |
| **Maximum coverage amount** | 8x salary OR $1,250,000 | 100% of EE Coverage OR $250,000 | $10,000 |
| **Guarantee issue** | up to $500,000 | up to $25,000 | up to $10,000 |

14

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**                                                                    FLEX SPENDING

## How Do the Flexible Spending Accounts Work?

A flexible spending account allows you to set aside money pre-tax to use in two ways:

- The health care FSA may be used for out-of-pocket healthcare expenses for you and your family members

- The dependent care FSA may be used for child care expenses

- These accounts are elected for the calendar year and may be used through March 15 of the following year. Any unused funds after March 15 are lost.

- The Uber FSAs are administered by Navia Benefits.

| | Health Care FSA | Dependent Care FSA |
|---|---|---|
| **Maximum contribution amount** | • Up to $2,650 per employee annually | • Up to $5,000 per household annually |
| **Eligible Expenses** | • Health related deductibles (medical, dental, vision)<br>• Copays and coinsurance<br>• Prescription medication | • Workday childcare services<br>• Cost of care at a licensed daycare<br>• Before or after-school care |
| **Ineligible Expenses** | • Cosmetic surgery<br>• Non-prescription medication<br>• Life insurance premiums | • Education expenses<br>• Non-workday childcare expenses<br>• Transportation expenses for childcare |
| **How do I utilize the funds in my account?** | You will receive a debit card for participation in the Health Care FSA account. This will be loaded with your annual election amount and can be used to pay for most healthcare expenses. If you were to pay out-of-pocket for an expense, you could submit the receipt for reimbursement. | As you incur child care expenses, you can submit receipts for reimbursement using the Navia Benefits website or mobile app. Funds will be added to your account each pay period and you will be reimbursed as you submit receipts for expenses. |
| **What happens to account funds at the end of the year?** | Use it or lose it.  By IRS regulations, the account holder loses any unclaimed money in the account at the end of the plan year.  The IRS allows a 2.5 month "grace period" at the end of the plan year regarding unused Healthcare FSA funds. Consult your full plan summary to confirm your specific timeframe. If you leave the company mid-way through the year, you lose any funds that you haven't spent by your last day. | |
| **How do I make changes to my participation?** | You can make changes to your participation and/or contribution amount during open enrollment period or with a qualifying event only.  Make sure you budget and plan ahead according to your projected health and dependent care needs. | |
| **Where can I get more information?** | IRS Publication 502: Medical and Dental Expenses, and IRS Publication 503: Child and Dependent Care Expenses list eligible expenses.  These publications are available online at www.irs.gov/formspubs/index.html, or by calling 1-800-TAX-FORM. | |

15

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

PRE-TAX COMMUTER PROGRAM



## Pre-Tax Commuter

This program allows you to pay for their monthly commuter expenses on a pre-tax basis. Funds are directly deducted from your paycheck. Participation in this benefit and the contribution amount can be changed at any time throughout the plan year. To participate, there is a $3/month fee.

| | Commuter |
|---|---|
| Provider Information | Navia Services |
| Maximum contribution amount | • Up to $260 monthly for transit<br>• Up to $260 monthly for parking |
| What expenses are allowed? | • Mass transit fares<br>• Monthly bus passes<br>• Vanpooling fees<br>• Parking in relation to daily commute |
| What expenses are not allowed? | • Taxi fares<br>• Bridge tolls<br>• Cost of auto maintenance<br>• Uber services |
| How do I enroll? | • Employees enroll directly in the Navia portal<br>• Enrollment completed by the 20th of the month will be effective the 1st of the following month |
| How do I use this benefit? | • Once enrolled, you will receive a debit card in the mail from Navia to use when paying for your commute expenses. You may also purchase passes directly on the Navia website.<br>• If you already participate in our FSA program through Navia, your funds will be automatically loaded on your existing debit card |
| How do I manage my account? | • Upon enrollment, you will receive an email from Navia with instructions on how to register your account and manage your funds |
| Where can I find more information about this benefit? | • Please visit our teamdot page here for more information on this program. |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

**401K**

## 401K



Uber's 401K plan is managed by Fidelity. You can choose to make pre-tax and/or post-tax (Roth) contributions. There is a selection of funds that you can choose to invest in. If you do not actively make a change, you will be automatically enrolled at 3% and you will be defaulted into the target date funds after your first 30 days.

| | |
|---|---|
| **Provider** | Fidelity, Plan #77833<br>www.netbenefits.com |
| **When can I enroll?** | • Immediate<br>• Must be 18 years of age |
| **How do I enroll?** | • Online through the link above<br>• Employees are auto enrolled at 3% deferral, unless you opt out online. Default election increases 1% each year, up to 6% |
| **How much can I contribute?** | • 1 – 90% of paycheck<br>• Annual Deferral limit: $18,000 for 2016<br>    • $24,000 if over age 50 |
| **Available account type(s)** | • Pre-tax (Traditional)<br>• Post-tax (Roth) |

| | Pre-tax (Traditional) | Post-tax (Roth) |
|---|---|---|
| **Key account attributes** | • Contributions are made before taxes are applied, which reduces current tax burden.<br>• All capital gains, dividends, interest, etc. grow within the account on a tax-deferred basis.<br>• Account holder becomes eligible to withdraw at age 59 ½. Withdrawals will be taxed at then-current rates and total income levels.<br>• All withdrawals prior to eligibility are subject to limitations, taxes, and /or penalties. | • Contributions are made after taxes have been applied.<br>• All capital gains, dividends, interest, etc. grow tax-free in the account.<br>• Account holder becomes eligible to withdraw at age 59 ½. Withdrawals are not subject to any taxes.<br>• Account holder can withdraw up to the contribution amount at any time. Any withdrawals above the contribution amount (such as capital gains, interest, and dividends) are subject to taxes and penalties. |

| | |
|---|---|
| **Rollovers** | • Initiate the rollover request from a previous account with your previous employer<br>• Once you've received the rollover check, submit along with a rollover form to your plan administrator |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

# ADDITIONAL BENEFITS AND PERKS



| | |
|---|---|
| **Uber Credits** | **Monthly Credits**<br><br>• You will receive monthly credits equivalent to the average fare of your home city, multiplied by 15. For example, if the average fare in your city is $13, multiply that by 15, and you'll receive $195 in credits per month<br>• 17% discount is always in effect and applied to all subsequent trips<br>• Uber credits used for non-business related rides are taxable income |
| **Wellbeing Reimbursement** | **Up to $68 per month**<br><br>• Submit proof of payment to Navia Benefits to receive this benefit.<br>• This benefit is not applicable to interns |
| **Paid Time Off** | **Vacation:** Employees accrue up to 100 hours/year<br>• Accrual will be at a rate of 1 hour for every 20.8 hours worked<br>• Unused vacation time will be carried forward at the end of every year into the new year up to a maximum of 150 hours accrued/year<br>• All vacation is subject to manager approval<br><br>**Sick Time:** Employees accrue up to 80 hours/year<br>• Accrual will be at a rate of 1 hour for every 26 hours worked<br>• Unused sick time will be carried forward into the new year at the end of every year up to a maximum of 80 hours |
| **Paid Company Holidays** | New Year's Day - Martin Luther King, Jr. Day - Memorial Day Independence Day - Labor Day - Thanksgiving Day Day after Thanksgiving - Christmas Day |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

# UBER

## ADDITIONAL BENEFITS AND PERKS

| | |
|---|---|
| **OneMedical Membership** | **Membership is covered 100% by Uber using our company code: UBRXOM**<br>• Same Day Appointments<br>• 24/7 clinical support line<br>• Mobile app with "Treat Me Now" feature<br>• Sign up at onemedical.com/activate |
| **Mental Health Support**<br><br>**Lyra Health** | **Mental health benefits** through Lyra Health which provides our employees with:<br><br>• Easy online tool to help employees find the right care<br>• Nationwide access to top-tier therapists, psychiatrists, and self-guided apps<br>• Convenient provider visits in person or via live video, at no cost to you and your household members<br>• 24/7 access to the Lyra Care Team<br><br>For more information contact care@lyrahealth.com |
| **Student Loan Refinancing**<br><br>**SoFi** | **Got student loans? Earn $300 by refinancing them with SoFi.**<br>• Visit: www.sofi.com/Uber<br>• Email: ask@sofi.com<br>• Call: 855.456.7634 |
| **Fertility Support Services**<br><br>**progyny**<br>Clinical Expert \| Consumer Champion<br><br>**Progyny** | **Get discounts on a catalog of products and services:**<br>• Increased fertility benefit (PPO Plus and EPO only)<br>• Specialized network of providers utilizing new advanced technology for infertility<br>• Dedicated nurse support<br>• Support and financial assistance for adoption/surrogacy<br>• Egg freezing<br>• To take advantage of fertility and egg freezing services, you must be enrolled in the PPO Plus or EPO<br>• For more information, contact help@collectivehealth.com & for benefit and care related questions, call 888-203-4825 |
| **Pregnancy Support Services**<br><br>**Ovia** | **New benefit for expecting moms** through Ovia, a mobile app that provides pregnancy advice and support including:<br>• Mobile app for full lifecycle pregnancy support<br>• Ovulation & pregnancy tracking<br>• Ongoing pregnancy support<br>• 24/7 case management (nurses)<br>• Health assessments for early identification of high risk pregnancies<br>• For more information, contact support@oviahealth.com |

# UBER

## APPENDIX:ADDITIONAL INFORMATION

# Health Benefit Definitions

| | |
|---|---|
| **Accidental Death and Dismemberment (AD&D)** | Accidental Death & Dismemberment (AD&D) Insurance is a limited form of life insurance that provides your beneficiaries with financial protection when you die due to an accident, or when you accidentally lose your sight or a limb. |
| **Admission / Admit** | When an enrollee is taken to a hospital and formally accepted by the facility for stays typically lasting longer than 2 days.  The process of admission to a hospital is performed by the doctor.  The doctor makes this complex decision to admit a patient based on medical judgment and necessity of more intensive care. |
| **Benefit Period** | The length of time that the Short-Term Disability (STD) and/or Long-Term Disability (LTD) benefits will be paid to an employee. The maximum benefit period is determined by the member's age at the point of disability. Benefits will be paid from the end of the elimination period until the earliest of: (1) Completion of the benefit duration, (2) Employee's recovery, or (3) Employee's death.  Common benefit periods include:<br>•To age 65<br>•Age Discrimination Employment Act (ADEA)<br>•Social Security Normal Retirement Age (SSNRA)<br>•Reducing Benefit Duration (RBD) |
| **Claim** | A request by a member (or his/her provider) for the insurance company to pay for services obtained. |
| **Coinsurance** | The percentage of the charges the member is required to pay for a medical service in a plan after the deductible has been met. For example, the insurance company may pay 80% of the covered claim, and the member pays the remaining 20%. |
| **Copay** | The flat fee paid by the member when a medical service is received, i.e. $20 for a doctor's visit or $20 for a prescription.  Copays do not apply to the deductible. |
| **Deductible** | The set dollar amount a member must pay before the insurance carrier begins paying for medical expenses. |
| **Domestic Partner** | Your partner may qualify as a domestic partner if:<br>•Neither the employee nor the partner are married or legally separated from any other person<br>•The employee and partner are each other's sole domestic partner and intend to remain so indefinitely<br>•Both the employee and partner are at least 18 years of age<br>•The employee and partner are not related to each other<br>•The employee and partner have assumed mutual obligations for the welfare of each other, including "basic living expenses" and a common residence for a minimum period of time, specified time period based on carrier, and intend to do so indefinitely.<br><br>Domestic partners are not currently recognized as IRS dependents.  Therefore, the portion of premiums your employer pays on behalf of your domestic partner must be taxed.  This process is called "imputed income" (see definition in the "Disability and Life Insurance Definitions" section). Also, any premiums you pay which are attributable toward the domestic partner coverage must be taxed.  These premiums are deducted on a post tax basis. |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**                                                APPENDIX:ADDITIONAL INFORMATION

## Health Benefit Definitions (continued)

| | |
|---|---|
| **Eligible Dependents** | When covering dependents, you must select the same plans for your dependents as you select for yourself.<br><br>Eligible dependents include:<br>•Your legal spouse or qualified domestic partner<br>•Your children.  Your children may include natural, adopted, or stepchildren.<br>•Your qualified domestic partner's children<br>Note:  Per the Patient Protection and Affordable Care Act, all medical plans must allow dependents to remain on the plan up to age 26 regardless of the dependent's student, financial, or marital status.  For Dental and Vision plans, age limits vary per carrier.  Please see the People Team for specific age limits for these plans. |
| **Elimination Period** | The amount of time (a specific number of days or months) the employee must meet before the disability benefit is paid. |
| **Evidence of Insurability** | A statement of medical history and related information to be used to determine whether an applicant will be approved for supplemental life insurance coverage. |
| **Exclusive Provider Organization (EPO)** | An EPO operates similarly to a PPO in that a group of hospitals and physicians are contracted with insurance companies to provide medical services.  Generally, EPOs do not offer benefits for services provided by out-of-network providers, but some EPOs do provide limited benefits.  As with a PPO, out of pocket costs are lowest when a provider is used within the EPO network. |
| **Explanation of Benefits** | An Explanation of Benefits (EOB) document  is a statement sent to you by your health plan carrier to explain what medical procedures and services were rendered and what the plan paid for on your behalf. |
| **Health Maintenance Organization (HMO)** | An HMO is a managed care plan that requires you to receive your medical care from hospitals and doctors in the HMO network.  Your Primary Care Physician (PCP) coordinates your medical care and refers you to specialists (within their medical group) and hospitals as necessary. |
| **Imputed Income** | The IRS deems that the premiums paid by your employer for life insurance coverage in excess of $50,000 is imputed income.  The IRS defines imputed income as income that may not be seen or delivered as cash, but is income that comes in the form of a benefit or income by having a benefit provided.  Hence, the IRS deems basic life insurance coverage to be imputed income.  The IRS takes this position because life insurance benefits are paid tax-free to the beneficiary. |
| **In-Network Provider** | A network provider is a hospital, doctor, medical group, and/or other healthcare provider contracted to provide services to insurance carrier enrollees for less than their usual fees. |
| **In-Patient** | Enrollee who visits a hospital or other healthcare facility and requires at least an overnight stay or occupies a hospital bed. |

21

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**                                    APPENDIX: ADDITIONAL INFORMATION

## Health Benefit Definitions (continued)

| | |
|---|---|
| **Negotiated Fee** | Refers to the fee schedule that participating network providers agree to accept as payment in full. |
| **Out-of-Network Provider** | An out-of-network provider is a hospital, doctor, medical group, and/or other healthcare provider who are not contracted to provide services to insurance carrier customers for less than their usual fees. |
| **Out-of-Pocket Maximum** | The maximum amount the member would have to pay in a plan year for eligible expenses. After reaching the Out-of-Pocket maximum, the plan pays 100% of the allowable charges for covered services in network for the remainder of the plan year. |
| **Out-Patient** | Enrollee who visits a hospital, clinic, or provider's office for treatment but does not stay overnight or occupy a hospital bed. |
| **Preferred Provider Organization (PPO)** | PPO refers to a group of hospitals and physicians that are contracted with insurance companies to provide medical services. Out-of-pocket costs are lower when a provider is used within the PPO network (called in-network), even though members still receive lower levels of benefits when seeing a provider outside of the PPO network (called out-of-network). |
| **Premium** | The monthly fee that is paid to an insurance company or health plan to provide health coverage. When this term is applied to an employee, this fee is often shared with the employer. |
| **Qualifying Event** | A qualified event allows the member to add or remove dependents from the plan within **30 days** of the qualifying event. Coverage added as a result of these events will be effective date of event. Typical qualifying events include:<br>•Marriage, divorce, termination of a domestic partnership<br>•Birth or adoption of a child<br>•Death of a spouse or dependent<br>•End in spouse's employment or group insurance coverage |
| **Tax Choice Plan** | Employer may choose to give the employee a choice of whether the premium for disability is paid before or after taxes.<br>•**Pre-tax Option**: You don't pay taxes on the benefit until you actually receive the benefit. If you were to go out on disability under this option, you would receive a percentage of your base salary (per the benefit) minus taxes.<br>•**Post-tax Option:** You are taxed on the premiums (as opposed to the benefit amount) associated with the disability benefit regardless if you are out on disability or not. However, if you do go out on disability the 60% of your income is received wholly and is not taxed. |

DocuSign Envelope ID: 06AC690C-E8A4-4D58-A573-C52554C3A09D

**UBER**

BENEFITS QUESTIONS & SUPPORT

## Questions?  Get Help!

The Uber Benefits Team is available to help you get the most out of your benefits programs and answer any number of questions you may have.If you have further questions you can reach out to the Employee Help Center for further assistance! All of this information and more detail is available on the U.S. benefit pages of teamdot.

|  | Provider Name | Provider Phone Number | Provider Website |
|---|---|---|---|
| Medical | Collective Health | (844) 803-0214 | email: help@collectivehealth.com my.collectivehealth.com |
|  | Kaiser | (800) 464-4000 | kp.org |
|  | UPMC | (888) 876-2756 | upmchealthplan.com/members |
| Dental | Guardian | (800) 541-7846 | guardiananytime.com |
| Vision | VSP | (800) 877-7195 | vsp.com |
| FSA/Commuter | Navia Services | (800) 669-3539 | naviabenefits.com |
| 401(k) | Fidelity | (800) 294-4015 | netbenefits.com |
| Life & Disability | Liberty Mutual | (800) 320-7585 | libertymutual.com |
| Lyra Health | Mental Health Support | (877) 978-2142 | uber.lyrahealth.com |
| Progyny | Fertility Services | (888)203-4825 | help@collectivehealth.com |
| Ovia | Pregnancy Support |  | support@ovuline.com |
| Cigna World Traveler | Cigna | Plan Information (800) 243-1348 | cignaenvoy.com |

23

# EXHIBIT C

American Arbitration Association and International Centre for Dispute Resolution

Employment Arbitration Rules

Case Number: 01-20-0014-8969                    Amended Demand of <u>Sir Lawrence Davis</u>

Sir Lawrence Davis
-vs-
Uber USA Phoenix

---

NOTE TO PARTY FILING THIS AMENDMENT:  Please consult the appropriate fee schedule to determine whether additional fees are required to amend this demand/counterclaim.   This amendment may result in a track change under the applicable rules.  Please contact your AAA/ICDR case representative if you have any questions.

---

The previously-filed demand dated (<u>9/15/20</u>) is incorporated herein by reference and amended as follows (please include the contact information for any additional parties, if applicable):

*See* Attached Amended Exhibit A and B

Signed:     <u>/s/ Christopher R. Houk</u>

Name:      <u>Christopher R. Houk</u>

Date:       <u>2/23/20</u>
            Counsel for Sir Lawrence Davis

---

Copies of this amendment should be sent to all parties and the AAA/ICDR.  If this amendment adds parties that have not been served with the original demand, this amendment and the original filing documents should be served upon those parties. After the arbitrator has been appointed, no new or different claim/counterclaim (as opposed to an increase or decrease) can be submitted without the arbitrator's consent. This amendment can either be uploaded on the documents tab or emailed to the AAA case representative.  The AAA case representative will advise you as to any change in fees.

---

Exhibit A – Nature of Claims

Sir Lawrence Davis, an African American male employee, was employed by Uber USA Phoenix from August 2018 until December 3, 2019, when he was terminated. He performed his job duties well, receiving accolades from supervisors and mentors and recommendations for promotions.

Uber discriminated against Mr. Davis on the basis of race, sex, or retaliation, including by

- Negatively stereotyping him as an "angry black person" and making personnel decision based on bias.
- Hiring a less-qualified white, female coworker, Elise Anaya, for a promotion over Mr. Davis.
  - While Mr. Davis had four years of Uber experience and four years of prior experience in the field, Ms. Anaya did not have any prior work experience necessary for the position.
  - Two of Mr. Davis's supervisors recommended him for the promotion.
  - While Mr. Davis has a master's degree, Ms. Anaya does not.
  - Following the hiring of Ms. Anaya, Uber gave confusing and contradictory answers as to the reasons for its hiring decision. Uber refused to confirm even basic information such as whether Mr. Davis interviewed for one position or two, conflating the two positions at times and differentiating them at other times.
- Issuing undeserved performance evaluations to Mr. Davis shortly after he began raising concerns about Uber's unfair hiring practices.
- Placing Mr. Davis on a series of development plans, claiming that he did not meet the required hours on certain projects, ignoring that
  - several of Mr. Davis's supervisors repeatedly approved his hours and never informed him that there was problem with where he focused his hours and
  - (2) Uber informed him that he was, in fact, meeting his hours.
- Terminating Mr. Davis while he was on a development plan.

Mr. Davis filed a series of complaints alleging race, sex discrimination, and retaliation about Uber's inconsistent hiring process and about sex and race discrimination in hiring of Ms. Anaya. Mr. Davis also filed a Charge of Discrimination with the EEOC based on race and sex discrimination and retaliation. While Uber claims it did an investigation, it got key facts wrong and failed to investigate all of Mr. Davis's claims.

Uber terminated Mr. Davis's employment because of his race and retaliation in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 USC § 2000e-3(a), and because of sex discrimination and retaliation under Title VII.

Race and retaliation claims brought under 42 U.S.C. § 1981 have no cap on damages. The available damages for Section 1981 and Title VII claims are: back pay, front pay, compensatory, punitive damages and attorneys' fees.

Mr. Davis filed charges of discrimination and received right to sue letters in EEOC/CRD Nos. 540-2019-03150/ CRD-2019-0553; EEOC 540-2020-02906.


### Exhibit B - Qualifications of the Arbitrator

Familiarity with race and sex discrimination, and retaliation cases in employment under Title VII and Section 1981. A retired judge or magistrate or a mediator steeped in employment law would be preferable.

# EXHIBIT D



Western Case Management Center
Patrick Tatum
Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

April 6, 2021

**VIA ELECTRONIC MAIL**

Christopher R. Houk, Esq.
Houk Law Firm
1050 East Southern Avenue
Suite A-3
Tempe, AZ 85282

Kristy Peters, Esq.
Littler Mendelson, PC
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016

**Case Number: 01-20-0014-8969**
**Sir Lawrence Davis**
**-vs-**
**Uber USA Phoenix**

Dear Parties:

Inasmuch as there were no objections to the appointment of Tod F Schleier, his appointment is hereby confirmed.

The Arbitrator has scheduled a telephonic Arbitration Management Conference for **April 19, 2021 at 9:00 am, Arizona Time.** The call-in information is as follows:

**First, click:** https://meet.loopup.com/BYD0Dg2

**Or, if you are offline, dial in:**
**(by joining, you agree to the privacy policy at loopup.com)**
**Guest Dial-in Code: 2477177#**
  **USA: +1 (855) 633-2040**

The American Arbitration Association encourages you to share this initial letter with your client and invite them to participate in this Arbitration Management Conference. Many topics that have a direct bearing on the timeliness and efficiency of this arbitration will be discussed. All participants should have their calendars available during the conference call.

Enclosed is the Management Conference Guide which covers items to be discussed during the Arbitration Management Conference. The parties are further encouraged to discuss any additional items they deem necessary. Participants will select a date for the Arbitration Hearing during the conference call. All dates

established should be realistic dates that work for the parties, their representatives, and their witnesses.

We ask the parties to confer, agree on as many deadlines as applicable, and submit a proposed scheduling order by **April 15, 2021**, in advance of the conference call. In the experience of the AAA, we have found that this greatly assists in the efficiency and cost of the process. If both parties can agree on dates that are in line with the expedited nature of arbitration, the Arbitration Management Conference will be used to confirm these arrangements.

In an effort to assist the parties in creating an efficient and cost-effective plan for exchanging discovery in this matter, we are providing a link to the AAA's Initial Discovery Protocols for Employment Arbitration Cases. To review the new Discovery Protocols, click here.

On behalf of the AAA, we look forward to serving as a resource throughout the course of this matter.

Thank you,

 /s/
Daphne J Crayne
Manager of ADR Services
Direct Dial: (559)490-1914
Email: daphnecrayne@adr.org
Fax: (855)433-3046

Enclosure

cc:   Vicky Ramirez
      Yijee Jeong, Esq.
      Linda Bullis
      Tod F. Schleier, Esq.

# EXHIBIT E

**N THE MATTER OF THE ARBITRATION OF**

| | |
|---|---|
| Sir Lawrence Davis Jr., | Case No. 01-20-0014-8969 |
| Claimant, | **ORDER** |
| vs. | |
| Uber USA Phoenix, | (Assigned to Arbitrator Tod F. Schleier) |
| Respondent. | |

Pending before the Arbitrator is Respondent's Motion for Summary Judgment. Both parties have submitted extensive briefs and voluminous exhibits.  The Arbitrator has reviewed the briefs, exhibits, and applicable case law and enters the following Order.

**A. Factual Background.**

**1.  The Parties as well as Claimant's Employment Background.**

Respondent is a San Francisco-based software company that develops multi-sided platforms to connect service providers with customers. One of Uber's most widely known platforms, the ("Rides Platform"), allows consumers ("Riders") to connect with independent businesses offering transportation services ("Drivers") through Respondent's software application accessible on most smartphones ("Uber App").  Respondent operates in over 70 countries and employs thousands of people in hundreds of offices worldwide.

Claimant, an African-American male, began working for Respondent in Phoenix on August 6, 2018 as Community Support Representative ("CSR"). (Deposition of Lawrence Davis ("Davis Depo."), Resp. Exhibit A, 35:12-17; 63:5-10; 64:3-9).[1]

Claimant's job duties included handling questions from riders and drivers to help navigate problems that may arise. (*Id*., 64:3-9; Deposition of David Cane ("Cane Depo."),

---

[1] The Arbitrator will refer to Claimant's Exhibits as "Cl." and Respondent's Exhibits as "Resp."

Resp. Exhibit 2, 20:6-16). The goal of a CSR is to resolve problems promptly with exceptional support and exceptional communication to develop a trustworthy relationship. (*Id.*). CSRs are held to certain performance metrics, one of which is customer satisfaction ratings ("CSAT scores"). (Resp. Exhibit A, Davis Depo. 78:12-21; Declaration of David Cane ("Cane Decl."), Resp. Exhibit C, ¶ 5). Specifically, following an interaction with a CSR, Riders and Drivers are asked to participate in a survey to rate their satisfaction with how the CSR handled their issue on a scale of one to five, five being the best. (Resp. Exhibit C, Cane Decl. ¶ 5). These survey scores are one tool used to measure the CSR performance. (*Id.*).

Respondent developed a team called Task Force that officially rolled out in January 2019.  (Resp. Exhibit A, Davis Depo. 70:25 – 71:18; 75:5 – 76:4; Exhibit 8; Declaration of Chris Gibson ("Gibson Decl."), Resp. Exhibit D, ¶ 5). Task Force handled escalated situations or situations that required extra research or care. (Resp. Exhibit A, Davis Depo. 70:25 – 71:7; Resp. Exhibit B, Cane Depo 28:8-11; Resp. Exhibit C, Cane Decl. ¶ 6; Resp. Exhibit D, Gibson Decl. ¶ 5; Declaration of Rebeca Garcia ("Garcia Decl."), Resp. Exhibit E, ¶ 5). Claimant was selected to participate on Task Force and even helped write the Standard Operating Procedures ("SOP"). (Resp. Exhibit A, Davis Depo. 70:21-24; 73:25 – 74:2; 76:16-22; Exhibit 9).

Task Force members were permitted to use up to three hours per day for Task Force duties and they would allocate this time as "Project Time" to identify why they were not on the phone queue handling customer calls. (Resp. Exhibit A, Davis Depo. 74:7-23; Resp. Exhibit C, Cane Decl. ¶ 6; Resp. Exhibit D, Gibson Decl. ¶ 7; Resp. Exhibit E, Garcia Decl. ¶ 5). The SOP that Claimant helped write specifically identified the three-hour limitation for using Project Time. (Resp. Exhibit A, Davis Depo. 73:25 – 74:2; 76:16-22; Exhibit 9). ("No more than 3 hours in a shift representing the task force"). Task Force members were required to maintain a CSAT score of 4.8 out of 5 over a rolling three-week period in order to remain on Task Force, and this expectation was clearly set forth in the Task Force SOP.

(Resp. Exhibit A, Davis Depo. 76:16 – 77:9, Exhibit 9; Resp. Exhibit D, Gibson Decl. ¶ 6).

Additionally, at the time Task Force rolled out, Chris Gibson, Customer Support Manager for Task Force, specifically reminded Claimant and other Task Force members that they were still held to CSR standards, including CSAT metrics, when not working on Task Force. (Resp. Exhibit A, Davis Depo. 73:21 – 74:2; 75:5 – 76:12; Exhibit 8). At many of the Task Force weekly meetings, Task Force members were reminded of the three-hour maximum limitation for performing Project Time (Task Force duties) and this limitation was specifically included in the meeting agendas. (Resp. Exhibit A, Davis Depo. 83:15 – 84:3; Exhibit 13; Resp. Exhibit D, Gibson Decl. ¶ 8). Further, the Task Force slide deck included with the weekly Agenda also set forth the three-hour limitation and CSAT metric requirements for Task Force members. (Resp. Exhibit D, Gibson Decl. ¶ 9, Exhibit 1). Therefore, Claimant knew, or certainly should have known, of the three-hour Project Time limitation and the required CSAT metrics for remaining on Task Force.

**2. Claimant Applies for the Claims Associate Position and is Not Selected.**

Claimant applied for a Claims Associate position in April 2019. (Cl. Exhibit 7, Email to Davis from Respondent titled "Application received for Claims Associate", dated April 8, 2019, Davis 000123) (*See also* Motion for Summary Judgment (MSJ) 7:11-12; Declaration of Diana Rivera, Resp. Exhibit I, ¶ 5). Claimant came highly recommended for the role by his Team Lead, Zayin Javier, who described Claimant as "a great asset." (Cl. Exhibit 6, Zayin Javier's Letter of Reference on Behalf of Claimant, Davis 000001). Claimant interviewed for the Claims Associate position.

The interview process consisted of meeting with three different Team Leads for 30 minutes each. (Resp. Exhibit I, Rivera Decl. ¶ 6). Additionally, the interview consisted of a live and written exercise for each applicant to perform. (*Id.*). Respondent contends Claimant was not selected for the Claims Associate position because of his verbal answers to interview questions based on a standard list of competencies and because of his written exercise score. (*Id.*). The three Team Leaders that Claimant interviewed with, Karen

Mischne, Tyler Brown, and Alyssa Wadell, unanimously decided not to recommend Claimant for the position. (Resp. Exhibit I, Rivera Decl. ¶ 6; Exhibit 1).

Because both the weekday and weekend Claims Associate positions included the same interview process, once Claimant was rejected for the weekend position, he was no longer considered for weekday positions. (Resp. Exhibit I, Rivera Decl. ¶ 7-8; Exhibit 2). Had Claimant been selected for the Claims Associate role, he would have been given the opportunity to select whether he wanted a weekend or weekday position, depending on availability. (Resp. Exhibit A, Davis Depo. 68:18 – 70:8; Exhibits. 6, 7; Resp. Exhibit I, Rivera Decl. ¶ 7).

Following the interview, Respondent attempted to meet with Claimant to provide him with interview feedback, which is the typical process for internal candidates. (Resp. Exhibit I, Rivera Decl. ¶ 8; Exhibit 2). However, Claimant refused to meet to receive the interview feedback. (Resp. Exhibit A, Davis Depo. 68:5-17; Exhibit 5).[2]

The Claims Associate Job Description called for a preferred college degree and one to two years of customer service experience, preferably in insurance, (Cl. Exhibit 8, Claims Associate Job Profile, UBER 000982), both of which Claimant had accomplished as he had several years of experience with Respondent and a master's degree in criminal justice. (Cl. Exhibit 9, Claimant's resume as of June 2021, Davis 000566-000568). Elise Anaya, a Hispanic female was hired for the Claims Associate position. (MSJ 8:12-13). Claimant contends Anaya's experience and education fell short of what the position required.  Anaya had a bachelor's degree and no experience in insurance. (Cl. Exhibit 10, Elise Anaya's Resume, p. 10, UBER 002402-2403). Her resume reflects that prior to being employed by

---

[2] Respondent hired the following individuals for the weekday Claims Associate position for requisition 48002: Elise Anaya (Hispanic or Latino), Justin Gill (White), James Anolick (White), Bernitha Davis (African American), Harry Moore (White), and Jacob Henry (White). Additionally, Uber hired the following individuals for the weekend Claims Associate position for requisition 46762: Michael Smith (two or more races), Briana Lyles (African American), Reyna Villegas (Mexican), Teaon Thortvedt (African American), Raymond Ronan (White), Lauren Gault (African American), Jaime Cantu (Mestizo), Christina Ortiz (unknown), Tiani Medrano (Hispanic or Latino), and Faith Dyer (White). (Resp. Exhibit G, Yogerst Decl. ¶ 15).

Respondent, her experience was low-level and irregular, including working as an intern for a magazine, a video game salesperson at GameStop, a salesperson at Arizona Science Center, and a medical billing associate. (*Id*.). Claimant claims he received inconsistent and contradictory explanations as to why he was not selected for the Claims Associate position.

Respondent justifies the decision to hire Anaya instead of Claimant by claiming she performed better at her interview and that Claimant did not answer questions fully. (MSJ 20:19-21; 7:18-8:2). However, Respondent recommended Lauren Gault and Briana Lyles for hire even though their interview scorecards said they provided short, non-specific responses that appeared to be a problem to the interviewers. (Cl. Exhibit 13, Team Interview Scorecards for Lauren Gault, Bates Nos. UBER 006963-006966, UBER 006968-006970, and UBER 006975; Team Interview Scorecards for Briana Lyles at Bates Nos. UBER 006979 and UBER 006981-006982).[3]

Finally, Respondent further claims that the discrepancy between Claimant and Anaya's experience and education was irrelevant. (MSJ 20:13-16.) In discovery, Respondent produced a compilation of interview scorecards for others who were considered for the position. (Cl. Exhibit 13, Claims Position Interviewee Resumes and Scorecards). Claimant contends these scorecards demonstrate that Respondent seriously considered applicants' experience, noting experience in almost every single applicant's scorecard. (*Id*.). Claimant states scorecards consistently noted that a lack of insurance experience was a major problem, including the scorecards of Anaya, Faith Dyer, Reyna Villegas, Bernitha Davis, Justin Gill, Ray Ronan, Michael Smith, Tiani Medrano, and Lauren Gault. (*Id*.; Cl. Exhibit 13, Team Interview Scorecards for Anaya at UBER 006933 and UBER 006935; for Villegas at UBER 006941, Ray Ronan at UBER 006938 and UBER 006940; for Justin Gill at  UBER 006932, UBER 006939, and UBER 006948; for Michael

---

[3] Respondent admitted that it failed to provide any other information on the interviewees' performance at interviews, so it is difficult for the Arbitrator to make a true comparison. (Cl. Exhibit 14, Respondent's Fifth Supplemental Response to First Request for Production, 4:5-7, stating "Uber has been unable to locate the written assessments or interview notes for these individuals but will supplement if these documents are located.").

Smith at UBER 006946-006947 and UBER 006949; for Tiani Medrano at UBER 006956-006957, UBER 006958-006962, and UBER 006973; for Bernitha Davis at UBER 006976 and UBER 006980; for Lauren Gault at UBER 0069631- UBER 006966, UBER 006968-006970, and UBER 006975; and for Faith Dyer at  UBER 006983-006986). Jaime Cantu's experience in skilled labor, like  Anaya's, was called into question several times across interviewers' notes. (*Id.*; Cl. Exhibit 13, Team Interview Scorecards for Jaime Cantu at UBER 006951, UBER 006953-006955, and UBER 006958).

### 3.  Claimant is Removed From The Task Force Due to His Failure to Meet Required Metrics and Disciplined Due to His Misuse of Project Time.

During April 2019, Claimant's CSAT scores fell below the required threshold to remain on Task Force. Specifically, his score for the week of April 1st was 3.20, his score for the week of April 8th was 4.26, his score for the weeks of April 15th and 22nd was 3.00, and his score for the week of April 29th was 4.00. (Resp. Exhibit A, Davis Depo. 77:10 – 78:2 & Exhibit 10). As a result, and per the established protocol, on May 2, 2019, Claimant was removed from Task Force. (Resp. Exhibit A, Davis Depo. 77:10 – 78:2; Exhibit 10). Claimant's Team Lead, Rebeca Garcia, and Manager, Samantha Johnson, communicated this decision. (*Id.*). Garcia and Johnson also placed Claimant on coaching plan that set forth various tools to assist Claimant in improving his CSAT scores. (Resp. Exhibit A, Davis Depo. 78:25 – 79:4; Exhibit 11).  Diana Velazquez (female, Hispanic or Latino), was also removed from Task Force for this same reason and similarly placed on a coaching plan. (Declaration of Evette Plant ("Plant Decl."), Resp. Exhibit F, ¶ 7; Exhibit 1).  Indeed, Respondent has issued similar performance plans or terminated other employees in the same line of business ("LOB") for failing to meet CSAT metrics. (Resp. Exhibit F, Plant Decl. ¶ 8; Exhibit 2).

On May 2, 2019, Garcia noticed that Claimant had not logged into the phone queue during his entire shift. (Resp. Exhibit D, Gibson Decl. ¶ 10; Exhibit 2; Resp. Exhibit E, Garcia Decl. ¶ 7; Exhibit 1). Garcia also discovered Claimant was offline from the phone queue during his entire shift on May 1, 2019 and for the majority of his shift on April 30,

2019 as well. (Resp. Exhibit D, Gibson Decl. ¶ 10; Exhibit 2; Resp. Exhibit E, Garcia Decl. ¶ 7; Exhibit 1). This was unusual for a CSR as an essential function of this position is to provide customer support telephonically to Drivers and Riders. (Resp. Exhibit A, Davis Depo. 64:3-12; Resp. Exhibit E, Garcia Decl. ¶ 7).

This raised concerns to Garcia that if Claimant was not logged into the phone queue during his entire shift, he may have been in Project Time for more than the allowed three hours. (Resp. Exhibit C, Cane Decl. ¶ 7). If he was on Project Time status, then he was not performing his essential and required CSR duties and not receiving important performance metrics that come from customer interactions. (*Id.*). Garcia presented this information to Johnson, who informed her supervisor, David Cane, Program Lead, about Claimant's failure to log into the phones and potential overuse of Project Time. (Resp. Exhibit C, Cane Decl. ¶ 7; Resp. Exhibit E, Garcia Decl. ¶ 8; Exhibit 2).

Respondent began an investigation into Claimant's use of Project Time between April 2 – May 2, 2019, and whether Claimant had been informed of the three-hour limitation. (Resp. Exhibit C, Cane Decl. ¶ 8). On May 8, 2019, Cane and Garcia met with Claimant to discuss his overuse of Project Time, because when he was using Project Time, he was not performing his essential CSR duties or obtaining essential performance metrics. (Resp. Exhibit C, Cane Decl. ¶ 7, 9; Resp. Exhibit E, Garcia Decl. ¶ 9). Cane followed up with an email to Claimant on May 9, 2019, setting forth the dates and hours of Claimant's Project Time as well as links to various documents Claimant received setting forth the three-hour limitation for Project Time. (Resp. Exhibit A, Davis Depo. 82:8 – 84:5; Exhibits 12, 13, 14; Resp. Exhibit C, Cane Decl. ¶ 9; Exhibits 1, 2).

Respondent also conducted an audit of Project Time use for the relevant Task Force members to determine if others on the Task Force were using Project Time in the same manner. (Resp. Exhibit B, Cane Depo. 37:3 – 38:19; Resp. Exhibit C, Cane Decl. ¶ 10). The audit revealed that Claimant's Project Time was 90% higher than the other Task Force members. (Resp. Exhibit C, Cane Decl. ¶ 11; Exhibit 3).

Garcia and Johnson, who were Claimant's supervisors, confirmed that Claimant was never authorized or instructed to use so much Project Time. (Resp. Exhibit C, Cane Decl. ¶ 12). Claimant argued he had permission to work more than the maximum of three-hours of Project Time, but Cane reviewed Claimant's arguments, spoke with relevant managers, and determined that Claimant did not have permission to use Project Time more than three hours per shift. (Resp. Exhibit B, Cane Depo. 40:9-23; 72:20 – 73:23; Exhibit 12; Resp. Exhibit C, Cane Decl. ¶ 13; Resp. Exhibit G, Yogerst Decl. ¶ 10-11).

Based on the audit, Cane, in conjunction with Human Resources, determined Claimant's use of Project Time violated its Standard of Conduct and attendance/schedule adherence policies because he did not have permission to use Project Time more than three hours per shift and he was not performing his required call duties as a CSR when misusing Project Time. (Resp. Exhibit B, Cane Depo. 37: 1 – 38: 19; Resp. Exhibit C, Cane Decl. ¶ 15). As noted above, Claimant went days without logging into the phone queue despite the fact that responding to calls is his primary duty as a CSR. (Resp. Exhibit E, Garcia Decl. ¶ 7; Exhibit 1) As a result, on May 28, 2019, Garcia drafted a Final Written Warning for Claimant. (Resp. Exhibit C, Cane Decl. ¶ 18). On May 30, 2019, Garcia and Cane met with Claimant to present him with the Final Written Warning for misconduct based on his overuse of Project Time in the Task Force. (Resp. Exhibit A, Davis Depo. 84:9 – 86:10; Exhibit 15; Resp. Exhibit C, Cane Decl. ¶ 16; Resp. Exhibit E, Garcia Decl. ¶ 10).

### 4. Claimant is Placed on a Coaching Plan and Subsequently Files Internal Complaints.

On May 2, 2019, Claimant was put on a Coaching Plan to improve his Customer Satisfaction (CSAT) scores. (Cl. Exhibit 15, May 2, 2019, Coaching Plan, UBER 000959-000960). He was soon thereafter removed from the Coaching Plan on June 24, 2019, because of a system malfunction which calculated the CSAT scores incorrectly. (Cl. Exhibit 17, Email to Claimant from Rebecca Garcia titled "1:1 Recap June 19, 2019" Davis 000272-000273). This was used against Claimant once again, when he was put on a second Coaching Plan on July 18, 2019, even though the scoring system continued to malfunction.

(Cl. Exhibit 16, Pages from Monthly Concierge Sync data for 2019, Davis 0001318-0001319; Cl. Exhibit 18, July 18, 2019, Coaching Plan, UBER 0001318-0001318; Cl. Exhibit 20, Davis Decl. ¶ 10).

On May 29, 2019, Claimant submitted a complaint through Respondent's Integrity Helpline claiming the hiring process was not consistent. (Resp. Exhibit A, Davis Depo. 91:19 – 92:15; Exhibit 17; Cl. Exhibit 19, Davis' May 29, 2019, Internal Complaint, UBER 000001-000002). Although Claimant's Declaration contends the internal complaint was for sex and race discrimination (Cl. Exhibit 20, Davis Decl. ¶ 9), a careful review of the internal complaint he actually filed reveals there were no allegations of unlawful discrimination in this complaint. (Cl. Exhibit 19).

On May 30, 2019, Claimant submitted a second complaint claiming that he was retaliated against for submitting his initial complaint the previous day related to his abuse of Project Time that same day. (Resp. Exhibit A, Davis Depo. 92:19 – 94:21; Cl. Exhibit 18). Claimant also submitted a third complaint on May 30, 2019 alleging retaliation. (Resp. Exhibit A, Davis Depo. 94:25 – 95:17; Exhibit 19). Notably, neither Garcia nor Cane, the leaders who provided Claimant with his May 30, 2019 Final Written Warning, had knowledge of his May 29th complaint about the Claims Associate hiring process at the time they issued the Final Written Warning. (Resp. Exhibit C, Cane Decl. ¶ 17; Resp. Exhibit E, Garcia Decl. ¶ 11; Resp. Exhibit G, Yogerst Decl. ¶ 12). Further, the Final Written Warning was drafted prior to the May 29, 2019 ethics complaint. (Resp. Exhibit C, Cane Decl. ¶ 18; Exhibit 4). After submitting these internal complaints, Claimant began secretly recording select conversations with Respondent's employees using a Fitbit device. (Resp. Exhibit A, Davis Depo. 109:4 – 111:13).

Claimant's three complaints were submitted to Chelsea Yogerst, an Employee Relations ("ER") investigator, to investigate. (Resp. Exhibit G, Yogerst Decl. ¶ 6-7, Exhibits 1, 2). It is the job of the ER investigator to conduct workplace investigations into employee relations concerns promptly, thoroughly, and with neutrality. (Resp. Exhibit G, Yogerst Decl. ¶ 5). Yogerst and other Respondent Uber ER employees attempted to

interview Claimant about his allegations, but he refused to meet with them. (Resp. Exhibit A, Davis Depo. 98:7 – 105:20; Exhibits 20, 21, 22; Resp. Exhibit G, Yogerst Decl. ¶ 8; Exhibit 3). Yogerst conducted a thorough investigation into Claimant's claims, which included interviewing twelve witnesses and examining multiple documents. (Resp. Exhibit G, Yogerst Decl. ¶ 9; Exhibit 4). Based on her investigation, Yogerst did not substantiate Claimant's allegations and concluded he was treated fairly throughout the interview process and the hiring decision for the Claims Associate position, the issuance of the Final Written Warning, and his removal from the Task Force. (Resp. Exhibit G, Yogerst Decl. ¶ 9-13; Exhibit 5). Yogerst closed out her investigation with Claimant on July 23, 2019. (Resp. Exhibit G, Yogerst Decl. ¶ 16; Exhibit 6).

### 5. Respondent Continues to Use Various Tools to Help Claimant Improve His Performance Metrics to Meet Minimum Standards and Continues to Investigate the Numerous Complaints Raised by Claimant.

In April 2019, Respondent released a different phone system that resulted in customer satisfaction surveys being sent to Riders and Drivers in the Uber App rather than the survey being conducted at the end of the phone call with the CSR. (Resp. Exhibit C, Cane Decl. ¶ 19). This led to a decrease in the number of customer satisfaction surveys that Respondent received and caused the CSAT ratings for all CSRs to drop. (*Id*. ¶ 19, 20; Exhibit 5). As a result, Uber changed its required CSAT scores for CSRs from a set number (previously 4.8/5) and instead based the metrics on the average CSAT scores for other CSRs in the same line of business. (Resp. Exhibit C, Cane Decl. ¶ 21, 22). On June 24, 2019, Garcia alerted Claimant that Uber would remove him from the coaching plan he was issued on May 2, 2019 as a result of these changes while Uber worked through the new CSAT metric system. (Resp. Exhibit A, Davis Depo. 113:21 – 115:3; Exhibit 25).

After implementing the new CSAT metrics based on LOB average, Claimant continued to receive CSAT scores that were lower than the LOB average for three consecutive weeks. (Resp. Exhibit A, Davis Depo. 117:3-7; 117:25 – 118:2; Exhibit 27). As a result, on July 18, 2019, Garcia issued Claimant a coaching plan setting forth tools

and opportunities to help Claimant increase his individual CSAT score to meet or exceed the LOB average. (Resp. Exhibit A, Davis Depo. 116:19 – 118:2; Exhibit 27). Claimant argued that the scores were unfair because of the change in the phone system, but Garcia explained that Uber had moved to the LOB average in response to the lower number of surveys, so Claimant was fairly evaluated in comparison to his peers. (Resp. Exhibit A, Davis Depo. 118:6 – 16; Exhibit 28). Indeed, the new CSAT score compared the same team doing the same work at the same time, so it was even more of an equitable measure than the previous CSAT standard of 4.8/5. Cane also provided Claimant with additional information to questions he had about his metrics and how they were calculated. (Resp. Exhibit A, Davis Depo. 126:11 – 128:20; Exhibits 33, 34). Evette Plant, Human Resources Business Partner, also offered to meet with Claimant to explain his metrics and walk through any questions he may have when he expressed concerns of retaliation, but Claimant declined to  meet with her. (Resp. Exhibit A, Davis Depo. 123:9 – 126:7; 127:4 – 128:4;  Exhibits 32, 34; Resp. Exhibit F, Plant Decl. ¶ 9; Exhibit 3).

Shortly after Claimant was placed on his coaching plan, Garcia requested that Johnson attend her weekly 1:1 meetings with Claimant because Garcia did not believe they were productive and was uncomfortable with her interactions with Claimant. (Resp. Exhibit E, Garcia Decl. ¶ 13; Cl. Exhibit 2, Krystal Harding Depo. 107:24 – 119:20). In particular, there was a 1:1 on May 16, 2019 in which Garcia felt Claimant was passive aggressive and dismissive of any coaching. (Resp. Exhibit E, Garcia Decl. ¶ 12; Exhibit 3). Claimant's attitude, tone, and body language caused Garcia to feel uncomfortable during the meeting. (*Id.*).

Additionally, as demonstrated by the recordings provided by Claimant, there was a 1:1 meeting on July 24, 2019 with both Garcia and Johnson where Claimant was not receptive to the coaching and instead began arguing with his managers. (Resp. Exhibit A, Davis Depo. 189:4-11; Exhibit 61; Transcript of July 24, 2019 meeting and electronic recording, Resp. Exhibit J). The recording confirms Claimant's tone was loud and rather aggressive to the point that Johnson informed Claimant that he was bullying her and she

asked that he change the way he was talking to her. (Resp. Exhibit J.) Garcia also stated that Claimant was bullying Johnson. (*Id.*).

In August 2019, Cane began conducting 1:1 meetings with Claimant because both Garcia and Johnson felt uncomfortable with their interactions and that the meetings were not productive. (Resp. Exhibit A, Davis Depo. 118:20 – 120:18; 122:15-20; Exhibits 29, 30; Resp. Exhibit B, Cane Depo. 85:19 – 86:7; Resp. Exhibit E, Garcia Decl. ¶ 12;  Cl. Exhibit 2, Harding Depo. 107:24 – 119:20).

Johnson then sat in on the 1:1 meetings with Claimant and thereafter told Cane that she herself also did not feel comfortable having effective, efficient 1:1 conversations with Davis. (Resp. Exhibit B, Cane Depo. 85:19 – 86:7). Garcia and Johnson mentioned that they felt uncomfortable because Davis was not receptive when they would address him during the 1:1s, present him with his metrics, coach him, and try to give him recommendations. (Resp. Exhibit B, Cane Depo. 88:5-15; Resp. Exhibit E, Garcia Decl. ¶ 12). Garcia and Johnson stated that Claimant would often deny or argue the validity of the suggestions provided during the 1:1s and felt the meetings were not productive. (*Id.*). As a result, Cane began conducting 1:1s with Claimant and found the 1:1s to not be productive for similar reasons—Claimant was not receptive and seemed to want to argue and debate every statement, key performance indicator ("KPI"), or recommendation, and gave off the impression that he did not want to get better and was very defiant. (Resp. Exhibit B, Cane Depo. 89:7-17).

Claimant continued to raise complaints about his metrics, about Cane and Plant being involved in his performance management, and about alleged discriminatory and retaliatory treatment.  Respondent regularly attempted to meet with Claimant to discuss his concerns and investigate Claimant's internal complaints. (Resp. Exhibit A, Davis Depo. 128:8-11; 130:16 – 132:14; Exhibits 34, 35). Claimant also continued to have low CSAT scores.

On September 12, 2019, Cane met with Claimant and alerted him that he was "still significantly below expectations for CSAT" and discussed with Claimant "next steps in

regard to [him] not meeting expectations of [his] coaching plan." (Resp. Exhibit A, Davis Depo. 122:15 – 123:4; Exhibit 31). Cane also informed Claimant that Cane was leaving Respondent and that leadership would be contacting Claimant to let him know who would be facilitating his 1:1 meetings going forward. (*Id.*).

Cane's employment with Uber ended in September of 2019. (Resp. Exhibit B, Cane Depo. 9:10-11). After Cane left his employment, his direct report, Krystal Harding, Senior Community Operations Manager, and Ben Burgos, Operations Manager, took over the role of attending Claimant's 1:1 meetings. (Cl. Exhibit 2, Harding Depo. 7:3-7; 67:12-16; Krystal Harding Declaration ("Harding Decl."), Resp. Exhibit K, ¶ 4).

Because Claimant had not successfully completed his coaching plan as his CSAT scores were under LOB average, on September 24, 2019, Harding and Burgos presented Claimant with a development plan, which is often the performance tool used after a coaching plan. (Resp. Exhibit A, Davis Depo. 132:16 – 133:7; Exhibit 36; Resp. Exhibit B, Cane Depo. 14:20 – 18:2). Claimant admits that failing to meet CSAT scores is a legitimate reason for Respondent to place someone on a development plan. (Resp. Exhibit A, Davis Depo. 134:15-18). Under the development plan, Respondent implemented a number of tools designed to help Claimant improve his CSAT scores, including reverse shadowing and coaching sessions. (Resp. Exhibit A, Davis Depo. 134:19-25). In response to the development plan, Claimant sent an email to Harding alleging that it was retaliatory and harassing. (Resp. Exhibit A, Davis Depo. 135:11 – 136:21; Exhibit 38; Resp. Exhibit G, Yogerst Decl. ¶ 17; Exhibit 7). As a result, Harding referred Claimant's emailed complaint to Yogerst to conduct an investigation. (Resp. Exhibit A, Davis Depo. 135:11 – 136:21; Exhibit 38). Once again, Claimant refused to meet with Yogerst to investigate his latest complaints of discrimination and retaliation. (*Id.*).

In October 2019, Burgos and Harding continued to meet with Claimant to help him improve, and Claimant continued to raise allegations against Respondent, including that Harding (who is the same race as Claimant) was "attempt[ing] to paint [him] as an aggressive, angry black male . . ." (Resp. Exhibit A, Davis Depo. 136:25 – 138:16; Exhibit

39; Cl. Exhibit 2, Harding Depo. 64:12 – 67:16). Respondent continued to respond to Claimant's questions about metrics and referred his discrimination and retaliation complaints to Yogerst for investigation. (*Id.*; Resp. Exhibit G, Yogerst Decl. ¶ 18; Exhibit 8).

**6.   The October 2019 Interaction Between Claimant and Ruffin Chevaleau.**

On October 16, 2019, Ms. Ruffin Chevaleau, the Phoenix COE Site Leader, reported to Harding that she had a negative interaction with Claimant in which he seemed frustrated and rolled his eyes at her and sucking his teeth when she was speaking to him. (Cl.  Exhibit 2, Harding Depo. 44:3 – 51:7; Cl. Exhibit 1, Employee Relations Investigation Report dated November 7, 2019, UBER 001311-1328). Because Harding was Claimant's supervisor, Harding delivered Chevaleau's feedback to him, including that Claimant made frustrated and annoyed noises. (Cl. Exhibit 2, Harding Depo. 41:8 – 42:10; 51:4-7). Claimant responded by emailing Chevaleau, and copying his entire management team, Yogerst, and multiple of Respondent's executives that he believed Harding's coaching regarding his interaction with Chevaleau was discriminatory and retaliatory. (Resp. Exhibit A, Davis Depo. 138:20 – 140:25; Exhibit 40; Resp. Exhibit G, Yogerst Decl. ¶ 19; Exhibit 9). Claimant's discrimination and retaliation complaint was included in Yogerst's ongoing investigation and, again, Claimant refused to be interviewed as part of the investigation. (Resp. Exhibit A, Davis Depo. 140:17-25; 145:6-15;  Exhibit 44; Resp. Exhibit G, Yogerst Decl. 22; Exhibit 12).

Harding confronted Davis about using noises on a recording with Davis:

Ruffin mentioned yesterday to me that she had an interaction with you in the break room where you seemed kind of frustrated, and her perception was that when she spoke to you, that you sucked your teeth and rolled your eyes a little bit.

14

(Cl. Exhibit 2, Harding Depo. 45:10-14; 44:2-5, 11, 45:10-14, 23-24, 46:1-14, 47:20-23, 48:6-10, 23-49:4) (playing a recording of Harding with Claimant, then being questioned about it) (Exhibit 3, recording, Davis 3385).

In her deposition, Harding explained:

> Q.· ·What feedback were you sharing with Sir Lawrence?
> A.· ·Ruffin's perceived interaction with him.
> Q.· ·And what did she say about her interaction with Sir Lawrence?
> A.· ·That they passed each other in the break room. She spoke to him.
> · And he looked away or rolled his eyes or sucked his teeth, I don't
> know, some variation of that, but didn't speak to her.

(Cl. Exhibit 2, Harding Depo.  38).

Although there is no evidence in the record of any of Respondent's employees, managers, or supervisor making any type of racial comment or epithet, Claimant claims to have been "highly offended" by this inquiry and directly confronted Chevaleau. He wrote to her, copying HR and others: "I believe this [accusation of sucking his teeth and rolling his eyes] is another attempt to create a false narrative in an effort to assassinate my character and paint me as an angry black man." (Cl. Exhibit 4, October 17, 2019, email to Ruffin Chevaleau, Davis 000216-000217).

Several days later, Harding asked to meet with Claimant to address the accusations that he did not say "Hello" to Chevaleau. (*Id*.). Claimant stated that he did not hear Chevaleau say "Hello." (*Id*.) He denied having done this and complained to Respondent that Chevaleau's accusation was evidence which supported Claimant's "angry black person" mantra. (*Id*.). Chevaleau and Harding warned Claimant that not saying hello was not appropriate. (*Id*.). When asked about reporting Claimant's behavior, Chevaleau denied it, and Respondent apparently believed her. (*Id*.). Chevaleau denied having any racial animus. (*Id*.).

As a further example offered by Claimant demonstrating what he calls  the "angry black person" trop, he contends that in a meeting between Claimant and his managers Rebeca Garcia and Samantha Johnson, Garcia and Johnson spent half an hour discussing

Claimant's continued failure to meet performance expectations and when he reasonably defended himself, they accused *him* of bullying them and making them feel uncomfortable. (Resp. Exhibit J, Rebeca Garcia Recording on 2019-07-24). The Arbitrator has reviewed the recording of the meeting and finds Claimant was "aggressive" and clearly not receptive to coaching and the recording is totally devoid of any racial overtones.

### 7. Claimant is Placed on a PIP for Low CSAT Scores, He Receives Another Written Final Warning and Is Ultimately Terminated.

Claimant's metrics continued to fall below LOB average and he did not successfully complete his development plan. (Resp. Exhibit A, Davis Depo. 135:4-7; Exhibit 37; Resp. Exhibit K, Harding Decl. ¶ 6). As a result, Harding informed Claimant that he would be moving to a performance improvement plan ("PIP"). (Resp. Exhibit A, Davis Depo. 141:19 – 143:2; Exhibit 42; Resp. Exhibit K, Harding Decl. ¶ 6). Claimant argued that he was experiencing unfair treatment and requested Yogerst to investigate. (*Id.*). Specifically, Claimant alleged Johnson, Burgos, and Harding were engaged in "retaliatory" behavior by issuing an "unwarranted" PIP. (Resp. Exhibit G, Yogerst Decl. ¶ 20 – 21; Exhibits 10, 11).

On Tuesday, October 29, 2019, Harding approached Claimant for their scheduled 1:1 with the intent of giving him the PIP that she told him he would be receiving. (Resp. Exhibit A, Davis Depo. 141:19-23; Exhibit 42; Cl. Exhibit 2, Harding Depo. 70:17 – 73:7; Resp. Exhibit K, Harding Decl. ¶ 7). In response, Claimant stated that he was unavailable and leaving for the day (in the middle of his scheduled shift). (Resp. Exhibit A, Davis Depo. 143:8-21; 144:11-24; Resp. Exhibit K, Harding Decl. ¶ 8). Harding asked Claimant to meet the following day, but Claimant said he would not be able to meet with her until Friday. (Resp. Exhibit A, Davis Depo.143:13-21; Cl. Exhibit 2, Harding Depo. 70:17 – 71:16; Resp. Exhibit K, Harding Decl. ¶ 9). Claimant emailed multiple managers and senior leadership of Respondent, as well as HR, claiming that Harding was "bullying" him which allegedly caused him to have "several asthma attacks" due to "the stress of Uber's environment." (Resp. Exhibit A, Davis Depo.143:3 – 144:2; Exhibit 43; Resp. Exhibit G, Yogerst Decl. ¶ 23; Exhibit 13).

On October 31, 2019, Harding delivered Claimant his PIP via email because Claimant had been unable to meet on either of the previous two days, which Harding believed constituted insubordination because Claimant had refused to attend the scheduled meeting for days which delayed the issuance of his PIP. (Resp. Exhibit A, Davis Depo. 146:14 – 147:4; Exhibits 46, 47; Resp. Exhibit F, Plant Decl. ¶ 11). Claimant continued to argue to Respondent's leadership and Human Resources that Harding was engaged in "harassment and bullying behavior." (*Id.* at Exhibit 46). Plant responded that Claimant's allegations have all been forwarded to Respondent's ER Investigations Team and were actively being investigated, agreed with Harding's assessment that Claimant was being insubordinate, and provided Claimant with Employee Assistance Program ("EAP") information. (*Id.* at Exhibit 46).

On November 5, 2019, Harding and Burgos were finally able to meet with Claimant to go over the PIP. (Resp. Exhibit A, Davis Depo. 147:2 – 148:23; Exhibit 47; Cl. Exhibit 2, Harding Depo. 94:2-19). The PIP was in effect from October 31, 2019 to November 28, 2019, during which Claimant was expected to improve his CSAT score, and Burgos and Harding continued to meet with him weekly throughout the PIP to track his progress and provide feedback designed to help improve his metrics. (Resp. Exhibit A, Davis Depo. 149:3-13; Exhibit 47).

Also on November 5, 2019, Harding presented Claimant with a Misconduct Final Written Warning due to his insubordination, disruptive and disrespectful behavior, and refusal to cooperate in investigations. (Resp. Exhibit A, Davis Depo. 149:23 – 152:25; Exhibit 48; Cl. Exhibit 2, Harding Depo. 68:19 – 79:24; Resp. Exhibit F, Plant Decl. ¶ 11).

Yogerst investigated Claimant's continuing allegations of discrimination and retaliation and concluded that Respondent's actions were not in violation of its discrimination, harassment, or retaliation policies. (Resp. Exhibit G, Yogerst Decl. ¶ 24-27; Exhibits 14, 15). On November 7, 2019, Yogerst met with Claimant to discuss the outcome of her investigation. (Resp. Exhibit A, Davis Depo. 145:22 – 146:10; Exhibit 45; Resp. Exhibit G, Yogerst Decl. ¶ 28; Exhibit 16). Claimant raised additional concerns

related to the PIP and Final Written Warning, and Respondent informed him these concerns would be investigated. (Resp. Exhibit A, Davis Depo. 153:4-19; Exhibits 45, 49). Claimant submitted follow-up information regarding his new concerns and complaint on December 2, 2019. (Resp. Exhibit A, Davis Depo. 153:23 – 157:8; Exhibit 50).

### 8.   Claimant Accesses Manager-Only Performance Documents, Sends Them to His Personal Email Address And Discusses the Issue With his Managers.

During his employment, Claimant executed a Confidential Information and Invention Assignment Agreement and acknowledged Uber's Network & Device Acceptable Use Policy. (Resp. Exhibit A, Davis Depo. 158:1-20; Exhibits 52, 53). Under Uber's Network & Device Acceptable Use Policy, Uber employees are specifically prohibited from "[c]opying, moving or storing nonpublic Uber information to local hard drives or portable electronic media such as external hard drives or USB drives, unless required for a defined business need" and from "[c]opying, publishing, sharing or storing Uber information on or to unauthorized third-party platforms and services unless prior approval is obtained . . ." (Resp. Exhibit A, Davis Depo.  Exhibit 53).

On October 25, 2019, Claimant located and accessed Uber-leadership only documents on Respondent's computer system specifically labeled "Leadership Tracker – Do Not Share." (Resp. Exhibit A, Davis Depo. 158:21 – 160:1). These spreadsheets helped Uber leadership track employee performance and contained private performance and behavioral information and discipline for employees in the LOB. (*Id.*; Resp. Exhibit K, Harding Decl. ¶ 10). The documents were intended for  management only, as expressly indicated on the first tab "THIS SHEET IS CONFIDENTIAL – MANAGERS & UP ONLY" in bolded capital letters with a red background. (Resp. Exhibit K, Harding Decl. ¶ 11). The tracker contained links to confidential documents concerning other Uber employees' performance reviews, including coaching, development, and performance improvement plans. (Resp. Exhibit K, Harding Decl. ¶ 12). Some of the files Claimant accessed were archived performance documents and not even current. (Resp. Exhibit A,

Davis Depo. 172:8-13). As a non-manager, Claimant had no right to access these files. (Resp. Exhibit K, Harding Decl. ¶ 13).

Claimant downloaded these confidential files onto his work computer and then emailed these files to himself using his personal email account. (Resp. Exhibit A, Davis Depo. 159:14 – 160:1; 161:22 – 163:16; 164:7-18 – 165:25; Exhibits 55, 56, 57, 58). These actions were brought to Harding's attention after Claimant's name was seen in the editing history of a manager-only document. (Cl. Exhibit 2, Harding Depo. 96:7 – 100:24). As a result, on November 19, 2019, Harding and Burgos met with Claimant to discuss his conduct, which meeting was again secretly recorded by Claimant. (Resp. Exhibit A, Davis Depo. 172:25 – 175:23, 179:19 – 180:16; Transcript of November 19, 2019 meeting and electronic recording, Resp. Exhibit M).

During this conversation, Claimant denied still having access to these leadership tracker documents despite the fact that he downloaded the documents onto his computer and emailed them to his personal email account. (*Id.*). After his discussion with Harding and Burgos denying he had access to this information, Claimant called his mother and informed her that "they mad because I accessed a confidential . . .you know how I told you I found a bunch of stuff? . . ." (Resp. Exhibit A, Davis Depo. 181:16 – 183:19; Exhibit M).

### 9. Respondent Terminates Claimant After He Fails to Meet The Metrics Set Forth in His PIP.

Claimant's metrics did not improve and he continued to fail to meet CSAT score requirements in the PIP. (Resp. Exhibit K, Harding Decl. ¶ 14; Cl. Exhibit 2, Harding Depo. 28:14- 16; 95:6 -96:4). As a result, Harding and Burgos met with Claimant on December 3, 2019 and informed him that his employment was terminated due to performance. (Resp. Exhibit A, Davis Depo. 185:7-19; Resp. Exhibit H, Harding Decl. ¶ 14.).

Yogerst continued her investigation into Claimant's most recent concerns, including his allegation that his December 3, 2019 termination was discriminatory and retaliatory. (Resp. Exhibit G, Yogerst Decl. ¶ 29). On January 3, 2020, Yogerst finalized her report. (Resp. Exhibit G, Yogerst Decl. ¶ 30; Exhibits 17, 18). On January 13, 2020, Yogerst

informed Claimant she had completed the investigation into his concerns and they were unsubstantiated. (Resp. Exhibit A, Davis Depo. 157:12-15; Exhibit 51; Resp. Exhibit G, Yogerst Decl. 31; Exhibit 19).

Respondent confirmed that Claimant had misappropriated confidential information and on January 6, 2020, Respondent's legal counsel contacted Claimant about his violation of the Confidential Information and Invention Assignment Agreement and Uber's Network & Device Acceptable Use Policy. (January 6, 2020 email from Uber's legal counsel, Resp. Exhibit N). Upon not receiving a response, Uber's legal counsel followed up with Claimant again on January 22, 2020 about his conduct. (*Id.*).

Uber's Human Resources Business Partner stated that:
Uber considers violations of Uber's Confidential Information and Invention Assignment Agreement and Uber's Network & Device Acceptable Use Policy and lying during investigations to be offenses subject to discipline, up to and including termination. Had Mr. Davis been employed at the time we confirmed that he had misappropriated confidential employee records, Uber would have terminated his employment given the seriousness of his actions.

(Resp. Exhibit F, Plant Decl. ¶ 16). Claimant has put forth no evidence in the record that other employees who engaged in similar policy violations were not terminated - or any other evidence to refute Plant's testimony.

## B.  LEGAL ANALYSIS

In his Response, Claimant contends Respondent discriminated against him—an African American male—based on race, gender, and retaliation when it allegedly:

● Denied him the Claims Associate position, citing subjective criteria (interviewing skills) and choosing a white female who was objectively less qualified;

● Punished him for overuse of "Project Time," but not others who overused "Project Time;"

● Disciplined him because of the way he complained about discrimination;

● Terminated him for low customer satisfaction scores, but not others with low scores; and

20

● Stereotyped him as an "angry black person."

(Claimant's Response, p. 1-2).

### 1. Did Respondent Discriminate Against Claimant When He Was Rejected for the Claims Associate Position?

To establish a claim of race discrimination under Title VII or 42 U.S.C. § 1981, Claimant must show that: (1) he belongs to a protected class; (2) he was performing satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Because respondent has set forth legitimate, non-discriminatory reasons for its actions, Claimant must prove by the preponderance of the evidence that "the proffered reason was not the true reason for the employment decision. ". . .directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Chuang v. Univ. of Calif., Davis, Bd. of Trs.*, 225 F.1115, 1124 (9th Cir. 2000).

Claimant claims Respondent selecting Elise Anaya for the Claims Associate position was discriminatory because of his master's degree and more experience than Anaya and he should have received the position. Respondent responds that Claimant compared himself to only one of the 16 people hired for the Claims Associate position and that Respondent hired people of Claimant's same race and same sex for the position; indeed, it argues that four African-American individuals and seven identified as males out of the 16 coworkers cuts against his discrimination claim. Respondent further relies on the subjective judgment of the three Team Leaders who unanimously recommended against hiring Claimant for the Claims Associate position in light of his verbal answers to interview questions and his written exercise  was unsatisfactory.

21

On June 15, 2020, in *Bostock v. Clayton County Board of Commissioners*, 140 S.Ct. 1731 (2020) the Supreme Court ruled in a 6-3 decision that Title VII's prohibition on workplace "sex" discrimination clearly encompasses discrimination based on one' sexual orientation transgender status because "homosexuality and transgender status are inextricably bound up with sex." Justice Gorsuch also spoke to Respondent's argument that because it hired other African Americans and males for the Claims Associate position, it did not discriminate against Claimant.

In essence, Respondent contends that it did not discriminate against Claimant because the evidence shows that it has treated others in Claimant's protected class well by hiring them into the Claims Associate position. But *Bostock* makes it clear this argument does not fly when it stated: "The consequences of the law's focus on individuals rather than groups are anything but academic. Suppose an employer fires a woman for refusing sexual advances. It is no defense for the employer to note that, while it treated the individual woman worse than it would have treated a man, it gave preferential treatment to female employees overall. The employer is liable for treating this woman worse in part because of her sex." Thus, the focus is how the employer treats the individual, not how it treats a group.

The Arbitrator has reviewed the resumes and scorecards of the individuals who applied for the Claims Associate position which are part of the record. From the scorecards, it is clear the interviewers did use some subjective criteria in evaluating the candidates for the Claims Associate position. "[T]he subjective nature of these criteria provides further circumstantial evidence that [the employer] denied [the employee] the promotion as a form of retaliation…." *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001); "Evidence of pretext may include .... the use of subjective criteria." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (citations omitted); *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) ("We have previously stated that subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized.") (citations omitted). "[A]n

employer's heavy use of "highly subjective" criteria, such as "interpersonal skills," could support an inference of discrimination. *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1298 (D.C. Cir. 1998) (citation omitted).

In light of the use of subjective criteria and Claimant's prior experience as an underwriter and a claims adjuster with Farmers Insurance Group as compared to Anaya's total lack of insurance experience, the Arbitrator finds genuine issues of material fact on the issue of whether Respondent discriminated against Claimant on account of his race and sex when it rejected him for the Claims Associate position. Respondent's Motion for Summary Judgment on this claim will therefore be denied.

### 2. Did Respondent Discriminate Against Claimant When He Was Disciplined for Overuse of Project Time?

Claimant claims Respondent subjected him to disparate treatment regarding the Project Time issue, for which he received a Final Written Warning on May 30, 2019. He contends several of his coworkers were allowed to work more than three hours on projects without any negative treatment or disciplinary action. In support of his contention, Claimant argues the following parts of the record demonstrate disparate treatment: Cl. Exhibit 26, Uber's Excel Spreadsheet depicting Verint data for Spring 2019, UBER 006871; Cl. Exhibit 20, Davis's Declaration ¶ 4; Cl. Exhibit 27, Task Force Project Times UBER 001164-001165; Cl. Exhibit 25, ACRD Interrogatories, UBER 001133-001134; and Cl. Exhibit 34, Email from Uber Counsel regarding race and gender of task force members:

He provides the following evidence to support his claim:

Jade Clark- White Female -Daily average - 4.50 hours Project Time – 12 days over 3.0 hours

James Anolick - White Male -Daily average - 8.97 hours Project Time -  10 days over 3.0 hours

Michelle Volrich – White Female – Daily average – 3.21 Project Time – 6 days over 3 hours

Keyandrea Scott – African American Female – Daily average – 3.05 Project Time -  6 days over 3 hours

(Cl. Exhibit 43, Sir Lawrence's Data Analysis of Uber's Excel Spreadsheet depicting Verint data for Spring 2019, Cl. Exhibit 26 UBER 006871; Cl. Exhibit 20, Davis's Declaration ¶ 4 (explaining Exhibit 43).  Although these individuals went over the three-hour maximum, unlike Claimant,  there is no evidence in the record that these individuals were disciplined for going over Project Time.

And Claimant further contends that Respondent ignored its progressive discipline policy by issuing the Final Written Warning instead of lesser disciplinary actions. (Claimant's Response, p. 27) and cites the following to support his contention:  Respondent had a progressive discipline system for behavioral infractions such as Project Time violation that includes a documented coaching, a final written warning, then an employment review by HR for termination. (Cl. Exhibit 5, David Cane Depo. 14:20-15:24, Uber had progressive discipline for *behavioral infractions*—first "Documented Coaching", then "Final Written Warning", then "Employment Review" by HR for termination; Cl. Exhibit 5, David Cane Depo. 79:19, "The overuse of project time is a behavioral thing…."; Cl. Exhibit 5, David Cane Depo. 15:7-12; 17:18-18:2, Uber also had progressive discipline for *behavioral infractions,* which has its "own different…course of correction."—first "Coaching Plan", then "Performance Improvement Plan", then "Employment Review" by HR for termination; Cl. Exhibit 5, David Cane Depo. 68:16-18, "Meeting CSAT score thresholds is *performance*, yes.").

Respondent counters that it conducted its own internal audit in May 2019 of Project Time and that Claimant's Project Time usage was nearly six hours per day and 90% higher than other Task Force members. (Resp. Exhibit B, Cane Decl, ¶ 11; Exhibit 3).  Similarly, Respondent attacks the audit Claimant prepared and contends Claimant's audit calculations do not make sense and that the Arbitrator should not second-guess Respondent's decisions or act as a "super personnel department," citing *Branscomb v. Group USA, Inc.*, 2010 WL 5151322, at *2 (D.Ariz. Dec. 13, 2010) (citing *Odima v. Westin Tuscon Hotel Co.*, 991

24

F.2d 595, 602 (9th Cir. 1993) (explaining "[t]he district court must not substitute its judgment about whether the employment decisions were wise, or even fair, for that of the employer");. *see also, DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."). Respondent further argues it does not have a progressive disciplinary process for behavior or performance issues and that its Handbook explicitly states that Respondent may use any level of discipline. (Uber U.S. Employee Handbook, Resp. Exhibit O; Cl. Exhibit 2, Harding Depo. 32:9-18).

The Arbitrator finds there are genuine issues of material fact as to whether Claimant was subjected to disparate treatment on account of his race and sex when other coworkers outside of his protected class were not disciplined for exceeding the three-hour Project Time limitation and Claimant's receipt of a Final Written Warning. Moreover, the Arbitrator also finds genuine issues of material fact concerning Respondent's progressive discipline policy in light of Cane's deposition testimony. The Arbitrator will deny Respondent's Motion for Summary Judgment on this claim.

### 3. Did Respondent Subject Claimant to Hostile Work Environment or Disparate Treatment Based on Race or Sex and Retaliation After Complaints?

#### (i)      The May 30, 2019 Final Written Warning.

Claimant argues he was subjected to unjustified discipline and evaluations that created a hostile work environment or subjected him to disparate treatment that was both due to his race and sex or due to retaliation for engaging in protected conduct starting with his May 29, 2019 complaint about the Claims Associate position which was followed by a second complaint on May 30, 2019 claiming he was retaliated against for submitting his initial complaint the previous day because he had received the Final Written Warning relating to Project Time. Claimant also submitted a third complaint on May 30, 2019

alleging retaliation.  (Resp. Exhibit A, Davis Depo. 92:19 – 92:21; Exhibit 18 and 94:25 – 95:17; Exhibit 19).

Claimant first alleges he received the Final Written Warning for his use of Project Time and his coworkers, who worked more than three hours per day on Project Time, were not.  The Arbitrator has addressed that issue in Section 2 above.  Claimant claims that the timing between the May 29, 2019 complaint and his receipt of the Final Written Warning on May 30, 2019 and subsequent termination establishes a causal link.

In order to prevail on a retaliation claim, it is Claimant's burden of proof to demonstrate: (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 693 (9th Cir. 2017). See, 42 U.S.C. § 12203(a). If the plaintiff makes a prima facie case of retaliation, "[t]he burden then shifts to the employer to provide a legitimate, [nonretaliatory] reason for the adverse employment action." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). "If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual" *Id.*; *see*, *Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472-73 (9th Cir. 2015) ("We apply the Title VII burden shifting framework, as established in McDonnell Douglas[,] to retaliation claims under the ADA.") (citations omitted).

"While oral complaints may constitute protected activity, the complaint must give the employer 'fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation.'" *Kasten v. Saint-Gobain Perf. Plastics Corp.*, 562 U.S. 1, 13 (2011). The complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." An informal complaint must concern some violation of law. *Id.*; *see also*, *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 276 (2009).

In reviewing the May 29, 2019 complaint, the term "discrimination" does not appear and Claimant admits there is no allegation of unlawful discrimination in that complaint.

26

(Resp. Exhibit A, Davis Depo. 91:19-92:15; Exhibit 17). Although an employee need not utter "magic words" to put his employer on notice that he is complaining about unlawful discrimination, *see*, *Kitchen v. WSCO Petroleum Corp.*, 481 F.Supp.2d 1136, 1145 (D.Or. 2007), an employer must reasonably be aware that its employee is engaging in protected activity. *See*, *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (discussing causal link).

When assessing the record to determine whether there is a "genuine issue for trial," the Arbitrator must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inference in his favor." *Horphag*, 475 F.3d at 1035 (citation omitted). Although a close question, the Arbitrator views Claimant's May 29, 2019 complaint just barely crosses the protected activity standard.

Moreover, in order to prevail on a retaliation claim, the Claimant must demonstrate the decision makers had knowledge of any protected activity. *Brooks v. Capistrano Unified School Dist.*, 1 F.Supp.3d 1029, 1037 (C.D. Calif. 2014) ("In general, if the decision maker does not have knowledge of the plaintiff's protected activity, there can be no retaliation for engaging in that activity.")  However, neither Garcia nor Cane, the leaders who provided Claimant with his May 30, 2019 Final Written Warning, had knowledge of his May 29th complaint about the Claims Associate hiring process at the time they issued the Final Written Warning.  (Resp. Exhibit C, Cane Decl. ¶ 17; Resp. Exhibit E, Garcia Decl. ¶ 11; Resp. Exhibit G, Yogerst Decl. ¶ 12).

Consequently, the Arbitrator grants Respondent's Motion for Summary Judgment on Claimant's claim that the May 30, 2019 Written Final Warning was retaliatory. Moreover, the Arbitrator finds that the Written Final Warning was not the result of a hostile work environment and has  entered his ruling on whether it was disparate treatment due to his race previously in this Order.

(ii)    **The November 5, 2019 Second Final Written Warning, Development Plan and Termination.**

a.  *Claimant's Claim of Discriminatory/Retaliatory Final Warning and Termination.*

The record demonstrates Claimant continued to have low CSAT scores during the summer of 2019.  On September 12, 2019, Cane met with Claimant and alerted him that he was "still significantly below expectations for CSAT" and discussed with him "next steps in regard to [him] not meeting expectation of [his] coaching plan." (Resp. Exhibit A, Davis Depo. 122:15 – 123:4; Exhibit 31).  Cane left Respondent later in September and Krystal Harding and Ben Burgos took over the rule of Claimant's 1:1 meetings.

On September 24, 2019, Harding and Burgos presented Claimant with a development plan, a performance tool used after a coaching plan.  Claimant admits that failing to meet CSAT scores is a legitimate reason for Respondent to place someone on a development plan. (Resp. Exhibit A, Davis Depo. 134:15-18).  Claimant believed the development plan was retaliatory and harassing and Yogerst was requested to investigate this claim.

In October, Burgos and Harding continued to meet with Claimant and Claimant alleged Harding (who is the same race as Claimant) was "attempt[ing] to paint Claimant as an aggressive, angry black male…" (Resp. Exhibit A, Davis Depo. 136:25 – 138:16; Exhibit 39).  When Claimant failed to complete his development plan successfully, Respondent decided to place Claimant on a PIP and Harding attempted to meet with Claimant to provide him with the plan, which meetings Claimant postponed until October 31, 2019.  During that meeting, Claimant again alleged Respondent was discriminating and retaliating against him. All of Claimant's complaints were investigated throughout 2019.

In light of Claimant's refusal to attend investigation related meetings with HR relative to his multiple complaints, his refusal to meet with Harding, and disruptive and disrespectful behavior, on November 5, 2019, a Second Final Written Warning was issued to Claimant.  Having reviewed the record submitted by the parties, the Arbitrator finds no evidence supporting Claimant's contention that the development plan, PIP, or the Second

28

Final Written Warning were discriminatory or retaliatory.  Moreover, in *Losa v. Salt River Project*, 2020 WL 3574592 (D. Ariz. 7-1-20), Judge Liburdi stated:

> Plaintiff has also not demonstrated that SRP's development plan was an adverse employment action.  Multiple courts have held that placing an employee on a development plan is not an adverse employment action for retaliation purposes.  *See, e.g., James v. C-Tran.*, 130 F. App'x 156, 157 (9th Cir. 2005) ("Because the performance improvement plan was non-disciplinary training that did not materially impact [plaintiff's] compensation, terms, conditions, or privileges of employment, it was not an adverse employment action; *Cozzi v. City of Marin*, 787 F.Supp.2d 1047, 1061 (N.D. Cal. 2011); ("Written warnings and performance improvement plans are not adverse employment actions where they do not materially affect the terms and conditions of employment.").  Seeing no evidence that Mr. Losa's improvement plan materially impacts his employment, this Cout agrees with these prior cases.

Respondent has proffered legitimate, non-discriminatory and non-retaliatory reasons for issuing these plans, the Final Written Warning, and termination on December 3, 2019.  *Millsaps v. Pinal County Superior Court*, 494 Fed. Appx. 821, 822 (9th Cir. 2012) (holding the employer articulated a legitimate, non-discriminatory business reason for its decision to termination plaintiff when it asserted plaintiff's job performance was unsatisfactory).

Moreover, the record demonstrates that Claimant's coworkers received performance plans and/or were terminated for failing to meet CSAT metrics who were female and outside of Claimant's protected class demonstrating Respondent did not discriminate against Claimant on account of his race or sex.  (Resp. Exhibit F, Plant Decl. ¶ 8; Exhibit 2).

The Arbitrator finds Claimant has failed to demonstrate pretext. To meet his burden, Claimant must produce specific and substantial evidence of pretext. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Claimant's evidence must be more than the minimum allegations necessary to establish a *prima facie* case, and he cannot meet his burden by relying on bare assertions. *Id.*

29

### b.  Claimant's Hostile Work Environment Claim Fails.

Moreover, based upon the record, Claimant cannot establish a severe or pervasive hostile work environment. To establish an actionable hostile work environment claim, Claimant must show: (1) he was subjected to verbal or physical conduct of a discriminatory nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Vasquez*, 349 F.3d at 642. Again, Claimant admits that while he was employed by Uber, no one made any comments to him about his race or sex. (Resp. Exhibit A, Davis Depo. 28:25 – 30:1; 42:19 – 21). Instead, Claimant relies on one alleged statement that he "sucked his teeth" in response to a greeting to claim that he was subjected to a hostile work environment. "Conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Simple teasing, offhand comments, and isolated incidents—such as what occurred here— do not constitute discriminatory changes in the "terms and conditions" of employment and, therefore, do not constitute unlawful harassment. *Id.* Rather, a claimant has the high burden of showing that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" to demonstrate it was sufficiently hostile or abusive to establish an actionable harassment claim. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Courts determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787-88 (internal quotation marks omitted). Here, Claimant cannot establish the alleged conduct was severe or pervasive. *See Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1037 (9th Cir. 1990) (holding that no reasonable jury could find a hostile work environment existed even though plaintiff alleged the employer posted a racially offensive cartoon, made racially offensive slurs, and targeted Latinos when enforcing rules); *Vasquez*, 349 F.3d at 642 (holding that a supervisor's conduct toward Hispanic

probation officer was not sufficiently severe or pervasive to create a hostile work environment when she made statements that the officer had "typical Hispanic macho attitude" and that he should transfer to a field assignment because "Hispanics do good in the field").

Based on the record, Claimant's hostile work environment claim must fail as a matter of law.

The Arbitrator therefore grants Respondent's Motion for Summary Judgment relative to Claimant's Title VII and 42 U.S.C. § 1981 race, sex, and retaliation claims.

### 4. Are Claimant's Damages Cut-Off By After-Acquired Evidence?

Respondent alleges that if Claimant was not terminated due to his CSAT metrics in December 2019, it would have terminated his employment on January 6, 2020 when it confirmed Claimant had violated the Confidential Information and Invention Assignment Agreement and Respondent's Network & Device Acceptable Use Policy pursuant to *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995 and *O'Day v. McDonnel Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996). (Resp. Exhibit F, Plant Decl. ¶ 16). Claimant counters the documents he accessed were not password-protect and related to his discrimination claims involving comparator information to establish disparate treatment.

The Arbitrator rejects Claimant's ex post facto justifications. It is undisputed Claimant downloaded confidential manager-only files which contained performance ratings and discipline of multiple of Claimant's coworkers; Claimant admits to engaging in this conduct. (Resp. Exhibit A, Davis Depo. 158:21-160:1). Claimant accessed and misappropriate confidential company information and the Arbitrator finds his misconduct was unreasonable, the information could have been requested in discovery, and that Claimant's conduct constitutes after-acquired evidence which cuts off Claimant's damages as of January 6, 2020.

Accordingly,

**IT IS HEREBY ORDERED** denying Respondent's Motion for Summary Judgment relative to Claimant not being selected for the Claims Associate Position and relative to Claimant's claim that he was subjected to disparate treatment on account of his race when he received the First Final Written Warning on May 30, 2019.

**IT IS FURTHER ORDERED** granting Respondent's Motion for Summary Judgment on Claimant's Title VII and 42 U.S.C. § 1981 claims for race, sex and retaliation relating alleged conduct by Respondent post May 30, 2019 up to and including Claimant's termination.

**IT IS FURTHER ORDERED** Claimant's damage claims are cut off on January 6, 2020 based upon after acquired evidence.

DATED this 30th day of June 2022.

SCHLEIER LAW OFFICES, P.C.

_____
Tod F. Schleier
Arbitrator

A COPY of this Order was sent via electronic mail on this 30th day of June 2022 to:

Christopher Houk, Esq.
HOUK LAW FIRM
1050 E. Southern Avenue, Suite A-3
Tempe, AZ  85282
chouk@houklawfirm.com
Attorneys for Claimant

Kristy Peters
Yijee Jeong
LITTLER MENDELSON, P.C.
2425 E. Camelback Road, Suite 900
Phoenix, AZ  85016

1  kpeters@littler.com
2  yjeong@littler.com
   Attorneys for Respondents
3
4  Daphne Crayne
   Case Manager
5
   /s/ Cindy J. Anderson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT F

N THE MATTER OF THE ARBITRATION OF

| | |
|---|---|
| Sir Lawrence Davis Jr, | Case NO. 01-20-0014-8969 |
| Claimant, | **FINAL AWARD** |
| v. | |
| Uber USA Phoenix, | (Assigned to Arbitrator Tod F. Schleier) |
| Respondent. | |

The arbitration hearing in this matter was held from August 15-17, 2022. Christopher Houk represented Claimant and Kristy Peters and Yijee Jeong represented Respondent.

Sixteen witnesses provided sworn testimony and fifty-five exhibits were admitted into evidence. The Arbitrator has reviewed the transcripts of the hearing, the admitted exhibits, the parties post-hearing closing arguments, the prior legal memoranda submitted by the parties in connection with prior motions, and the Arbitrator's notes taken during the hearing.

Based upon this review, the Arbitrator issues the following Order.

**INTRODUCTION**

The issues remaining for resolution in this case pursuant to the parties' Amended Joint Arbitration Statement are as follows: (1) Did Respondent fail to hire Claimant for the Claims Associate position because of his race or sex in violation of Title VII of the Civil Rights Act of 1964 or 42 U.S.C. §1981? (2) Did Respondent issue Claimant a Final Written Warning in May 2019 because of his race or sex in violation of Title VII of the Civil Rights Act of 1964 or 42 U.S.C. 1981? and (3) The nature and extent of Claimant's damages, if any?

**FACTUAL BACKGROUND**[1]

**1. The Parties and Claimant's Job Duties as Community Support Representative.**

Respondent is a San Francisco-based software company that develops multi-sided platforms to connect service providers with customers. One of Uber's most widely known platforms, the ("Rides Platform"), allows consumers ("Riders") to connect with independent businesses offering transportation services ("Drivers") through Respondent's software application accessible on most smartphones ("Uber App"). Respondent operates in over 70 countries and employs thousands of people in hundreds of offices worldwide.

Claimant, an African-American male, began working for Respondent in Phoenix in August 2018 as a Community Support Representative ("CSR") ((Tr. August 15, 2022 (hereinafter referred to as "Tr. I") at 12:15-18). As a CSR, Claimant's job duties included handling questions from Riders and Drivers to help navigate problems that may arise. (Tr. I at 17: 9-17; Cl. Ex. 4). The goal of a CSR is to resolve problems promptly with exceptional support and exceptional communication to develop a trustworthy relationship. CSRs are held to certain performance metrics, one of which is customer satisfaction ratings ("CSAT scores"). (Tr. I at 111:25-112:2). Specifically, following an interaction with a CSR, Riders and Drivers are asked to participate in a survey to rate their satisfaction with how the CSR handled their issue on a scale of one to five, five being the best. These survey scores are one tool used to measure the CSR's performance.

Respondent developed a team called Task Force that officially rolled out in January 2019. Task Force handled escalated situations or situations which required extra research or care. (Tr. I at 53:20-54:6). Claimant was selected to participate on Task Force and even helped write the Standard Operating Procedures ("SOP"). (Tr. I at 116:14-16).

Task Force members were permitted to use up to three hours per day for Task Force duties and they would allocate this time as "Project Time" to identify why they were not

---

[1] For purposes of this Factual Background, the Arbitrator has also considered the parties' Statements of Undisputed Facts submitted in connection with dispositive motions, as well as the testimony of the witnesses at the arbitration hearing.

on the phone queue handling customer calls. (Tr. I at 54:16-21; 191:10-192:1). The SOP that Claimant helped write specifically identified the three-hour limitation for using Project Time. (Resp. Ex. 6 - "No more than 3 hours in a shift representing the task force"). Task Force members were required to maintain a CSAT score of 4.8 out of 5 over a rolling three-week period in order to remain on Task Force, and this expectation was clearly set forth in the Task Force SOP.  (*Id.*).   Claimant knew of the three-hour Project Time limitation and the required CSAT metrics for remaining on Task Force. (Tr. I at 116: 5-8; 16-21).

### 2.  Claimant Applies for the Claim Associate Position.

On April 18, 2019, Claimant submitted an application for a Claims Associate weekday position. (Tr. I at 15:11-16:3; Cl. Ex. 3). Claimant came highly recommended for the role by his Team Lead, Zayin Javier, who described Claimant as "a great asset." (Cl. Ex. 2). Claimant's manager, Samantha Johnson, also recommended him specifically for the role, describing him as delivering "extraordinary support and owner experience to our driver partners," that he is "ready to transition into a leadership position," and that he "strengthens our business in the long term." (Cl. Ex. 29).

The Claims Associate Job Description listed several qualifications for the job as follows:

- College degree preferred
- 1-2 years customer service experience.  Insurance experience a plus
- Effective written and verbal communication skills to provide information in a clear and concise manner and to communicate with a variety of individuals
- Extraordinary attention to detail
- Ability to maintain quality in a fast-paced and pressured environment
- Ability to learn and apply claims policies and procedures

(Cl. Ex. 4).

Claimant satisfied these qualifications. (Cl. Ex. 5). He had a decade of key experience, including almost two years at Respondent as a Customer Support Specialist, two years as an insurance claims adjuster, two years as an insurance underwriter, and four

years as a zoning compliance analyst. (*Id*). Additionally, he holds a Master's degree and did so at the time he applied. (*Id.*). Interviewer Karen Mischne testified that education is important and that all qualifications listed are important. (Tr. August 17, 2022 (hereinafter referred to as "Tr. III") at 24:2-5).

Alyssa Waddell, Tyler Brown, and Karen Mischne interviewed Claimant on May 1, 2019. (Tr. I at 136:16-21). Although he had applied for the Claims Associate weekday position, Claimant was aware that he had been asked to interview for the weekend Claims Associate position and agreed to this interview. (Tr. I at 136:4-9). Except for the shift, the weekend and weekday roles were identical and had the same interview process panel and exercise. (Tr. August 16, 2022 (hereinafter referred to as "Tr. II") at 51:24-52:21; Joint Ex. 5).

### 3.  Claimant is Not Selected for the Claims Associate Position.

The hiring panel did not recommend Claimant for the Claims Associate position due to his verbal answers to interview questions. (Tr. II at 85:1-13; 132:25-133:11; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13). Specifically, each hiring panel member was concerned that Claimant would not be receptive to coaching and constructive feedback based on his disclosure that he would argue with management and frequently challenge his quality assurance ("QA") scores. (Tr. II at 58:13-25; 85:11-86:8; 133:12-17; Tr. III at 25:6-22).

In comparison, the hiring panel noted that other candidates (including candidates who were the same race or sex as Claimant) demonstrated they were "open to feedback," "coachable," and would "respond[] well to constructive feedback," (Joint Ex. 9 at UBER 006980, 006986, 006938). The Claims Associate position is process driven and depends on managerial coaching in order to continuously improve and to meet established metrics. (Tr. II at 85:11-86:8; Tr. III at 19:25-20:7; 25:6-22). The ability to accept and incorporate constructive feedback is critical in how a Claims Associate learns to be customer-centric, to adhere to established standard protocols, and improve the quality of the experience for Uber's users. (Tr. II at 58:13-25; 85:11-86:8; 117:16-118:6; 128:3-9).

Claimant's lack of coachability became a red flag for each member of the hiring panel. There is a very specific insurance claims process that needs to be followed to ensure all important information is sent to insurance carriers after an incident and errors in following this process—and resistance to coaching on how to adhere to this process—could significantly harm Respondent. (Tr. II at 85:11-86:8; Resp. Ex. 13). For example, errors delay the claims handling process and inaccurate first notice of loss information results in inaccurate coverage and harms Uber's relationship with the insurance carriers who expect accurate information. (Tr. II at  85:11-86:18; Tr. III at 32:3-24; Resp. Ex. 13). If an error is great enough or frequently occurs, it could lead to carriers refusing to carry a policy for Uber's drivers. (Tr. II at 96:15-97:19). Further, the error could implicate different insurance policies that have significant monetary differences. (Tr. III at 32:3-24). Therefore, it is important for Claims Associates to take constructive feedback and apply it to their work. (Tr. III at 33:17-34:11).

It was concerning to the hiring panel when Claimant admitted that he often pushed back against performance feedback, instead of incorporating it and improving his overall performance, especially when lack of adherence to the claims process could significantly impact Respondent and its relationship with insurance carriers. (Tr. III at 25:6-22).

Claimant's resistance to coaching was not the hiring panel's only concern based on the interview. Specifically, the hiring panel noted that Claimant: gave responses based on one particular situation for a series of different critical thinking questions; did not provide direct answers to some of the questions; and provided generic answers to situational questions that did not give the hiring panel a thorough understanding of whether or not Claimant would be able to succeed in the Claims Associate position. (Tr. II at 66:16-67:2; 85:11-86:8; 132:25-133:11; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13).

Additionally, two of Claimant's written exercise responses, conducted as part of the interview process, were incorrect. (Tr. II at 83:24-84:12; Resp. Ex. 14). The majority of the applicants who were hired for the Claims Associate position either answered all of the

written exercise questions correctly or only missed one. (Tr. II at 101:8-17; Joint Ex. 5 at UBER000064).

Based upon these reasons, Respondent alleges that Claimant was rejected for the Claims Associate position.

### 4. Claimant's Comparators.

At the hearing and in connection with prior motions filed in this matter, Claimant introduced evidence that other female and Caucasian employees were hired into the Claims Associate position who lacked the necessary educational qualifications, prior insurance experience, or customer service experience. He contends this demonstrates disparate treatment and discrimination.

Respondent hired Elyse Anaya (Hispanic female) for the position. (Cl. Ex. 23). Ms. Anaya's experience and education fell short of what the position required. While Claimant held a master's degree, Ms. Anaya had only a bachelor's degree. (Cl. Ex. 6). She did not have any experience in insurance. (*Id.*). Before joining Uber, Ms. Anaya's experience was low-level and irregular, including working as an intern for a magazine, a video game salesperson at GameStop, a salesperson at Arizona Science Center, and a medical billing associate. (*Id.*).

Similarly, Respondent hired Faith Dyer (Caucasian female) for the position. (Joint Ex. 2, Interviewee Resumes and Scorecards, Dyer's Resume at UBER 006899). Just as with Ms. Anaya, Ms. Dyer's previous experience was low level. She was only 18 years old at the time and had just graduated high school. (*Id.*) Her only previous work experience was as a cashier at Castle's and Coasters theme park. (*Id.*) Ms. Dyer's lack of experience was noted as a "con" by each interviewer. (*Id.*). Even so, Ms. Dyer was still considered a strong candidate and labeled a strong "cultural" candidate. (*Id.*).

Respondent also hired James Anolick (Caucasian male) for the position. While Mr. Anolick worked as a COE Specialist at Respondent about the same amount of time as Claimant, his only previous experience was as a pizza delivery driver. (Joint Ex. 2, Interviewee Resumes and Scorecards, Anolick's Resume, UBER 006981- UBER 006982).

Interviewer Alyssa Waddell described Mr. Anolick as lacking insurance experience. (*Id.* At Anolick's Interview Scorecard, UBER 006920).

Respondent also hired Reyna Villegas (Hispanic female) for the position even though her prior experience consisted of short experiences as a customer service associate at Freshly food delivery for only nine months and guest experience captain at Buffalo Wild Wings restaurant. (*Id.* At Villegas's Resume, UBER 006895-UBER 006896). Interviewer Karen Mischne framed Ms. Villegas's lack of experience as having "developmental opportunities for prioritization." (*Id.* At Villegas's Interview Scorecard, UBER 006934).

Claimant also introduced evidence demonstrating Respondent ignored the job description's stated preference for insurance experience and hired people with little or no insurance experience anyway: Anaya, Dyer, Villegas, Jaime Cantu, Bernitha Davis, Justin Gill, Ray Ronan, Michael Smith, Tiani Medrano, and Lauren Gault. (*Id.*, Scorecards for Anaya at UBER 006933 and UBER 006935; for Villegas at UBER 006941; for Ronan at UBER 006938 and UBER 006940; for Gill at UBER 006932, UBER 006939, and UBER 006948; for Smith at UBER 006946-006947 and UBER 006949; for Medrano at UBER 006956-006957, UBER 006958-006962, and UBER 006973; for Davis at UBER 006976 and UBER 006980; for Gault UBER 0069631-UBER 006966, UBER 006968-006970, and UBER 006975; for Dyer at UBER 006983-006986; and for Cantu at  UBER 006951, UBER 006953-006955, and UBER 006958).

Finally, in support of his disparate treatment discrimination claim, in Claimant's Closing Argument, he includes a multi-page chart summarizing information from Joint Exhibit 2 which are the interviewee resumes and scorecards prepared by each of the interview panelists.  The chart shows the identity, race and gender, highest level of education, experience, and the interviewers' comments relative to Claimant's comparators. (Joint Ex. 2, Interviewee Resumes and Scorecards, UBER 006844-006986).

### 5.  The Task Force And The Three-Hour Daily Limitation For Project Time.

Diamond Driver is Uber's loyalty program for high tier Drivers. (Tr. I at 188:17-189:7).  As Drivers take on more rides and earn points, they are placed into tiers (Blue,

Gold, Platinum and Diamond), with Diamond Drivers as the highest tier. (Tr. I at 188:17-189:7). Task Force is an escalation support team for Diamond Drivers. (Tr. II at 198:17-19). Essentially, Task Force is a back-office team that assists with project-based work, therefore allowing customer support representatives to be available for incoming calls. (Tr. I at 53:20-54:6). Community support representatives are expected to be available to take inbound calls and tickets. (Tr. I at 191:10-192:1). To avoid being assigned to inbound calls and tickets coming into the phone queue, community support representatives had to log into auxiliary codes, including Project Time. (Tr. I at 191:10-192:1). The Project Time code meant that the community support representative had been asked to work on a specific project and would not be in the queue to take inbound calls or tickets. (Tr. I at 191:10-192:1). An employee would not be able to keep up with their performance metrics if they were spending significant time on Project Time. (Tr. II at 154:16-155:7; 199:16-19). Chris Gibson (African-American)  was the Task Force Manager and Ben Williamson was the Team Lead.   (Tr. I at 14:14-17; 114:25-115:5; Tr. II at 198:20-23).

During the relevant time period, there was a daily limitation of Project Time set at three hours. (Tr. II at 198:24-199:4). This cap was communicated to Claimant. (Tr. II at 198:24-199:7). Moreover, Claimant helped  write the standard operating procedures for Task Force which specifically stated that members could not work more than three hours per shift representing the Task Force. (Tr. I at 116:14-117:21, Resp. Ex. 6). Claimant also received the Task Force meeting agendas and was well aware, at least as of February 2019, that Task Force members were no longer allowed to dedicate more than three hours a day to Task Force or floor support. (Tr. I at 117:22-24; 118:2-9; Resp. Ex. 23).

The Task Force meeting agendas stated that only team leads and managers could provide exceptions to the three-hour limitation and team members were not permitted to work extra Project Time based on their own initiative. (Tr. I at 118:11-18). If a member of Task Force needed to go over their assigned three-hour schedule, permission was needed from Mr. Gibson and Mr. Williamson which could be provided through a Slack message, an email, or if done verbally with a follow-up documentation. (Tr. I at 173:20-174:9; Tr. II

at 158:4-14; 201:19-25). Therefore, Task Force members were required to seek management authorization before exceeding their Project Time limitation or logging their use of project time into Uber's tracking systems. (Resp. Ex. 6).

**6. Claimant is Removed From The Task Force Due to His Failure to Meet Required Metrics and Disciplined Due to His Misuse of Project Time.**

Claimant's team lead in April 2019 was Zayin Javier. Mr. Javier was out on leave from April 3, 2019 through April 19, 2019 and again on April 24, 2019. (Tr. III at 7:25-8:14). Because of Mr. Javier's need for continued leave, in May of 2019, Claimant transferred to Team Lead Rebeca Garcia's team. (Tr. II at 185:18-186:7).  During April 2019, Claimant's CSAT scores fell below the required threshold to remain on Task Force. (Joint Ex. 3).  As a result, and per the established protocol, on May 2, 2019, Claimant was removed from Task Force. (Resp. Ex. 9). Ms. Garcia and Ms. Johnson also placed Claimant on a coaching plan that set forth various tools to assist Claimant in improving his CSAT scores. (Joint Ex. 3).

On May 2, 2019, Ms. Garcia noticed that Claimant had not logged into the phone queue during his entire shift. (Tr. II at 179:17-183:6). She also discovered Claimant was offline from the phone queue during his entire shift on May 1, 2019 and for the majority of his shift on April 30, 2019 as well. (Resp. Ex. 9). This was unusual for a CSR as an essential function of this position is to provide customer support telephonically to Drivers and Riders. (Tr. II at 180:11-20).

This raised concerns to Ms. Garcia that if Claimant was not logged into the phone queue during his entire shift, he may have been in Project Time for more than the allowed three hours. If he was on Project Time status, then he was not performing his essential and required CSR duties and not receiving important performance metrics that come from customer interactions. (*Id.*). Ms. Garcia presented this information to Mr. Williamson, Mr. Gibson and Ms. Johnson and spoke to each about the situation.  (Tr. II at 181:21-183:6).

Respondent began an investigation into Claimant's use of Project Time between April 2 – May 2, 2019, and whether Claimant had been informed of the three-hour

limitation.  On May 8, 2019, Mr. Cane and Ms. Garcia met with Claimant to discuss his overuse of Project Time, because when he was using Project Time, he was not performing his essential CSR duties or obtaining essential performance metrics. (Tr. II at 187:1-188:8). Mr. Cane followed up with an email to Claimant on May 9, 2019, setting forth the dates and hours of Claimant's Project Time, as well as links to various documents Claimant received setting forth the three-hour limitation for Project Time. (Resp. Ex. 2).

Respondent also conducted an audit of Project Time use for the relevant Task Force members to determine if other current  Task Force members were using Project Time in the same manner. (Resp. Ex. 8). The audit revealed that Claimant's use of Project Time was significantly higher than the other Task Force members. (*Id.*).

Ms. Garcia and Ms. Johnson, who were Claimant's supervisors, confirmed that Claimant was never authorized or instructed to use so much Project Time. (Tr. II at 188:2-4). Claimant argued he had permission to work more than the maximum of three-hours of Project Time, but Mr. Cane reviewed Claimant's arguments, spoke with relevant managers, and determined that Claimant did not have permission to use Project Time more than three hours per shift. After Mr. Cane's investigation and consideration of the relevant information, Mr. Cane ultimately decided to issue Claimant a final written warning due, in part, to the sheer amount and frequency of Claimant's overage. (Tr. I at 166:11-17; 194:11-20; 199:16-200:8; Resp.Ex. 8; Tr. III at 11:25-12:2).

Based on the audit and Claimant's admission that he was not instructed by leadership to stay in Project Time beyond three hours,  Mr. Cane, in conjunction with Human Resources, determined Claimant's use of Project Time violated its Standard of Conduct and attendance/schedule adherence policies because he did not have permission to use Project Time more than three hours per shift and he was not performing his required call duties as a CSR when misusing Project Time. (Tr. I at 193:3-194:2). As a result, prior to May 30, 2019, Ms. Garcia drafted a Final Written Warning for Claimant. (Resp. Ex. 10). On May 30, 2019, Ms. Garcia and Mr. Cane met with Claimant to present him with the

Final Written Warning for misconduct based on his overuse of Project Time in the Task Force. (Tr. I at 203:14-16; Tr. II at 190:22-191:19; Resp. Ex. 11).

**7.  Claimant Submits Three Internal Complaints about the Claims Associate Hiring Process.**

For his second legal claim, Claimant contends Respondent issued him a Final Written Warning on May 30, 2019 because of his race and sex. On May 29, 2019, Claimant submitted a complaint through Respondent's Integrity Helpline claiming the hiring process for the Claims Associate position was not consistent. (Tr. II at 11:22-25). Although Claimant contends the internal complaint was for sex and race discrimination (Cl. Ex. 12), a careful review of the internal complaint he actually filed reveals there were no allegations of unlawful discrimination in this complaint. (*Id*.).

On May 30, 2019, Claimant submitted a second complaint claiming that he was retaliated against for submitting his initial complaint the previous day related to his abuse of Project Time. (Cl. Ex. 53). Claimant also submitted a third complaint on May 30, 2019 alleging retaliation. (Cl. Ex 54).

Claimant's three complaints were submitted to Chelsea Yogerst, an Employee Relations ("ER") investigator, to investigate. (Tr. II at 11:17-25). It is the job of the ER investigator to conduct workplace investigations into employee relations concerns promptly, thoroughly, and with neutrality. (Tr. II at 10:21-23). Ms. Yogerst and other Respondent Uber ER employees attempted to interview Claimant about his allegations, but he refused to meet with them. (Joint Ex. 6, UBER 000028).

Notwithstanding Claimant's refusal to meet with Ms. Yogerst, she conducted a thorough investigation into Claimant's claims, which included interviewing twelve witnesses and examining multiple documents. (Joint Ex. 5 and 6). Based on her investigation, Ms. Yogerst did not substantiate Claimant's allegations and concluded he was treated fairly throughout the interview process and the hiring decision for the Claims Associate position, the issuance of the Final Written Warning, and his removal from the

Task Force. (*Id*.) Ms. Yogerst closed out her investigation with Claimant on July 23, 2019. (*Id*.).

**LEGAL ANALYSIS**

### A. Did Respondent Discriminate Against Claimant Because of His Sex or Race When Claimant was Rejected for the Claims Association Position?

At the trial phase, the *McDonnell Douglas* burden-shifting framework no longer applies. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir.2002) (en banc), *aff'd*, 539 U.S. 90 (2003) ("[I]t is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury."); *see also, Sanghvi v. City of Claremont*, 328 F.3d 532, 540 (9th Cir.2003) ("[I]t is error to charge the jury with the elements of the *McDonnell Douglas* prima facie case."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987). "Once at the trial stage, the plaintiff is required to put forward evidence of discrimination because of a protected characteristic." *Costa*, 299 F.3d at 856 (internal citation and quotation omitted).

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). To prevail on a Title VII claim, the plaintiff must prove that an adverse employment action was taken "because of" unlawful discrimination. *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 857 (9th Cir.2002). Title VII disparate-treatment claims like plaintiff's, "require the plaintiff to prove that the employer acted with conscious intent to discriminate." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805–06 (1973). See 9th Cir. Civ. Jury Instr. 10.1. (2017).,

The core of Claimant's disparate treatment discrimination claim is that female and Caucasian employees who were selected for the Claims Associate position did not meet some of the qualifications set forth in the Job Description, such as education, insurance experience, customer service, etc. (Cl. Ex. 4). The Resumes and Scorecards and interview notes admitted into evidence do demonstrate that many of those who were selected lacked some of the qualifications for the Claims Associate position.

There is no question that Claimant was qualified for the Claims Associate position. (Cl. Ex. 5).  However, the evidence is crystal clear Claimant was not selected due to his verbal answers during the job interview and his written examination.  The interview panel unanimously agreed that due to Claimant's lack of coachability, which was a key requirement for success as a Claims Associate, he would not be successful in the position. The evidence presented at the hearing clearly established Claimant was not hired for the Claims Associate position due to his verbal answers to interview questions which indicated he would not be receptive to coaching opportunities and constructive feedback. (Tr. II at 58:13-25; 85:1-86:8; 132:25-133:17; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13). As detailed above, the Claims Associate position is a process driven and customer-centric position that requires its associates to accept and incorporate feedback. (Tr. II at 58:13-25; 85:11-86:8; 117:16-118:6; 128:3-9; Tr. III at 19:25-20:7; 25:6-22).

Claimant introduced no evidence at the hearing that any of the panel members harbored racial or sex-based animus. Indeed, Claimant himself testified nobody at Respondent made any comment about his race or sex. (Tr. I at 37:1-3). Furthermore, multiple candidates of Claimant's same race and same sex were selected for the position which confirms Respondent had no discriminatory intent. (Cl. Ex. 23).

As noted in the Arbitrator's June 30, 2022 Order on Summary Judgment, the panelists' conclusion about Claimant's lack of coachability was borne out by what occurred throughout the remainder of Claimant's employment.  Respondent repeatedly attempted to coach Claimant during the remainder of his employment, without success, which ultimately led to the termination of Claimant's employment.  This pattern of refusing constructive criticism and feedback confirms the panelists' conclusion about Claimant's lack of coachability and his unwillingness to accept constructive criticism.  The Arbitrator finds that Respondent's reasons for not selecting Claimant for the Claims Associate position are not pretextual and are worth of belief.

Claimant contends that Respondent's use of subjective criteria and decision-making is evidence of pretext which were used to reject Claimant from the Claims Associate

position.   The Ninth Circuit, however, holds that the presence of subjective criteria is not *per se* evidence of intentional discrimination. In *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir.1984), the Ninth Circuit stated:

> We have explicitly rejected the idea that an employer's use of subjective employment criteria has a talismanic significance: 'Even assuming subjectivity was involved here, it has never been held that subjective evaluation by an employer is per se prohibited by Title VII, or alone shifts to the defendant the burden of proving absence of intentional bias....' *Title VII is the law's promise that employment decisions will not be based on non-permissible discriminatory criteria, not that subjective criteria will be eliminated.* [Plaintiff] cannot render sound business judgment illegal by labeling it subjective. Many criteria for higher level jobs are not easily articulable, and their conversion to writing does little to stop employers who desire to discriminate.

735 F.2d at 345 (quoting *Ward v. Westland Plastics, Inc.,* 651 F.2d 1266, 1270 (9th Cir.1980)) (emphasis added). *See also, Jauregui v. City of Glendale,* 852 F.2d 1128, 1135 (9th Cir.1988) ("The use of subjective factors to evaluate applicants for hire or promotion is not illegal *per se.*").

On the other hand, *Casillas* clarified that a plaintiff may combine proof of reliance on subjective criteria with other evidence to show pretext. *Casillas* held that "[a]n employer's use of subjective criteria is to be considered by the trial court with the other facts and circumstances of the case." *Id.* at 345. Other Ninth Circuit case law establishes that the use of highly subjective criteria in employment decisions should be subject to close scrutiny. "Subjective job criteria present potential for serious abuse and should be viewed with much skepticism. Use of subjective job criteria ... provides a convenient pretext for discriminatory practices. Subjective criteria may easily be asserted as the reason for an adverse employment decision when, in fact, the reason was discriminatory." *Nanty v. Barrows Co.,* 660 F.2d 1327, 1334 (9th Cir.1981) (overruled on other grounds), *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756 (9th Cir.1996)). *See also, Bergene v. Salt River Project Agr., Improvement & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001) ("Against the background of the other evidence of pretext, the subjective nature of [the

criteria provides further circumstantial evidence that [defendant] denied [plaintiff] the promotion as a form of retaliation....").

A similar case is *Stones v. Los Angeles Cmty. Coll. Dist.,* 796 F.2d 270 (9th Cir.1986), which was tried to the district court and appealed. In *Stones,* the plaintiff, a "highly accomplished black woman educator" who held the position of assistant dean, brought suit against her employer, a community college district, for failure to promote her to a dean position. *Id.* at 271. Plaintiff was neither called for an interview nor was she hired for four different dean openings. In its defense, the defendant noted that plaintiff's file contained a number of "tracers," which were subjective assessments from past supervisors expressing the opinion that plaintiff was condescending, rigid, and lacking in communicative and diplomatic skills. *Id.* at 273–4.

The Court found that the defendant's reliance on personal evaluations was a legitimate non-discriminatory reason for the failure to promote, and that the subjective nature of the evaluations did not invalidate their usefulness. *Id.* at 274. *See also, Stones v. Los Angeles Cmty. Coll. Dist.,* 572 F.Supp. 1072, 1082–3, n. 12 (C.D.Cal. 1983) (district court's explanation of acceptable use of subjective evaluation criteria). In *Stones,* the Ninth Circuit's standard of review was one of clear error following the bench trial. *Id.* at 272. The Court stated the plaintiff must show more than the presence of subjective evaluations to prevail on a discrimination claim and noted the plaintiff had not pointed to any evidence showing that defendant's use of a subjective process was unusual or inconsistent with defendant's general promotion or reassignment policies.

The Arbitrator finds in this case that the use of subjective criteria is not a pretext demonstrating discrimination. Claimant produced no evidence that Respondent's use of a subjective process was unusual or inconsistent with its general promotion or reassignment policies. Moreover, the panel's decision was unanimous and the bases for the panel's decision were consistent.

15

Accordingly, the Arbitrator finds Claimant failed to prove that he was not selected for the Claims Associate position because of his sex or race in violation of Title VII or 42 U.S.C § 1981.

**B. Did Respondent Discriminate Against Claimant Due to His Race or Sex When it Issued a Final Written Warning on May 30, 2019?**

The evidence submitted at the hearing clearly demonstrated Claimant greatly exceeded the three hours of Project Time on multiple occasions in April and May of 2019. (Tr. I at 118:19-22). Claimant failed to produce evidence that any of Respondent's managers authorized him to exceed the three-hour Project Time limit and his manager, Ms. Garcia, testified she never authorized him to exceed the time limit.

Following an investigation and audit of then current Task Force members, Mr. Cane ultimately made the decision to issue Claimant a Final Written Warning. (Tr. I at 166:11-17; 194:11-20; Tr. III at 11:25-12:2). The audit demonstrated Claimant significantly exceeded the three-hour limit throughout April and May 2019 and significantly exceeded the use of Project Time when compared to other Task Force members.[2] (Resp. Ex. 8). Mr. Cane testified that he used the audit in making his decision to issue Claimant a Final Written Warning. (Tr. I at 199:20-22). In fact, Mr. Cane considered terminating Claimant in light of his excessive use of Project Time and has terminated other employees for first-time behavior issues. (Tr. I at 203:22-204:24). Mr. Cane further testified that Claimant's race or sex did not play a role in his decision to issue a Final Written Warning. (Tr. I at 205:25-206:2).

Claimant's sex and race discrimination claim based upon his receipt of the Final Written Warning on May 30, 2019 fails because he cannot establish that an adverse employment action occurred. "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of ... employment.'" *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir.2008) (quoting *Chuang v. Univ. of Cal.*

---

[2] Claimant emphasizes that according to his calculations, Mr. Anolick exceed Claimant's use of Project Time. However, Mr. Anolick left Respondent's employment in April 2019 and the audit conducted only focused on currently Task Force members.

*Davis, Bd. of Trustees,* 225 F.3d 1115, 1126 (9th Cir.2000); *see also, Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818–19 (9th Cir.2002).

"Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action," at least where the warning letter does not result in material changes to the conditions or terms of employment. *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046, *10 (D. Ariz. 2014). *See also, Tumblin v. USA Waste of Cal., Inc.*, 2016 WL 3922044, *8 (C.D. Cal. 2016); *Sanchez v. California*, 90 F. Supp. 3d 1036, 1056 (E.D. Cal. 2015) ("Written warning …are not adverse actions where they do not materially affect the terms and conditions of employment (same); *Govan v. Sec. Nat'l Fin. Corp.*, 2011 WL 1843294, *3 (D. Ariz. 2011) ("While Plaintiff believes the warning to be unfounded, he presents no evidence that it was disseminated to others or resulted in a demotion, a change in job duties, or any other material change in the terms, conditions, or privileges of his employment. In short, the warning cannot reasonably be construed as an adverse employment action.") (citation omitted); *Hoang v. Wells Fargo Bank, N.A.*, 724 F.Supp.2d 1094, 1104 (D. Or. 2010) ("[S]ince the letter did not implement any materially adverse change in the terms and conditions of Hoang's employment, it was not itself an adverse employment action.").

Claimant has provided no evidence suggesting that Respondent's May 30, 2019 Final Written Warning had any effect, let alone a material effect, on his job duties or compensation. The Arbitrator finds that Claimant's inability to apply for another position for six months due to the Final Written Warning was not a material effect on his job or compensation.

Therefore, the Arbitrator finds the Final Written Warning is not an adverse employment action because Claimant continued to enjoy the same terms and conditions of employment at Respondent. *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046 *10 (D. Ariz. 2014) ("Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action[]" where the letter does not result in material changes to the conditions or terms of employment").

The Arbitrator finds Claimant failed to prove that he received the May 30, 2019 Final Written Warning  because of his sex or race.

**IT IS HEREBY ORDERED** finding for Respondent on Claimant's claims of race or sex discrimination under Title VII or race discrimination under 42 U.S.C. §1981.

Dated this 31st day October 2022.

SCHLEIER LAW OFFICES, P.C.

_____
Tod F. Schleier
Arbitrator

A COPY of this Order was sent via electronic mail on this 31st  day of October 2022 to:

Christopher Houk, Esq.
HOUK LAW FIRM
1050 E. Southern Avenue, Suite A-3
Tempe, AZ 85282
chouk@houklawfirm.com
Attorneys for Claimant

Kristy Peters
Yijee Jeong
LITTLER MENDELSON, P.C.
2425 E. Camelback Road, Suite 900
Phoenix, AZ 85016
kpeters@littler.com
yjeong@littler.com
Attorneys for Respondents

Daphne Crayne
Case Manager

/s/ Cindy J. Anderson

# EXHIBIT G

**AMERICAN ARBITRATION ASSOCIATION**

**EMPLOYMENT ARBITRATION TRIBUNAL**

| | |
|---|---|
| Sir Lawrence Davis Jr, | Case NO. 01-20-0014-8969 |
| Claimant, | **FINAL AWARD** |
| v. | |
| Uber USA Phoenix, | |
| Respondent. | |

I, Tod F. Schleier, the undersigned arbitrator, having been designated in accordance with the arbitration Agreement entered into by the above-named parties, and dated July 24, 2018, and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD, as follows:

The arbitration hearing in this matter was held from August 15-17, 2022. The hearing was held by Schleier Law Offices, P.C., 4600 East Shea Blvd., Suite 208, Phoenix, AZ  85027.  Christopher Houk represented Claimant and Kristy Peters and Yijee Jeong represented Respondent.

Sixteen witnesses provided sworn testimony and fifty-five exhibits were admitted into evidence.  The Arbitrator has reviewed the transcripts of the hearing, the admitted exhibits, the parties post-hearing closing arguments, the prior legal memoranda submitted by the parties in connection with prior motions, and the Arbitrator's notes taken during the hearing.

Based upon this review, the Arbitrator issues the following Order.

**INTRODUCTION**

The issues remaining for resolution in this case pursuant to the parties' Amended Joint Arbitration Statement are as follows: (1) Did Respondent fail to hire Claimant for the Claims Associate position because of his race or sex in violation of Title VII of the

Civil Rights Act of 1964 or 42 U.S.C. §1981? (2) Did Respondent issue Claimant a Final Written Warning in May 2019 because of his race or sex in violation of Title VII of the Civil Rights Act of 1964 or 42 U.S.C. 1981? and (3) The nature and extent of Claimant's damages, if any?

**FACTUAL BACKGROUND[1]**

    **1. The Parties and Claimant's Job Duties as Community Support Representative.**

Respondent is a San Francisco-based software company that develops multi-sided platforms to connect service providers with customers. One of Uber's most widely known platforms, the ("Rides Platform"), allows consumers ("Riders") to connect with independent businesses offering transportation services ("Drivers") through Respondent's

    **2.** software application accessible on most smartphones ("Uber App"). Respondent operates in over 70 countries and employs thousands of people in hundreds of offices worldwide.

Claimant, an African-American male, began working for Respondent in Phoenix in August 2018 as a Community Support Representative ("CSR") ((Tr. August 15, 2022 (hereinafter referred to as "Tr. I") at 12:15-18). As a CSR, Claimant's job duties included handling questions from Riders and Drivers to help navigate problems that may arise. (Tr. I at 17: 9-17; Cl. Ex. 4). The goal of a CSR is to resolve problems promptly with exceptional support and exceptional communication to develop a trustworthy relationship. CSRs are held to certain performance metrics, one of which is customer satisfaction ratings ("CSAT scores"). (Tr. I at 111:25-112:2). Specifically, following an interaction with a CSR, Riders and Drivers are asked to participate in a survey to rate their satisfaction with how the CSR handled their issue on a scale of one to five, five being the best. These survey scores are one tool used to measure the CSR's performance.

---

[1] For purposes of this Factual Background, the Arbitrator has also considered the parties' Statements of Undisputed Facts submitted in connection with dispositive motions, as well as the testimony of the witnesses at the arbitration hearing.

**3.** Respondent developed a team called Task Force that officially rolled out in January 2019. Task Force handled escalated situations or situations which required extra research or care. (Tr. I at 53:20-54:6). Claimant was selected to participate on Task Force and even helped write the Standard Operating Procedures ("SOP"). (Tr. I at 116:14-16).

Task Force members were permitted to use up to three hours per day for Task Force duties and they would allocate this time as "Project Time" to identify why they were not on the phone queue handling customer calls. (Tr. I at 54:16-21; 191:10-192:1). The SOP that Claimant helped write specifically identified the three-hour limitation for using Project Time. (Resp. Ex. 6 - "No more than 3 hours in a shift representing the task force"). Task Force members were required to maintain a CSAT score of 4.8 out of 5 over a rolling three-week period in order to remain on Task Force, and this expectation was clearly set forth in the Task Force SOP. (*Id.*). Claimant knew of the three-hour Project Time limitation and the required CSAT metrics for remaining on Task Force. (Tr. I at 116: 5-8; 16-21).

**4. Claimant Applies for the Claim Associate Position.**

On April 18, 2019, Claimant submitted an application for a Claims Associate weekday position. (Tr. I at 15:11-16:3; Cl. Ex. 3). Claimant came highly recommended for the role by his Team Lead, Zayin Javier, who described Claimant as "a great asset." (Cl. Ex. 2). Claimant's manager, Samantha Johnson, also recommended him specifically for the role, describing him as delivering "extraordinary support and owner experience to our driver partners," that he is "ready to transition into a leadership position," and that he "strengthens our business in the long term." (Cl. Ex. 29).

The Claims Associate Job Description listed several qualifications for the job as follows:

- College degree preferred
- 1-2 years customer service experience.  Insurance experience a plus

- Effective written and verbal communication skills to provide information in a clear and concise manner and to communicate with a variety of individuals
- Extraordinary attention to detail
- Ability to maintain quality in a fast-paced and pressured environment
- Ability to learn and apply claims policies and procedures

(Cl. Ex. 4).

Claimant satisfied these qualifications. (Cl. Ex. 5). He had a decade of key experience, including almost two years at Respondent as a Customer Support Specialist, two years as an insurance claims adjuster, two years as an insurance underwriter, and four years as a zoning compliance analyst. (*Id*). Additionally, he holds a Master's degree and did so at the time he applied. (*Id.*). Interviewer Karen Mischne testified that education is important and that all qualifications listed are important. (Tr. August 17, 2022 (hereinafter referred to as "Tr. III") at 24:2-5).

Alyssa Waddell, Tyler Brown, and Karen Mischne interviewed Claimant on May 1, 2019. (Tr. I at 136:16-21). Although he had applied for the Claims Associate weekday position, Claimant was aware that he had been asked to interview for the weekend Claims Associate position and agreed to this interview. (Tr. I at 136:4-9). Except for the shift, the weekend and weekday roles were identical and had the same interview process panel and exercise. (Tr. August 16, 2022 (hereinafter referred to as "Tr. II") at 51:24-52:21; Joint Ex. 5).

**5.  Claimant is Not Selected for the Claims Associate Position.**

The hiring panel did not recommend Claimant for the Claims Associate position due to his verbal answers to interview questions. (Tr. II at 85:1-13; 132:25-133:11; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13). Specifically, each hiring panel member was concerned that Claimant would not be receptive to coaching and constructive feedback based on his disclosure that he would argue with management and frequently challenge his quality assurance ("QA") scores. (Tr. II at 58:13-25; 85:11-86:8; 133:12-17; Tr. III at 25:6-22).

**6.** In comparison, the hiring panel noted that other candidates (including candidates who were the same race or sex as Claimant) demonstrated they were "open to feedback," "coachable," and would "respond[] well to constructive feedback," (Joint Ex. 9 at UBER 006980, 006986, 006938). The Claims Associate position is process driven and depends on managerial coaching in order to continuously improve and to meet established metrics. (Tr. II at 85:11-86:8; Tr. III at 19:25-20:7; 25:6-22). The ability to accept and incorporate constructive feedback is critical in how a Claims Associate learns to be customer-centric, to adhere to established standard protocols, and improve the quality of the experience for Uber's users. (Tr. II at 58:13-25; 85:11-86:8; 117:16-118:6; 128:3-9).

**7.** Claimant's lack of coachability became a red flag for each member of the hiring panel. There is a very specific insurance claims process that needs to be followed to ensure all important information is sent to insurance carriers after an incident and errors in following this process—and resistance to coaching on how to adhere to this process—could significantly harm Respondent. (Tr. II at 85:11-86:8; Resp. Ex. 13). For example, errors delay the claims handling process and inaccurate first notice of loss information results in inaccurate coverage and harms Uber's relationship with the insurance carriers who expect accurate information. (Tr. II at 85:11-86:18; Tr. III at 32:3-24; Resp. Ex. 13). If an error is great enough or frequently occurs, it could lead to carriers refusing to carry a policy for Uber's drivers. (Tr. II at 96:15-97:19). Further, the error could implicate different insurance policies that have significant monetary differences. (Tr. III at 32:3-24). Therefore, it is important for Claims Associates to take constructive feedback and apply it to their work. (Tr. III at 33:17-34:11).

**8.** It was concerning to the hiring panel when Claimant admitted that he often pushed back against performance feedback, instead of incorporating it

and improving his overall performance, especially when lack of adherence to the claims process could significantly impact Respondent and its relationship with insurance carriers. (Tr. III at 25:6-22).

Claimant's resistance to coaching was not the hiring panel's only concern based on the interview. Specifically, the hiring panel noted that Claimant: gave responses based on one particular situation for a series of different critical thinking questions; did not provide direct answers to some of the questions; and provided generic answers to situational questions that did not give the hiring panel a thorough understanding of whether or not Claimant would be able to succeed in the Claims Associate position. (Tr. II at 66:16-67:2; 85:11-86:8; 132:25-133:11; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13).

**9.** Additionally, two of Claimant's written exercise responses, conducted as part of the interview process, were incorrect. (Tr. II at 83:24-84:12; Resp. Ex. 14). The majority of the applicants who were hired for the Claims Associate position either answered all of the written exercise questions correctly or only missed one. (Tr. II at 101:8-17; Joint Ex. 5 at UBER000064).

**10.** Based upon these reasons, Respondent alleges that Claimant was rejected for the Claims Associate position.

**11. Claimant's Comparators.**

At the hearing and in connection with prior motions filed in this matter, Claimant introduced evidence that other female and Caucasian employees were hired into the Claims Associate position who lacked the necessary educational qualifications, prior insurance experience, or customer service experience. He contends this demonstrates disparate treatment and discrimination.

**12.** Respondent hired Elyse Anaya (Hispanic female) for the position. (Cl. Ex. 23). Ms. Anaya's experience and education fell short of what the position required. While Claimant held a master's degree, Ms. Anaya had only a bachelor's degree. (Cl. Ex. 6). She did not have any experience in insurance. (*Id.*). Before joining Uber, Ms. Anaya's experience was low-level and

6

irregular, including working as an intern for a magazine, a video game salesperson at GameStop, a salesperson at Arizona Science Center, and a medical billing associate. (*Id.*).

**13.** Similarly, Respondent hired Faith Dyer (Caucasian female) for the position. (Joint Ex. 2, Interviewee Resumes and Scorecards, Dyer's Resume at UBER 006899). Just as with Ms. Anaya, Ms. Dyer's previous experience was low level. She was only 18 years old at the time and had just graduated high school. (*Id.*) Her only previous work experience was as a cashier at Castle's and Coasters theme park. (*Id.*) Ms. Dyer's lack of experience was noted as a "con" by each interviewer. (*Id.*). Even so, Ms. Dyer was still considered a strong candidate and labeled a strong "cultural" candidate. (*Id.*).

**14.** Respondent also hired James Anolick (Caucasian male) for the position. While Mr. Anolick worked as a COE Specialist at Respondent about the same amount of time as Claimant, his only previous experience was as a pizza delivery driver. (Joint Ex. 2, Interviewee Resumes and Scorecards, Anolick's Resume, UBER 006981- UBER 006982). Interviewer Alyssa Waddell described Mr. Anolick as lacking insurance experience. (*Id.* At Anolick's Interview Scorecard, UBER 006920).

**15.** Respondent also hired Reyna Villegas (Hispanic female) for the position even though her prior experience consisted of short experiences as a customer service associate at Freshly food delivery for only nine months and guest experience captain at Buffalo Wild Wings restaurant. (*Id.* At Villegas's Resume, UBER 006895-UBER 006896). Interviewer Karen Mischne framed Ms. Villegas's lack of experience as having "developmental opportunities for prioritization." (*Id.* At Villegas's Interview Scorecard, UBER 006934).

**16.** Claimant also introduced evidence demonstrating Respondent ignored the job description's stated preference for insurance experience and hired people with little or no insurance experience anyway: Anaya, Dyer,

Villegas, Jaime Cantu, Bernitha Davis, Justin Gill, Ray Ronan, Michael Smith, Tiani Medrano, and Lauren Gault. (*Id.*, Scorecards for Anaya at UBER 006933 and UBER 006935; for Villegas at UBER 006941; for Ronan at UBER 006938 and UBER 006940; for Gill at UBER 006932, UBER 006939, and UBER 006948; for Smith at UBER 006946-006947 and UBER 006949; for Medrano at UBER 006956-006957, UBER 006958-006962, and UBER 006973; for Davis at UBER 006976 and UBER 006980; for Gault UBER 0069631-UBER 006966, UBER 006968-006970, and UBER 006975; for Dyer at UBER 006983-006986; and for Cantu at  UBER 006951, UBER 006953-006955, and UBER 006958).

Finally, in support of his disparate treatment discrimination claim, in Claimant's Closing Argument, he includes a multi-page chart summarizing information from Joint Exhibit 2 which are the interviewee resumes and scorecards prepared by each of the interview panelists.  The chart shows the identity, race and gender, highest level of education, experience, and the interviewers' comments relative to Claimant's comparators. (Joint Ex. 2, Interviewee Resumes and Scorecards, UBER 006844-006986).

**17. The Task Force And The Three-Hour Daily Limitation For Project Time.**

**18.** Diamond Driver is Uber's loyalty program for high tier Drivers. (Tr. I at 188:17-189:7).  As Drivers take on more rides and earn points, they are placed into tiers (Blue, Gold, Platinum and Diamond), with Diamond Drivers as the highest tier. (Tr. I at 188:17-189:7). Task Force is an escalation support team for Diamond Drivers. (Tr. II at 198:17-19). Essentially, Task Force is a back-office team that assists with project-based work, therefore allowing customer support representatives to be available for incoming calls. (Tr. I at 53:20-54:6). Community support representatives are expected to be available to take inbound calls and tickets. (Tr. I at 191:10-192:1). To avoid being assigned to inbound calls and tickets coming into the phone queue, community support representatives had to log into auxiliary codes, including Project Time. (Tr. I at

191:10-192:1). The Project Time code meant that the community support representative had been asked to work on a specific project and would not be in the queue to take inbound calls or tickets. (Tr. I at 191:10-192:1). An employee would not be able to keep up with their performance metrics if they were spending significant time on Project Time. (Tr. II at 154:16-155:7; 199:16-19). Chris Gibson (African-American)  was the Task Force Manager and Ben Williamson was the Team Lead.   (Tr. I at 14:14-17; 114:25-115:5; Tr. II at 198:20-23).

19. During the relevant time period, there was a daily limitation of Project Time set at three hours. (Tr. II at 198:24-199:4). This cap was communicated to Claimant. (Tr. II at 198:24-199:7). Moreover, Claimant helped  write the standard operating procedures for Task Force which specifically stated that members could not work more than three hours per shift representing the Task Force. (Tr. I at 116:14-117:21, Resp. Ex. 6). Claimant also received the Task Force meeting agendas and was well aware, at least as of February 2019, that Task Force members were no longer allowed to dedicate more than three hours a day to Task Force or floor support. (Tr. I at 117:22-24; 118:2-9; Resp. Ex. 23).

The Task Force meeting agendas stated that only team leads and managers could provide exceptions to the three-hour limitation and team members were not permitted to work extra Project Time based on their own initiative. (Tr. I at 118:11-18). If a member of Task Force needed to go over their assigned three-hour schedule, permission was needed from Mr. Gibson and Mr. Williamson which could be provided through a Slack message, an email, or if done verbally with a follow-up documentation. (Tr. I at 173:20-174:9; Tr. II at 158:4-14; 201:19-25). Therefore, Task Force members were required to seek management authorization before exceeding their Project Time limitation or logging their use of project time into Uber's tracking systems. (Resp. Ex. 6).

20. **Claimant is Removed From The Task Force Due to His Failure to Meet Required Metrics and Disciplined Due to His Misuse of Project Time.**

9

Claimant's team lead in April 2019 was Zayin Javier. Mr. Javier was out on leave from April 3, 2019 through April 19, 2019 and again on April 24, 2019. (Tr. III at 7:25-8:14). Because of Mr. Javier's need for continued leave, in May of 2019, Claimant transferred to Team Lead Rebeca Garcia's team. (Tr. II at 185:18-186:7). During April 2019, Claimant's CSAT scores fell below the required threshold to remain on Task Force. (Joint Ex. 3). As a result, and per the established protocol, on May 2, 2019, Claimant was removed from Task Force. (Resp. Ex. 9). Ms. Garcia and Ms. Johnson also placed Claimant on a coaching plan that set forth various tools to assist Claimant in improving his CSAT scores. (Joint Ex. 3).

On May 2, 2019, Ms. Garcia noticed that Claimant had not logged into the phone queue during his entire shift. (Tr. II at 179:17-183:6). She also discovered Claimant was offline from the phone queue during his entire shift on May 1, 2019 and for the majority of his shift on April 30, 2019 as well. (Resp. Ex. 9). This was unusual for a CSR as an essential function of this position is to provide customer support telephonically to Drivers and Riders. (Tr. II at 180:11-20).

This raised concerns to Ms. Garcia that if Claimant was not logged into the phone queue during his entire shift, he may have been in Project Time for more than the allowed three hours. If he was on Project Time status, then he was not performing his essential and required CSR duties and not receiving important performance metrics that come from customer interactions. (*Id.*). Ms. Garcia presented this information to Mr. Williamson, Mr. Gibson and Ms. Johnson and spoke to each about the situation. (Tr. II at 181:21-183:6).

Respondent began an investigation into Claimant's use of Project Time between April 2 – May 2, 2019, and whether Claimant had been informed of the three-hour limitation. On May 8, 2019, Mr. Cane and Ms. Garcia met with Claimant to discuss his overuse of Project Time, because when he was using Project Time, he was not performing his essential CSR duties or obtaining essential performance metrics. (Tr. II at 187:1-188:8). Mr. Cane followed up with an email to Claimant on May 9, 2019, setting

forth the dates and hours of Claimant's Project Time, as well as links to various documents Claimant received setting forth the three-hour limitation for Project Time. (Resp. Ex. 2).

Respondent also conducted an audit of Project Time use for the relevant Task Force members to determine if other current  Task Force members were using Project Time in the same manner. (Resp. Ex. 8). The audit revealed that Claimant's use of Project Time was significantly higher than the other Task Force members. (*Id*.).

Ms. Garcia and Ms. Johnson, who were Claimant's supervisors, confirmed that Claimant was never authorized or instructed to use so much Project Time. (Tr. II at 188:2-4). Claimant argued he had permission to work more than the maximum of three-hours of Project Time, but Mr. Cane reviewed Claimant's arguments, spoke with relevant managers, and determined that Claimant did not have permission to use Project Time more than three hours per shift. After Mr. Cane's investigation and consideration of the relevant information, Mr. Cane ultimately decided to issue Claimant a final written warning due, in part, to the sheer amount and frequency of Claimant's overage. (Tr. I at 166:11-17; 194:11-20; 199:16-200:8; Resp.Ex. 8; Tr. III at 11:25-12:2).

Based on the audit and Claimant's admission that he was not instructed by leadership to stay in Project Time beyond three hours,  Mr. Cane, in conjunction with Human Resources, determined Claimant's use of Project Time violated its Standard of Conduct and attendance/schedule adherence policies because he did not have permission to use Project Time more than three hours per shift and he was not performing his required call duties as a CSR when misusing Project Time. (Tr. I at 193:3-194:2). As a result, prior to May 30, 2019, Ms. Garcia drafted a Final Written Warning for Claimant. (Resp. Ex. 10). On May 30, 2019, Ms. Garcia and Mr. Cane met with Claimant to present him with the Final Written Warning for misconduct based on his overuse of Project Time in the Task Force. (Tr. I at 203:14-16; Tr. II at 190:22-191:19; Resp. Ex. 11).

**21. Claimant Submits Three Internal Complaints about the Claims Associate Hiring Process.**

For his second legal claim, Claimant contends Respondent issued him a Final Written Warning  on May 30, 2019 because of his race and sex. On May 29, 2019, Claimant submitted a complaint through Respondent's Integrity Helpline claiming the hiring process for the Claims Associate position was not consistent. (Tr. II at 11:22-25). Although Claimant contends the internal complaint was for sex and race discrimination (Cl. Ex. 12), a careful review of the internal complaint he actually filed reveals there were no allegations of unlawful discrimination in this complaint. (*Id*.).

On May 30, 2019, Claimant submitted a second complaint claiming that he was retaliated against for submitting his initial complaint the previous day related to his abuse of Project Time. (Cl. Ex. 53). Claimant also submitted a third complaint on May 30, 2019 alleging retaliation. (Cl. Ex 54).

Claimant's three complaints were submitted to Chelsea Yogerst, an Employee Relations ("ER") investigator, to investigate. (Tr. II at 11:17-25). It is the job of the ER investigator to conduct workplace investigations into employee relations concerns promptly, thoroughly, and with neutrality. (Tr. II at 10:21-23). Ms. Yogerst and other Respondent Uber ER employees attempted to interview Claimant about his allegations, but he refused to meet with them. (Joint Ex. 6, UBER 000028).

Notwithstanding Claimant's refusal to meet with Ms. Yogerst, she conducted a thorough investigation into Claimant's claims, which included interviewing twelve witnesses and examining multiple documents. (Joint Ex. 5 and 6). Based on her investigation, Ms. Yogerst did not substantiate Claimant's allegations and concluded he was treated fairly throughout the interview process and the hiring decision for the Claims Associate position, the issuance of the Final Written Warning, and his removal from the Task Force. (*Id*.) Ms. Yogerst closed out her investigation with Claimant on July 23, 2019. (*Id*.).

**LEGAL ANALYSIS**

**A. Did Respondent Discriminate Against Claimant Because of His Sex or Race When Claimant was Rejected for the Claims Association Position?**

12

At the trial phase, the *McDonnell Douglas* burden-shifting framework no longer applies. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir.2002) (en banc), *aff'd*, 539 U.S. 90 (2003) ("[I]t is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury."); *see also, Sanghvi v. City of Claremont*, 328 F.3d 532, 540 (9th Cir.2003) ("[I]t is error to charge the jury with the elements of the *McDonnell Douglas* prima facie case."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987). "Once at the trial stage, the plaintiff is required to put forward evidence of discrimination because of a protected characteristic." *Costa*, 299 F.3d at 856 (internal citation and quotation omitted).

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). To prevail on a Title VII claim, the plaintiff must prove that an adverse employment action was taken "because of" unlawful discrimination. *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 857 (9th Cir.2002). Title VII disparate-treatment claims like plaintiff's, "require the plaintiff to prove that the employer acted with conscious intent to discriminate." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805–06 (1973). See 9th Cir. Civ. Jury Instr. 10.1. (2017).,

The core of Claimant's disparate treatment discrimination claim is that female and Caucasian employees who were selected for the Claims Associate position did not meet some of the qualifications set forth in the Job Description, such as education, insurance experience, customer service, etc.   (Cl. Ex. 4).   The Resumes and Scorecards and interview notes admitted into evidence do demonstrate that many of those who were selected lacked some of the qualifications for the Claims Associate position.

There is no question that Claimant was qualified for the Claims Associate position. (Cl. Ex. 5).  However, the evidence is crystal clear Claimant was not selected due to his verbal answers during the job interview and his written examination.  The interview panel unanimously agreed that due to Claimant's lack of coachability, which was a key requirement for success as a Claims Associate, he would not be successful in the position.

The evidence presented at the hearing clearly established Claimant was not hired for the Claims Associate position due to his verbal answers to interview questions which indicated he would not be receptive to coaching opportunities and constructive feedback. (Tr. II at 58:13-25; 85:1-86:8; 132:25-133:17; Tr. III at 25:6-22; 33:17-34:11; Resp. Ex. 13). As detailed above, the Claims Associate position is a process driven and customer-centric position that requires its associates to accept and incorporate feedback. (Tr. II at 58:13-25; 85:11-86:8; 117:16-118:6; 128:3-9; Tr. III at 19:25-20:7; 25:6-22).

Claimant introduced no evidence at the hearing that any of the panel members harbored racial or sex-based animus. Indeed, Claimant himself testified nobody at Respondent made any comment about his race or sex. (Tr. I at 37:1-3). Furthermore, multiple candidates of Claimant's same race and same sex were selected for the position which confirms Respondent had no discriminatory intent. (Cl. Ex. 23).

As noted in the Arbitrator's June 30, 2022 Order on Summary Judgment, the panelists' conclusion about Claimant's lack of coachability was borne out by what occurred throughout the remainder of Claimant's employment.  Respondent repeatedly attempted to coach Claimant during the remainder of his employment, without success, which ultimately led to the termination of Claimant's employment.  This pattern of refusing constructive criticism and feedback confirms the panelists' conclusion about Claimant's lack of coachability and his unwillingness to accept constructive criticism. The Arbitrator finds that Respondent's reasons for not selecting Claimant for the Claims Associate position are not pretextual and are worth of belief.

Claimant contends that Respondent's use of subjective criteria and decision-making is evidence of pretext which were used to reject Claimant from the Claims Associate position.  The Ninth Circuit, however, holds that the presence of subjective criteria is not *per se* evidence of intentional discrimination. In *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir.1984), the Ninth Circuit stated:

> We have explicitly rejected the idea that an employer's use of subjective employment criteria has a talismanic significance: 'Even assuming subjectivity was involved here, it has never been held that subjective

14

evaluation by an employer is per se prohibited by Title VII, or alone shifts to the defendant the burden of proving absence of intentional bias....' *Title VII is the law's promise that employment decisions will not be based on non-permissible discriminatory criteria, not that subjective criteria will be eliminated.* [Plaintiff] cannot render sound business judgment illegal by labeling it subjective. Many criteria for higher level jobs are not easily articulable, and their conversion to writing does little to stop employers who desire to discriminate.

735 F.2d at 345 (quoting *Ward v. Westland Plastics, Inc.,* 651 F.2d 1266, 1270 (9th Cir.1980)) (emphasis added). *See also, Jauregui v. City of Glendale,* 852 F.2d 1128, 1135 (9th Cir.1988) ("The use of subjective factors to evaluate applicants for hire or promotion is not illegal *per se.*").

On the other hand, *Casillas* clarified that a plaintiff may combine proof of reliance on subjective criteria with other evidence to show pretext. *Casillas* held that "[a]n employer's use of subjective criteria is to be considered by the trial court with the other facts and circumstances of the case." *Id.* at 345. Other Ninth Circuit case law establishes that the use of highly subjective criteria in employment decisions should be subject to close scrutiny. "Subjective job criteria present potential for serious abuse and should be viewed with much skepticism. Use of subjective job criteria ... provides a convenient pretext for discriminatory practices. Subjective criteria may easily be asserted as the reason for an adverse employment decision when, in fact, the reason was discriminatory." *Nanty v. Barrows Co.,* 660 F.2d 1327, 1334 (9th Cir.1981) (overruled on other grounds), *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756 (9th Cir.1996)). *See also, Bergene v. Salt River Project Agr., Improvement & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir.2001) ("Against the background of the other evidence of pretext, the subjective nature of [the] criteria provides further circumstantial evidence that [defendant] denied [plaintiff] the promotion as a form of retaliation....").

A similar case is *Stones v. Los Angeles Cmty. Coll. Dist.,* 796 F.2d 270 (9th Cir.1986), which was tried to the district court and appealed. In *Stones,* the plaintiff, a "highly accomplished black woman educator" who held the position of assistant dean, brought suit against her employer, a community college district, for failure to promote her

15

to a dean position. *Id.* at 271. Plaintiff was neither called for an interview nor was she hired for four different dean openings. In its defense, the defendant noted that plaintiff's file contained a number of "tracers," which were subjective assessments from past supervisors expressing the opinion that plaintiff was condescending, rigid, and lacking in communicative and diplomatic skills. *Id.* at 273–4.

The Court found that the defendant's reliance on personal evaluations was a legitimate non-discriminatory reason for the failure to promote, and that the subjective nature of the evaluations did not invalidate their usefulness. *Id.* at 274. *See also, Stones v. Los Angeles Cmty. Coll. Dist.,* 572 F.Supp. 1072, 1082–3, n. 12 (C.D.Cal. 1983) (district court's explanation of acceptable use of subjective evaluation criteria). In *Stones,* the Ninth Circuit's standard of review was one of clear error following the bench trial. *Id.* at 272. The Court stated the plaintiff must show more than the presence of subjective evaluations to prevail on a discrimination claim and noted the plaintiff had not pointed to any evidence showing that defendant's use of a subjective process was unusual or inconsistent with defendant's general promotion or reassignment policies.

The Arbitrator finds in this case that the use of subjective criteria is not a pretext demonstrating discrimination.  Claimant produced no evidence that Respondent's use of a subjective process was unusual or inconsistent with its general promotion or reassignment policies.  Moreover, the panel's decision was unanimous and the bases for the panel's decision were consistent.

Accordingly, the Arbitrator finds Claimant failed to prove that he was not selected for the Claims Associate position because of his sex or race in violation of Title VII or 42 U.S.C § 1981.

**B. Did Respondent Discriminate Against Claimant Due to His Race or Sex When it Issued a Final Written Warning on May 30, 2019?**

The evidence submitted at the hearing clearly demonstrated Claimant greatly exceeded the three hours of Project Time on multiple occasions in April and May of 2019. (Tr. I at 118:19-22). Claimant failed to produce evidence that any of Respondent's

managers authorized him to exceed the three-hour Project Time limit and his manager, Ms. Garcia, testified she never authorized him to exceed the time limit.

Following an investigation and audit of then current Task Force members, Mr. Cane ultimately made the decision to issue Claimant a Final Written Warning. (Tr. I at 166:11-17; 194:11-20; Tr. III at 11:25-12:2). The audit demonstrated Claimant significantly exceeded the three-hour limit throughout April and May 2019 and significantly exceeded the use of Project Time when compared to other Task Force members.[2] (Resp. Ex. 8). Mr. Cane testified that he used the audit in making his decision to issue Claimant a Final Written Warning. (Tr. I at 199:20-22). In fact, Mr. Cane considered terminating Claimant in light of his excessive use of Project Time and has terminated other employees for first-time behavior issues. (Tr. I at 203:22-204:24). Mr. Cane further testified that Claimant's race or sex did not play a role in his decision to issue a Final Written Warning. (Tr. I at 205:25-206:2).

Claimant's sex and race discrimination claim based upon his receipt of the Final Written Warning on May 30, 2019 fails because he cannot establish that an adverse employment action occurred. "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of ... employment.'" *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir.2008) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1126 (9th Cir.2000); *see also, Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818–19 (9th Cir.2002).

"Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action," at least where the warning letter does not result in material changes to the conditions or terms of employment. *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046, *10 (D. Ariz. 2014). *See also, Tumblin v. USA Waste of Cal., Inc.*, 2016 WL 3922044, *8 (C.D. Cal. 2016); *Sanchez v. California*, 90 F. Supp. 3d 1036, 1056 (E.D. Cal. 2015) ("Written warning …are not adverse actions where they do not materially

---

[2] Claimant emphasizes that according to his calculations, Mr. Anolick exceed Claimant's use of Project Time. However, Mr. Anolick left Respondent's employment in April 2019 and the audit conducted only focused on currently Task Force members.

affect the terms and conditions of employment (same); *Govan v. Sec. Nat'l Fin. Corp.*, 2011 WL 1843294, *3 (D. Ariz. 2011) ("While Plaintiff believes the warning to be unfounded, he presents no evidence that it was disseminated to others or resulted in a demotion, a change in job duties, or any other material change in the terms, conditions, or privileges of his employment. In short, the warning cannot reasonably be construed as an adverse employment action.") (citation omitted); *Hoang v. Wells Fargo Bank, N.A.*, 724 F.Supp.2d 1094, 1104 (D. Or. 2010) ("[S]ince the letter did not implement any materially adverse change in the terms and conditions of Hoang's employment, it was not itself an adverse employment action.").

Claimant has provided no evidence suggesting that Respondent's May 30, 2019 Final Written Warning had any effect, let alone a material effect, on his job duties or compensation.  The Arbitrator finds that Claimant's inability to apply for another position for six months due to the Final Written Warning was not a material effect on his job or compensation.

Therefore, the Arbitrator finds the Final Written Warning is not an adverse employment action because Claimant continued to enjoy the same terms and conditions of employment at Respondent. *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046 *10 (D. Ariz. 2014) ("Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action[]" where the letter does not result in material changes to the conditions or terms of employment").

The Arbitrator finds Claimant failed to prove that he received the May 30, 2019 Final Written Warning  because of his sex or race.

**IT IS HEREBY ORDERED** finding for Respondent on Claimant's claims of race or sex discrimination under Title VII or race discrimination under 42 U.S.C. §1981. This award is in full settlement of all claims (and counterclaims) submitted to this arbitration.

Per Rule 39(d), the administrative fees and expenses of the American Arbitration Association totaling $2,950.00 shall be borne as incurred, and the compensation and expenses of the arbitrator totaling $36,190.00 shall be borne as incurred.

Dated this 2nd day of November 2022.

SCHLEIER LAW OFFICES, P.C.

_____

Tod F. Schleier
Arbitrator

A COPY of this Order was sent via electronic mail on this 2nd day of November 2022 to:

Christopher Houk, Esq.
HOUK LAW FIRM
1050 E. Southern Avenue, Suite A-3
Tempe, AZ 85282
chouk@houklawfirm.com
Attorneys for Claimant

Kristy Peters
Yijee Jeong
LITTLER MENDELSON, P.C.
2425 E. Camelback Road, Suite 900
Phoenix, AZ 85016
kpeters@littler.com
yjeong@littler.com
Attorneys for Respondents

Daphne Crayne
Case Manager

/s/ Cindy J. Anderson

# EXHIBIT H

1

**N THE MATTER OF THE ARBITRATION OF**

2

3      Sir Lawrence Davis Jr,

4                Claimant,

5                v.

6      Uber USA Phoenix,

7                Respondent.

8

| | Case NO. 01-20-0014-8969 |
| **ORDER** |
| (Assigned to Arbitrator Tod F. Schleier) |

9

10         Pending before the Arbitrator is Respondent's Bill of Costs seeking $3,379.73 in

11

12     taxable costs and Claimant's Objection to the Bill of Costs. The Arbitrator has reviewed

13     the parties' submissions and the case law cited in those submissions.

14         Based upon this review, the Arbitrator issues the following Order.

15     **LEGAL STANDARD**

16

17         "Rule 54(d) creates a presumption in favor of awarding costs to prevailing

18

19     parties...." *Assoc.of Mex.-Am. Educators v. State of Cal*., 231 F.2d 572, 591 (9th Cir.

20     2000); *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1079 (9th Cir. 1999). However,

21     "whether to award costs ultimately lies within the sound discretion of the district court."

22     *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013); *See also Taniguchi v. Kan*

23     *Pacific Saipan, Ltd*., 566 U.S. 560, 565, (2012) ("Federal Rule of Civil Procedure 54(d)

24     gives courts the discretion to award costs to prevailing parties."). While "it is incumbent

25

26     upon the losing party to demonstrate why the costs should not be awarded," Federal Rule

27     of Civil Procedure 54(d)(1) "vests in the district court discretion to refuse to award

28

costs." *Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 591  (9th Cir. 2000). In addition to refusing to award costs, this Arbitrator may also award substantially reduced costs. *Morgal v. Williams*, CV 12-280-TUC, CKJ, 2016 WL 6082117, at *3  (D. Ariz. Oct. 18, 2016).

The Ninth Circuit has "approved several factors that would justify a district court's refusal to award costs to a prevailing party…." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003). These factors include "the losing party's limited financial resources; misconduct of the prevailing party; the importance of the issues, the importance and complexity of the issues; the merit of the plaintiff's case, even if the plaintiff losses; and the chilling effect on future civil rights litigants of imposing high costs." *Save Our Valley*, 335 F.3d at 945–46 (citations omitted).

## LEGAL ANALYSIS

### A.  Summary of the History of this Proceeding.

Before analyzing the Ninth Circuit factors above, it is important review some the developments in this matter.

On November 12, 2020, immediately after the case was filed and the Arizona Division of Civil Rights Section issueD a "no cause" dismissal after an investigation, Respondent made an Offer of Judgment in the amount of $40,000; Claimant ignored the offer and vigorously pursued litigation, which involved several discovery disputes.

After the completion of extensive discovery, Respondent filed a comprehensive Motion for Summary Judgment seeking dismissal of all of Claimant's legal claims.  After voluminous briefing, the Arbitrator granted summary judgment on the Title VII and 42

U.S.C. § 1981 claims for race and sex discrimination; dismissed the retaliation claim relating to Respondent's post-May 30, 2019 conduct, determined there were legitimate business reasons for the PIP, the second Final Written Warning, and termination; determined there was no severe pervasive hostile work environment; and most significantly, limited pay damages on Claimant's failure to hire claim to January 6, 2020 based upon after acquired evidence.

Consequently, the narrow  issues remaining for resolution in this case pursuant to the parties' Amended Joint Arbitration Statement at the arbitration hearing were as follows: (1) Did Respondent fail to hire Claimant for the Claims Associate position because of his race or sex in violation of Title VII of the Civil Rights Act of 1964 or 42 U.S.C. §1981? (2) Did Respondent issue Claimant a Final Written Warning in May 2019 because of his race or sex in violation of Title VII of the Civil Rights Act of 1964 or 42 U.S.C. 1981? and (3) The nature and extent of Claimant's damages, if any?

**B.  Claimant's Limited Financial Resources**

Courts "should consider the financial resources of the plaintiff and the amount of costs in civil rights cases" in determining whether to award costs. *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1079 (9th Cir. 1999. Claimant has submitted a declaration with exhibits in his Objection demonstrating his current earnings and that he is currently approximately $180,000 in debt due to various personal loans he has taken. However, Claimant's declaration fails to describe the circumstances and reasons for these personal loans, when they were incurred, why he left his employment at Valon Mortgage,  or what assets Claimant owns which might be liquidated to pay the Bill of Costs.  Claimant is

currently employed and has not made a showing that awarding costs will cause indigency or bankruptcy.  Indeed, considering the amount of costs sought, Claimant should be able to enter a payment plan with Respondent.  Therefore, this factor is neutral, at best.

### C.  Misconduct of the Prevailing Party

The Arbitrator has handled this case throughout this proceeding and finds specifically there has been no misconduct by the prevailing party or its counsel. Respondent produced thousands of pages of documents, made key witnesses available for deposition, filed a well-reasoned motion for summary judgment, and handled the arbitration hearing professionally and in good faith.  This is not a factor which affects Rule 54(d)'s presumption to award costs to the prevailing party.

### D.  The Merits of the Case

As noted above, 90% of Claimant's case was disposed of by motion for summary judgment.  The issues in this case were not novel, complicated or complex, but involved basic issues of discrimination law in existence for decades.  Moreover, after the Arbitrator limited Claimant's damages for the period prior to January 6, 2020 on Claimant's failure to hire claim, this should have been a red flag to Claimant that the case should be settled, especially considering the economic damages he might recover if he prevailed.  And Respondent prevailed on the remaining issues at the arbitration hearing.  . This is not a factor which affects Rule 54(d)'s presumption to award costs to the prevailing party.

### E.  Will Imposition of Costs Deter Future Civil Rights Litigation?

On page 7 of its Objection, Claimant cites multiple  court cases which have

discussed the chilling effects of awarding costs for future civil rights litigation.  The cases cited by Claimant all involve reported cases which are filed publicly and readily available for review by the public.  However, this  matter was a confidential, private arbitration proceeding not involving public filings.  AAA Rule 23 is titled Confidentiality and clearly provides this proceeding is confidential.

Therefore, the potential chilling effect on future civil rights proceedings is purely speculative, at best.  Again, this is not a factor which affects Rule54(d)'s presumption to award costs to the prevailing party.

**F.  Respondent's Requests Are Reasonable**

The Arbitrator finds Respondent's requests for costs are reasonable and the Arbitrator had been provided no justification to reduce the Respondent's Bill of Costs.

Accordingly,

**IT IS HEREBY ORDERED** denying Claimant's Objections to Respondent's Bill of Costs.

**IT IS FURTHER ORDERED** granting Respondent's Bill of Costs in the amount of $3,379.73.

Dated this 27th day December 2022.

SCHLEIER LAW OFFICES, P.C.

_____
Tod F. Schleier
Arbitrator

1

2

3 A COPY of this Order was sent via
electronic mail on this 27th day of
4 December 2022 to:

5 Christopher Houk, Esq.
HOUK LAW FIRM
6 1050 E. Southern Avenue, Suite A-3
7 Tempe, AZ 85282
chouk@houklawfirm.com
8 Attorneys for Claimant

9 Kristy Peters
Yijee Jeong
10 LITTLER MENDELSON, P.C.
11 2425 E. Camelback Road, Suite 900
Phoenix, AZ 85016
12 kpeters@littler.com
13 yjeong@littler.com
Attorneys for Respondents
14

15 Daphne Crayne
Case Manager
16

17 /s/ Cindy J. Anderson

18

19

20

21

22

23

24

25

26

27

28